IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSEPH CALDWELL,

       Plaintiff,

vs.                                     No. CIV 20-0003 JB/JFR

UNIVERSITY OF NEW MEXICO
BOARD OF REGENTS, NASHA
TORREZ, LOBO DEVELOPMENT
CORPORATION, ACC OP (UNM
SOUTH) LLC, and  EDDIE NUÑEZ,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on Defendant Eddie Nuñez' Motion for Judgment on the Pleadings, filed February 14, 2020 (Doc. 23)("Motion").  The Court held a hearing on April 24, 2020.  See Clerk's Minutes, filed April 24, 2020 (Doc. 36).  The primary issues are: (i) whether Plaintiff Joseph Caldwell has alleged facts sufficient to state a due process interest in (a) his continued enrollment at Defendant University of New Mexico ("UNM"); (b) playing basketball for UNM; (c) his reputation; and (d) his future professional basketball career; (ii) whether UNM's actions comported with procedural due process when Caldwell was banned from campus; (iii) whether Caldwell can sue Nuñez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were clearly established; and (iv) whether Nuñez violated

---

[1]On November 30, 2020, the Court entered an Order granting Defendant Eddie Nuñez' Motion for Judgment on the Pleadings, filed February 14, 2020 (Doc. 23).  See Order at 1-2, November 30, 2020 (Doc. 51).  In the Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

procedural due process, because Nuñez' actions -- banning Caldwell from campus -- shock the judicial conscience.  The Court concludes that (i) Caldwell has a due process property interest in his continued education at UNM, and Caldwell alleges sufficiently that Nuñez interfered with this interest by banning Caldwell from campus property, but Caldwell does not have a due process interest in playing basketball for UNM; his reputation; or his future professional basketball career; (ii) UNM's actions comported with procedural due process when Caldwell was banned from campus, because, although the campus ban is more than a de minimis taking of Caldwell's interest in his continued education, none of UNM's hearing procedures placed Caldwell at risk of erroneous deprivation and UNM has a legitimate interest in maintaining a safe learning environment and preserving its limited administrative resources; (iii) Caldwell cannot sue Nuñez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were not clearly established; and (iv) Nuñez did not violate Caldwell's substantive due process rights, because banning Caldwell from campus does not shock the judicial conscience.  Accordingly, the Court will grant Nuñez' request for judgment on the pleadings, because Caldwell does not state a claim against Nuñez upon which relief can be granted.

## FACTUAL BACKGROUND

The Court takes the facts from Caldwell's First Amended Complaint for Injunctive Relief and Damages ¶¶ 11-12, at 3, filed January 2, 2020 (Doc. 1)("First Amended Complaint").  The same standards for evaluating a rule 12(b)(6) motion apply to a motion for a judgment on the pleadings.  See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000)("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6)."). Thus, the Court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor."  Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012).

Plaintiff Joseph Caldwell enrolled at UNM in January 2019.  See First Amended Complaint ¶¶ 11-12, at 3.  In January 2019, Caldwell moved into Lobo Village development,[2] and his lease agreement had an end date of July 31, 2020.  See First Amended Complaint ¶¶ 12-13, at 3.  In April, 2019, Caldwell agreed to play as a point guard with UNM Men's Basketball program.  See First Amended Complaint ¶ 16, at 3.

On December 16, 2019, "the Albuquerque Police Department took a report of allegations of battery against" Caldwell.  First Amended Complaint ¶ 17, at 3.  The person who accused Caldwell of battery is not a UNM student.  See First Amended Complaint ¶ 18, at 4.  On December 19, 2019, UNM's Dean of Students' Office ("DOS") emailed Caldwell (the "December 19 Email"), informing him that, based on the recent allegations, he was (i) "hereby interim banned from all of UNM Campus, except for UNM Hospitals and Clinics for the purpose of seeking medical care and except for [his] in-person courses for Spring 2020 semester"; (ii) banned from Lobo Village and all on-campus housing facilities; (iii) banned from the Johnson Gym, except for attendance of a class he was registered for, and banned from any other portion of campus without express permission from the DOS; (iv) only permitted to register for or attend online courses, except for a class he was already registered for; and (v) failure to comply with the campus ban and the Code of Conduct charges would result in criminal charges for trespass that could lead to possible expulsion.  First Amended Complaint ¶¶ 19-21, at 4.  The December 19 Email also informed Caldwell that he would not be able to contact anyone at the DOS from December 21, 2019, through January 1, 2020, because UNM would be closed.  See First Amended Complaint ¶

---

[2]"Lobo Development Corporation ('LDC') is a UNM Regent-owned non-profit corporation organized for charitable and educational purposes which manages and rents out the properties at Lobo Village, where [Caldwell] resides."  First Amended Complaint ¶ 6, at 2.

19, at 4.  The December 19 Email stated that the recent allegations were "under the jurisdiction of the Office of Equal Opportunity."  See First Amended Complaint ¶ 20, at 4.

On December 19, 2019, Caldwell went to a meeting chaired by Nuñez (the "December 19 Meeting").  See First Amended Complaint ¶ 22, at 5.  Several other people from the athletic department and from UNM administration were present at the December 19 Meeting.  See First Amended Complaint ¶ 22, at 5.  Nuñez ran the December 19 Meeting and "informed [Caldwell] that he was banned from campus indefinitely" and that he was also banned from playing or practicing with the basketball team.  First Amended Complaint ¶ 23, at 5.

That same day, Caldwell received an eviction notice from Lobo Development Corporation, stating that he had to move out within three days or face eviction proceedings.  See First Amended Complaint ¶ 25, at 5.  The eviction notice stated that Caldwell was "[b]anned from the University of New Mexico, Residence Life and Student Housing, and American Campus Communities."  First Amended Complaint ¶ 26, at 5.  The eviction notice explained that Caldwell had violated his lease agreement, because of his "unlawful action causing serious physical harm to another person."  First Amended Complaint ¶ 26, at 5.

On December 20, 2019, Caldwell had a meeting with the Office of Equal Opportunity ("OEO"), where he denied the charges against him.  See First Amended Complaint ¶ 29, at 5.  Sometime after his meeting with the Office of Equal Opportunity, Caldwell had a meeting with Defendant Nasha Torrez, where Torrez reiterated that Caldwell was suspended, and that she would decide whether to extend his suspension.  See First Amended Complaint ¶ 30, at 5.  Torrez told Caldwell that the campus ban would remain in place until January 2, 2020, the end of the holiday break, and that Caldwell had no opportunity to appeal the ban.  See First Amended Complaint ¶ 30, at 5.

On December 30, 2019, Greg Golden, Assistant Dean of Students, emailed Caldwell.  See First Amended Complaint ¶ 35, at 6.  In the email, Golden informed Caldwell that if he wanted to discuss UNM's campus ban, Caldwell would have to reach out to Kelly Davis, UNM Student Conduct Officer in the Office of the Dean of Students, who had "promulgated the 'ban letter.'" First Amended Complaint ¶ 35, at 6.

 On January 10, 2020, Caldwell and his counsel had a meeting with Torrez.  See First Amended Complaint ¶ 40, at 7.  At the meeting, Torrez told Caldwell that a Student Conduct Officer, an employee in Torrez' office, "had imposed the ban and that [Torrez] was entirely uninvolved in that process."  First Amended Complaint ¶ 41, at 7.  When Caldwell asked that Torrez lift the ban entirely, Torrez stated that although she would consider his request, she could not say how long it would take her to decide whether to lift the ban or to what extent it would be lifted.  See First Amended Complaint ¶ 42, at 7.

UNM has a Code of Student Conduct ("CSC"), an Administrative Policies and Procedures Manual ("APP"), and a Student Grievance Procedure ("SGP").  See First Amended Complaint ¶ 64, at 10.  The APP states that the OEO "shall receive inquiries regarding issues involving civil rights issues; counsel claimants; evaluate claims; receive and process formal claims; prepare written investigative reports which contain findings of fact; and conciliate meritorious claims separately or  jointly with the parties."  First Amended Complaint ¶ 68, at 10.  Under UNM's polices, an accused student may seek "a discretionary review of [Office of Equal Opportunity's] determination through the Office of the President . . . and/or the Board of Regents."  First Amended Complaint ¶ 71, at 11.  UNM's policies also state:

> Should the Dean of Students Office take action based on the investigation's findings, both parties will have equal rights to appeal the action . . . [,] will have equal access to the information upon which the findings are based, have an equal opportunity to present evidence and witnesses (subject to the limitations in the

statement of complainant's rights []), and will receive equal notification of the results of the procedure. Both parties also will have the equal right to appeal the results of the grievance of the Dean of Students Office's decision . . . .

First Amended Complaint ¶ 72, at 11.

The APP states that UNM may impose "interim measures" on accused students, which

may include, but are not necessarily limited to, the following []: (1) directives [] that the parties have no contact with each other; (2) that one or more parties be moved to another office or location, be placed on paid administrative leave, or removed from a class; or (3) have a registration hold placed on a student account.

First Amended Complaint ¶ 74, at 11-12. Under the APP, the Dean of Students Office has the

authority to implement interim measures and these measures "stay in place until the end of any

review or appeal process." First Amended Complaint ¶ 75, at 12. Under the APP, the Dean of

Students may suspend a student indefinitely, without making any findings of wrongdoing and

without providing any of the above-described process. See First Amended Complaint ¶ 76, at 12.

The APP states:

The Dean of Students Office can impose a "no contact" order, which typically directs the complainant and respondent not to have contact with each other, either in-person or through electronic communication, pending the investigation and resolution of a complaint. The Dean of Students Office can arrange for changes in academic and/or on-campus living situations as needed. Other interim measures, as appropriate, can be implemented by the Dean of Students Office before the final outcome of the investigation and afterwards as needed.

First Amended Complaint ¶ 79, at 12.

As of January 13, 2020, the date Caldwell filed his First Amended Complaint, Caldwell

had received no written explanation from Torrez detailing her reasons for imposing the campus

ban, and Caldwell has had no opportunity to appeal the decision. See First Amended Complaint

¶ 81, at 13.

## PROCEDURAL BACKGROUND

On January 2, 2020, Caldwell filed his Complaint for Injunctive Relief and Damages, filed

January 2, 2020 (Doc. 1).  Then on January 13, 2020 Caldwell filed his First Amended Complaint, asserting two counts.  See First Amended Complaint ¶¶ 82-102, at 13-16.  For Count I, Caldwell asserts that all the Defendants had violated his right to substantive and procedural due process under the Fourteenth Amendment to Constitution of the United States of America.  See First Amended Complain ¶ 83, 86, at 13.  Caldwell alleges that the

> Defendants, under color of law within the meaning of 42 U.S.C. § 1983, deprived Plaintiff of rights and privileges secured by the United States Constitution and are liable for his injuries . . . by suspending Plaintiff, banning him from campus and evicting him from his residence, without making any findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against.

First Amended Complaint ¶ 83, 86, at 13.  For Count II, Caldwell asserts that UNM, Lobo Development Corporation, and ACC OP (UNM SOUTH) LLC breached their contractual obligations.  See First Amended Complaint ¶¶ 94- 102, at 15-16.

Torrez and Nuñez answered on January 29, 2020.  See Defendant Nasha Torrez's And Eddie Nuñez's Answer to Plaintiff's First Amended Complaint for Injunctive Relief and Damages, filed January 29, 2020 (Doc. 16)("Nasha and Nuñez Answer").

Lobo Development Corporation was dismissed without prejudice by stipulation.  See Plaintiff's Rule 41(a)(1)(A)(ii) Stipulation of Dismissal as to Lobo Development Corporation, filed January 30, 2020 (Doc. 18).  University of New Mexico Board of Regents was dismissed with prejudice by stipulation.  See Stipulation of Dismissal with Prejudice of University of New Mexico Board of Regents, filed March 10, 2020 (Doc. 26).  ACC OP (UNM SOUTH) LLC was dismissed with prejudice by stipulation.  See Stipulation of Dismissal with Prejudice of ACC OP (UNM SOUTH) LLC, filed August 26, 2020 (Doc. 50).

### 1. **Nuñez' Motion For Judgment On The Pleadings**.

On February 14, 2020, Nuñez moved for Judgment on the Pleadings under rules 12(c) and

12(h)(2) of the Federal Rules of Civil procedure.  <u>See</u> Motion at 1.  Nuñez argues that he is

protected by qualified immunity, that Caldwell has no protected liberty or property interest in

playing basketball for UNM, "so he has no constitutional right to do so, and even if [Caldwell] had

such a right, it is not clearly established."  Motion at 2.  Nuñez contends that a motion for judgment

on the pleading is equivalent to a motion to dismiss for failure to state a claim under rule 12(b)(6)

under the Federal Rules of Civil Procedure.  <u>See</u> Motion at 3.  Nuñez argues that the standards of

review for these two types of motions are identical, meaning that the court assumes the truth of all

well-pleaded facts in the complaint, and draws reasonable inferences therein in the light most

favorable to the plaintiff.  <u>See</u> Motion at 3. Nuñez argues that he is entitled to a judgment on the

pleadings, because Caldwell "has not stated a plausible claim that Mr. Nuñez violated his right to

due process, and has certainly not stated a plausible claim that Mr. Nuñez violated his clearly

established rights."  Motion at 4-5.  Nuñez contends that Caldwell only alleges two well-pleaded

facts: (i) "that Mr. Nuñez is UNM's athletic director," and (ii) that Nuñez "called and ran the

meeting at which Plaintiff was suspended from the basketball team."  Motion at 2 (citing the First

Amended Complaint).

  First, Nuñez argues that Caldwell has not alleged facts that demonstrate that Nuñez violated

Caldwell's right to either substantive or procedural due process.  <u>See</u> Motion at 5.  Nuñez contends

that to state a claim for damages against an official for a substantive due process violation, a

plaintiff must show that the alleged behavior "'shocks the conscience.'"  Motion at 5 (quoting <u>Cty.</u>

<u>of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998)).  Nuñez contends that the Supreme Court of

the United States of America has held that a law enforcement officer who killed a passenger in the

course of a police car chase did not violate the passenger's right to substantive due process, even

if the police had acted in a reckless, deliberately indifferent manner.  Motion at 5 (citing <u>Cty. of</u>

Sacramento v. Lewis, 523 U.S. at 848-854).  Nuñez also contends that the United States Court of Appeals for the Fifth Circuit has held that "the attachment of electrodes to a prisoner's genitalia, as part of a therapy for sex offenders, did not shock the conscience."  Motion at 5-6 (citing Coleman v. Dretke, 395 F.3d 216 (5th Cir. 2004)).[3]  Nuñez argues that if neither of these two scenarios shock the conscience, then his actions do not shock the conscience.  See Motion at 5. Nuñez also argues Caldwell has not stated a viable procedural due process claim, because Caldwell must allege facts that show that he was deprived of a liberty or property interest.  See Motion at 6 (citing Lauck v. Campbell County, 627 F.3d 805, 811 (10th Cir. 2010)).  Nuñez maintains that there is no liberty or property interest in playing interscholastic sports, meaning that Caldwell's procedural due process claim fails.  See Motion at 6.

Next, Nuñez argues that, even if Caldwell has alleged a plausible claim that Nuñez has committed a constitutional violation, Nuñez is entitled to qualified immunity.  See Motion at 6. Nunez argues that, when an official is acting in the scope of his or her duties, that official is

---

[3]The United States Court of Appeals for Fifth Circuit explained:

> "[S]ex offender treatment is different than traditional psychotherapy in that treatment is mandated, confrontational, structured, victim centered, focused on behaviors, and confidentiality is not maintained."  Treatment can include "interventions with psychopharmacological agents," polygraph exams to determine sexual history, and use of penile plethysmographs to "modify deviant sexual arousal and enhance appropriate sexual arousal."

> While these therapeutic measures are certainly intrusive, we do not believe that clearly established federal law, as determine by the Supreme Court, requires the conclusion that Texas's sex offender therapy "shocks the conscience." . . .  In the present case, sex offender treatment serves the government interest in protecting members of the community from future sex offenses.  In addition, as invasive as the therapy appears, we doubt that the parole panel imposed the therapy condition with the intent to injure [the Plaintiff].

Coleman v. Dretke, 395 F.3d at 224-25 (footnotes omitted).

"'shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Motion at 6 (quoting Davis v. Scherer, 468 U.S. 183, 191 (1984)).  Nuñez contends that Caldwell must not only show that he had a right to play intercollegiate sports, but that he had a clearly established right to play intercollegiate sports.  See Motion at 7.  Nuñez contends that the standard for when a law is "clearly established," is "'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains.'"  Motion at 7 (quoting Harman v. Pollock, 586 F.3d 1254, 1261 (10th Cir. 2009)).  Nuñez maintains that "there is no Tenth Circuit or Supreme Court case that would indicate that Plaintiff had a constitutionally protected liberty or property interest in playing intercollegiate sport."  Motion at 8.

### 2.    **The Response**.

Caldwell responds.  See Plaintiff's Response in Opposition to Motion for Judgment on The Pleadings by Defendant Nunez (Doc. 23), filed March 4, 2020 (Doc. 25)("Response").  Caldwell contends that "Nunez cannot show that no facts are in material dispute, meaning that this motion cannot be resolved on the pleadings alone."  Response at 2.  Caldwell quotes the Court for the proposition that a "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  Response at 2 (quoting Mata v. Anderson, 760 F. Supp. 2d 1068, 1082 (D.N.M. 2009)(Browning, J.)(quoting Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, PA, 442 F.3d 1239, 1244 (10th Cir. 2006)).

Caldwell argues that the First Amended Complaint clearly states a claim for due process violations by Nuñez.  See Response at 4.  Caldwell contends that not only is Nuñez "UNM's

athletic director and that he called and ran the meeting at which Plaintiff was suspended from the basketball team," he also alleges that

> Nunez was the individual who informed him he was banned from campus and that he was therefore evicted from his on-campus apartment, banned from attending classes, and otherwise unable to avail himself of any other UNM facilities.  Plaintiff alleges that although other UNM administration personnel were present for this meeting, Defendant Nunez chaired the meeting.  These allegations clearly support the natural inferences that Defendant Nunez was involved in the prior discussions and decisions to ban Plaintiff from campus.  Contrary to Defendant's assertion that Plaintiff's cause of action against Nunez "is limited to his suspension from the team," Plaintiff has in fact clearly alleged that Nunez had a much broader and more central role in the activities around Plaintiff's suspension.

Response at 4-5.  Caldwell argues that Nuñez was "an active and leading participant in the suspension which 'fell short [even] of what even a high school must provide to a student facing a days-long suspension.'" Response at 5 (Doe v. Purdue University, 928 F.3d 652, 663 (7th Cir. 2019)).  Caldwell contends that on the night that "Nuñez informed him of his suspension," he received no evidence and no opportunity to present his case, he had no notice of the charges against him, no explanation of the evidence, and no opportunity to present his side.  Response at 5 (citing Doe v. Purdue University, 928 F.3d at 663).  Caldwell contends that "Nuñez himself participated and continues to participate in the deprivation of a constitutional right."  Response at 5.

Next, Caldwell argues Nuñez is not entitled to qualified immunity.  See Response at 6. Caldwell contends that it may be appropriate for the Court to wait to rule on qualified immunity to "allow for additional briefing after the parties have an opportunity to conduct discovery rather than rule on a motion where 'material facts are in dispute.'"  Response at 6.  Caldwell argues that a plaintiff making a claim under § 1983 must allege: "(i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law." Response at 6 (citing West v. Atkins, 487 U.S. 42, 48 (1988)).  Caldwell maintains that Nuñez violated his right to procedural due process and that he had a "protected liberty and property interests in his

status as a student at the University, in the education he has undertaken to receive, and as a player

on the University basketball team, as well as a liberty interest in his reputation and future

professional career."  Response at 7-8 (citing <u>Goss v. Lopez</u>, 419 U.S. at 574; <u>Gaspar v. Bruton</u>,

513 F.2d 843, 850 (10th Cir. 1975)).  Caldwell argues:

> Even if there is not a clearly cognizable right to play intercollegiate athletics as
> Defendant's motion argues, a point Plaintiff does not concede, it matters not to the
> due process inquiry given that Plaintiff alleges Defendant Nunez's actions impaired
> his ability to attend class, live on campus and otherwise take part in the activities
> of a student athlete.

Response at 8.

Last, Caldwell contends that the Court should grant him leave to amend his First Amended

Complaint rather than dismissing the due process claims against Nuñez.  <u>See</u> Response at 9.

Caldwell contends that if his due process claims against Nuñez is deficient, the proper remedy is

to allow him to amend his complaint, because under rule 15(a)(2) of the Federal Rules of Civil

Procedure, the Court should allow a plaintiff to amend the complaint "when justice so requires."

Response at 9.  Caldwell maintains that "a motion to amend should be granted absent 'undue delay,

bad faith or dilatory motive on the part of the movant . . . [or] undue prejudice to the opposing

party.'" Response at 9 (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

### 3. **The Reply**.

Nuñez argues that the Court should grant the Motion because Caldwell has not disputed

that the "Complaint does not allege that Mr. Nuñez violated any of his liberty or property interests.

Plaintiff's Complaint against Mr. Nuñez is that he suspended Plaintiff from the basketball team.

There is no liberty or property interest in the ability to play interscholastic sports." Defendant

Eddie Nuñez's Reply Brief in Support of His Motion for Judgment on the Pleadings at 1, filed

March 18, 2020 (Doc. 29)("Reply").  Nuñez argues that no law shows that the ability to play

interscholastic sports is a clearly established right.  <u>See</u> Reply at 2.  Nuñez contends that Caldwell

does not dispute this conclusion.  See Reply at 2.

Next, Nuñez argues that, to the extent that Caldwell claims that Nuñez banned Caldwell from UNM's campus, Caldwell "has not alleged any facts that allow for the reasonable inference that Mr. Nuñez was involved with his suspension from campus."  Reply at 2.  Nuñez contends that

> [i]n his Complaint, [Caldwell] notes that, at the meeting chaired by Mr. Nuñez, he was reminded that he was suspended from campus, a fact of which he was already informed.  However, it does not follow that Mr. Nuñez was responsible for the campus ban. . . .  Plaintiff's Complaint contains no direct allegation or reasonable inference that Mr. Nuñez was involved with the decision to ban Plaintiff from campus.

Reply at 2-3 (citing Corona v. City of Clovis, 406 F. Supp. 1187, 1204 (D.N.M. 2019)(Herrera, J.)("Individual liability under Section 1983 must be based on personal involvement in the alleged constitutional violation.")).  Nuñez argues that it is "not reasonable to infer that the athletic director has any control over any other aspects of student life," and the First Amended Complaint alleges that other people instituted the campus ban -- not Nuñez.  Reply at 3.  Nuñez contends that the Complaint itself states that the disciplinary proceedings were under the Office of Equal Opportunity's jurisdiction.  See Reply at 3 (citing First Amended Complaint ¶ 20, at 4).  Nuñez argues that the First Amended Complaint contains no allegations that Nuñez was involved with the ban in any way, and that Torrez informed Caldwell that the ban had been made by the Student Conduct Officer, an employee in her office.  See Reply at 3.  Nuñez concludes, therefore, that "there is no allegation in the Complaint, or evidence in documents cited in the complaint, that would give rise to a reasonable inference that Mr. Nuñez had any involvement in the interim ban from campus to which Plaintiff alleges he was subjected."  Reply at 4.

### 4.    The Hearing.

The Court held a hearing on April 24, 2020.  See Clerk's Minutes at 1, filed April 24, 2020 (Doc. 36).  The Court began the hearing by stating that it wanted to ensure there was a solid basis

for federal jurisdiction.  See Transcript of Hearing at 4:5-6 (taken April 24, 2020)(Court)("Tr.").[4]

The Court stated that although Caldwell has raised a federal question, claims often are dismissed;

the Court, therefore, requested that the two defendant LLCs submit another letter indicating what

the citizenship of the LLCs are, who are the principals of those two LLCs, the citizenship of those

principals, and the citizenship of the trustees of the LLCs.  See Tr. at 4:12-17 (Court).  ACC OP

(UNM SOUTH) LLC stated it would.  See Tr. at 4:23-24 (Padilla).  The Court asked what

Caldwell's citizenship was, and Caldwell responded that he is a resident and citizen of New

Mexico, both now and at the time of the filing, and that there was an argument that he is a citizen

of Texas as well.  See Tr. at 5:1-11(Court, Fox-Young).

    Next, the Court stated that it had recently issued two lengthy opinions dealing with similar

issues as those at this hearing.  See Tr. at 7:1-6 (Court); Lee v. Univ. of New Mexico, 449 F. Supp.

3d 1071 (D.N.M. 2020)(Browning, J.); Hyman v. New Mexico State Univ., No. CIV 18-1103

JB\KK, 2020 WL 1514801, at *1 (D.N.M. Mar. 30, 2020)(Browning, J.).  The Court stated that,

based on its decision in Lee v. University of New Mexico, it did not "think there's much of a

substantive due process right here, but I do think, given my opinion in Lee, there may be some

procedural due process issues."  Tr. at 11-14 (Court).  The Court asked the parties to begin with

the substantive due process issue first, before moving on to the procedural due process issue.  See

Tr. at 7:14-21 (Court).  Nuñez agreed that he would address the Court's proposed structure, and

explained as background:

        The plaintiff is J.J. Caldwell.  And at some point, in December, mid-
    December, it came to the attention of UNM that Mr. Caldwell had been arrested
    and charged.  The charges were dropped without prejudice, so he may still yet be

---

[4]The Court's citations to the transcripts of each hearing in this Memorandum Opinion and
Order refer to the court reporter's original, unedited versions.  Any final transcripts may contain
slightly different page and/or line numbers.

- 14 -

charged with it.  But there was a police report that stated that he had committed two
different violent assaults on the same person twice, and this person said he had
strangled her, and so she filed a complaint.  As a result, UNM realized it had to take
action to suspend Mr. Caldwell for the protection of the school.

Tr. at 7:23-8:10 (Marcus).  The Court asked whether Caldwell was arrested and whether the

Albuquerque Police Department ("APD") or the campus police arrested Caldwell.  See Tr. at 8:11-

21 (Court).  Nuñez stated that he did not know whether Caldwell was arrested and "[i]f he was

arrested, he was released fairly quickly," and he did not know if it was APD or the campus police

department that arrested Caldwell, but that "there was a police report filed, and he was eventually

charged."  Tr. at 8:15-9:5 (Marcus).

Nuñez continued, stating:

[T]he plaintiff was a basketball player at UNM, and there were two different actions
taken essentially.  One was to suspend him from campus with a couple of
exceptions.  One of those exceptions was to attend a class he had already,
fortunately, signed up, and he did attend that class in person.  He was also told that
he could sign up for online classes, if he wanted to, but he could only go to the
campus to go to that class.  And the other exception was if he needed medical
treatment, that he could go to UNM clinic.

Tr. at 9:13-23 (Marcus). The Court interjected, asking who suspended Caldwell from campus.  See

Tr. at 9:24-25 (Court).  Nuñez responded:

It was the Office of the Dean of Students.  It . . . wasn't the Dean of Students
herself, but it was somebody in her office, a Ms. Kelly, I believe, the Student Life
Coordinator.  And so that was done . . . pursuant to . . . UNM handbook [which]
allows for . . . the ban.  That's fully done within the Office of the Dean of Students.
And the OEO was also involved with the suspension . . . . [Torrez] is the dean of
students, so she's in charge of handling issues pertaining to student life on campus.
. . .  Well, . . . it was . . . someone who worked in her office who did the actual act
of the campus ban,  but [Torrez] spoke with [Caldwell] afterwards and explained
the situation, . . . and any final decisions were up to her.  And as it turns out, [Torrez]
eventually rescinded it . . . it a few weeks later.  The campus ban was right before
winter break, right before . . . the school got the e-mail saying he was banned from
on December 21, 2019 and that lasted until the first of the year.  After the first of
the year, they had a meeting and the campus ban was rescinded

Tr. at 10:1-11:7 (Marcus).  Nuñez next explained that on December 19, 2019, Nuñez, the Athletic

Director, had a meeting with Caldwell, where "he reiterated the fact that there was a campus ban, and also, he added that the plaintiff was suspended from the basketball team until further notice." Tr. at 11:16-19 (Marcus).  Nuñez explained that although the campus ban was rescinded, the suspension from the basketball team was not, but that the basketball suspension

> ends up becoming a moot point because the basketball season ended invariably [because of] the pandemic.  So . . . the only involvement that Mr. Nuñez had was suspending the plaintiff from the basketball team, and that was it basically.  He didn't make any decisions regarding the campus ban.  And [Nuñez] told [Caldwell] that he was banned from campus, but that was it, he was just the messenger.  He's not only the messenger, but the message is something the plaintiff already knew.  So, Mr. Nunez had no involvement in that decision, but he was the one who informed the plaintiff and was probably largely his decision to ban the plaintiff from the basketball team, suspend him from the basketball team.

Tr. at 11:22-12:10 (Marcus).  Nuñez argued that there is no constitutional right to playing basketball, and for a substantive due process violation, the action "had to be something that shocked the conscience."  Tr. at 12:19-25 (Marcus).

The Court then asked whether there was a "document that is signed beyond the letter of intent which has some legal significance with the NCAA enforcement."  Tr. at 14:5-7 (Court). UNM responded that there were some documents related to "becoming an athlete at UNM," that "define the parameters of the scholarship," and that "the grants that's being made for the scholarship."  Tr at 14:15-19 (Hart).  UNM stated that a suspension has no impact on Caldwell's scholarship, housing, allowances, stating that a suspension has "no effect on his ability to access any of the benefits that come with the scholarship other than not being able to participate in team events like practice or games," but "[i]f you're kicked off the team, UNM no longer has an obligation to pay for your school or anything point."  Tr. 15:5:-8 (Hart).  UNM argued that although not every student has the privilege to play on the basketball team, that privilege does not give rise to a constitutional right that is protected by due process.  See Tr. at 16:18-17:6 (Hart).  Nuñez contended that Caldwell did not lose any benefits related to playing on the basketball team;

Caldwell only lost the privilege to play and practice with the team.  See Tr. 17:11-15 (Marcus).

In response, Caldwell stated that he "sign[ed]" with UNM's basketball team in April 2019, which was reported in the press.  Tr. at 19:9-24 (Fox-Young).  Caldwell stated a week before Christmas that he was told that he "was totally banned from campus, that he would have to leave his apartment, . . . and the Dean's Office informed him that he would to leave, that he was not permitted to use any facilities, avail himself of anything on campus."  Tr. at 20:1-10 (Fox-Young). As to the basketball team, Caldwell stated that Nuñez told him that he was

> ban[ed], he was suspended from the team. . . .  [H]e was barred.  He was not
> permitted to go to practices with the team, . . . the school stopped putting cash on
> the card provided to him to pay for essentials like rent and food.  He was not given
> meals anymore after morning and evening practice which is the main way that team
> athletes on that team eat.

Tr. at 20:11-20 (Fox-Young).  Caldwell argued that in addition to his property interest in his position on the basketball team,

> he also has this palpable liberty interest in his future career doing whatever it is that
> he wants to do, including playing basketball.  And that's why I think these cases
> with student athletes feel different because these actions to suspend or bar team
> members have great bearing on their due process, and so that sort of makes it a
> different sort of claim.

Tr. 21:12-19 (Fox-Young).  Caldwell admitted, however, that he is only "really raising a procedural due process claim, so I'm not going to get into details of argument of substantive due process.  I concede that this is really a procedural due process claim."  Tr. at 21:20-23 (Fox-Young).  The Court asked: "So you're not bringing a substantive due process claim?"  Tr. at 25:8-9 (Court).  Caldwell responded "No."  Tr. at 25:10 (Fox-Young).  Caldwell also clarified that there is no contract claim against either Torres or Nuñez.  See Tr. at 26:13-21 (Court, Fox-Young).

Next, Caldwell stated that, although a "police report was filed and a report," he "has never been arrested and has never been charged.  So, the actions were taken were not based upon any arrest or any pending case."  Tr. at 22:4-11 (Fox-Young).  Caldwell stated that "[l]ong after the

ban was imposed, there was a case filed in Albuquerque, but the district attorney in the second had

recused and that case is ultimately nullified," so it was "unrelated."  Tr. at 22:7-11 (Fox-Young).

The Court then asked Caldwell to clarify Nuñez role and to explain if Nuñez' role was only related

to the suspension from the basketball team.  See Tr. at 22:16-25 (Court).  Caldwell argued under

rule 12(c) standard, there are allegations that Nuñez "was involved with the Dean."  Tr. at 23:1-7

(Fox-Young).  Caldwell stated that he "intend[s] to amend the complaint to add" that Nuñez was

"very involved in the suspension. . . .  Nuñez had a far greater role we allege than the Court might

expect an Athletic Director to have."  Tr. at 23:7-16 (Fox-Young).  Caldwell requested the Court

to defer on the motions to allow Caldwell to conduct discovery.  See Tr. at 23:16-20 (Fox-Young).

Caldwell argued that, even if the Court were to rule now, "there's enough here for the Court to see

that Nunez called him in, chaired the meeting with staff from across the University and tells him

he can't be there.  He is involved at a much higher level[,] . . .  he's not just receiving input from

the Dean Students that he needs to pass along the message that Caldwell can't practice."  Tr. at

23:21-24:2 (Fox-Young).  Caldwell argued that "the allegations we make that Eddie Nuñez told

Caldwell he was banned from campus indefinitely you know is enough for the Court to deny the

12(c) motion. . . .  [Nuñez] chaired a meeting in which he kicked [Caldwell] off campus in

conjunction with the Dean's office."  Tr. at 24:14-21 (Fox-Young).

        The Court asked Caldwell to characterize Caldwell's interest in playing basketball.  See

Tr. at 25:11-16 (Court).  Caldwell responded that he has "both [a] property right[] and a liberty

interest. . . .  The liberty interest . . . is with regard to his career and his future prospects."  Tr. at

25:17-26:3 (Fox-Young).  Caldwell contended that his situation "is similar to a medical student

whose career cut short [and] his education is cut short, because they are suspended on Title 9

[meaning] they can't complete medical school.  His ability to play basketball and this year of

eligibility deprives him of that interest as well." Tr. at 26:7-12 (Fox-Young).

The Court asked whether Caldwell turned down a hearing that UNM offered him, to which

Caldwell responded that he did have

> a meeting with the Dean of Students.  [But i]t wasn't a hearing.  And this is the
> meeting [was] . . . due to this lawsuit and due to [Caldwell's] continuing and
> constant request for due process, the University without granting any process
> decided to go ahead and allow Mr. Caldwell to attend classes in person. So no, we
> never turned down a meeting and plaintiff never turned down a hearing at all.  He
> has not had a hearing and we have requested of the Dean's office, of O-E-O and of
> any other entity involved that he do have a hearing, and we've been denied.

Tr at 30:20-31:15 (Court, Fox-Young).

Nuñez responded that, although the alleged assault did not have a "sexual component,"

 Caldwell "strangled the same person twice.   In one of those instances, the person lost

consciousness."  Tr. at 32:4-10 (Marcus).  Nuñez continued:

> So I want to point out that what the plaintiff has been accused of is
> incredibly serious even if it wasn't sexually and posed a risk to people at UNM.  It
> was a serious act, aggravated act of domestic abuse and that even without a sexual
> component, it does raise a concern.  It does raise a concern to UNM student body.

Tr. at 32:10-16 (Marcus).

Nuñez stated that when he had the meeting with Caldwell where Caldwell "was informed

he was kicked off the campus," Caldwell "already knew he was kicked off the campus and there's

no evidence -- there's absolutely nothing in the complaint that said the Athletic Director took a

step beyond his duties and actually kicked the person off the campus."  Tr. at 21:18-24 (Marcus).

Nuñez argued that there was no evidence in the complaint or related documents that Nuñez made

the decision to ban Caldwell from campus, rather that decision is made by other departments at

UNM  See Tr. at 33:5-12 (Marcus).   Nuñez argued that, therefore, the complaint does not state a

claim against Nuñez as far as banning him from the campus, and "that there were grounds to have

an interim ban given the seriousness of the" alleged assault.  Tr. at 33:13-19 (Marcus).  Nuñez

argued that after a few weeks, after winter break,

> the ban is rescinded.  If you rescind the interim ban you don't have to offer any due process because it's done, there's no deprivation in that case.  So there was a meeting[.] . . . [T]he process that [Caldwell] has asked for is the ability to cross-examine witnesses, et cetera.  I don't think that that much process is required even, . . . [it] certainly isn't required if you're going to rescind the ban.

Tr. at 34:1-10 (Marcus).

Next, Nuñez argued that Caldwell, in his Response, concedes that there is no due process liberty or property interest in playing basketball, because the response does not mention such an interest; instead the response focused on the idea that Nuñez was involved in the campus ban.  See Tr. at 34:16-23 (Marcus).  Nuñez argued that there is no case law to support the contention that there is a right to play on a scholastic sports team and that the situation is distinguishable from a medical student, because there is no reasonable expectation that a collegiate basketball player will become a professional basketball player.  See Tr. at 35:2-15 (Marcus).  Nuñez argued that he was therefore entitled to judgment as a matter of law, because he did not violate a clearly established liberty or property interest.  See Tr. at 36:14-15 (Marcus).

Caldwell responded, contending that his Response, on page 25, states he has a property interest as a student in his education, his position as a basketball player, his reputation, and his future career.  See Tr. at 37:4-20 (Fox-Young).  Caldwell contended that, contrary to Nuñez' claim, Nuñez "was an active participant in the decision to completely ban from his campus."  Tr. at 37:21-22 (Fox-Young).  Nuñez argued that Caldwell did not cite any case law establishing that he has a property interest in playing collegiate sports or having a professional career as an athlete.  See Tr. at 38:14-39:9 (Marcus).  Nuñez argued that "there was credible evidence that [Caldwell] . . . has had a history of violence, of domestic violence, and therefore, he created a danger to the safety of the student body and also he created a risk of a disruption of the academic process."  Tr. at 45:1- (Marcus).  The Court asked, whether it is proper for UNM to label Caldwell as a risk, where "the

law enforcement and the judicial process doesn't deem him a danger to the community so that he should be locked up?" Tr. at 45:7-11 (Court). The Court stated that, often, a person who commits domestic violence is primarily a danger to the victim, but not the community at large. See Tr. at 45:18-46:8 (Court). Nuñez contended that the victim was connected in some capacity to UNM and that "[h]aving somebody like that on the campus does put people in danger generally and concerns about retaliation and concerns about some other issues." Tr. at 46:9-18 (Marcus).

The Court stated that it was surprised that there was not more case law addressing the issues, so it would have to give the issues some thought. See Tr. at 47:14-20 (Court). The Court stated that Nuñez, as the Athletic Director, might have a limited role, but that it would have to establish what Constitutionally protected interest was at stake. See Tr. at 47:20-48:4 (Court). The Court stated that the lack of case law related to the clearly establish prong meant that it was likely difficult for the § 1983 damages claim to survive. See Tr. at 48:11-18 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States,

561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct,

> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible."  The allegations must be enough that, if assumed to
> be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl.

Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, 278

F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule

'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir.

2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three

limited exceptions to this general principle: (i) documents that the complaint incorporates by

reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents

referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th

Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,

861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and

a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended

complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").

"[T]he court is permitted to take judicial notice of its own files and records, as well as facts which

are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000),

abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion

with numerous documents, and the district court cited portions of those motions in granting the

[motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[5] In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- whose deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

---

[5]Nard v. City of Okla. City is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, and the other published opinions cited herein, Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009), Poche v. Joubran, 389 F. App'x 768 (10th Cir. 2010), and Wallace v. United States, 372 F. App'x 826 (10th Cir. 2010), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which the plaintiffs refer to in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See also Sec. & Exch. Comm'n v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING JUDGMENT ON THE PLEADINGS

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006)(quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  The same standards for evaluating a 12(b)(6) motion apply to a motion for a judgment on the pleadings.  See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1160 ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6).").  Thus, a court

accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor."  Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1141.  All of the nonmoving parties' allegations are deemed true, and all of the movants' contrary assertions are deemed false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d at 340.  A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  A plaintiff must "nudge his claims across the line from conceivable to plausible" to survive a motion to dismiss.  Bell Atl. Corp. v. Twombly, 550 U.S. at 570.  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177.  The Tenth Circuit has stated:

"[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct,

much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." [Bell Atl. Corp. v. Twombly, 550 U.S. at 576 n.3]. See Airborne Beepers & Video, Inc. v. AT & T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."). The Twombly [v. Iqbal] Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." [550 U.S. at 591] n.10. Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin." Id.

Robbins v. Oklahoma, 519 F.3d at 1247-48.

A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(d). Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment. See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A Federal Procedure, Lawyers' Ed. § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d at 568, abrogated on other grounds by McGregor v. Gibson, 248 F.3d at 955. A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. See Jacobsen v. Deseret Book Co., 287 F.3d at 941-42. If, however, a complaint does not reference or attach a document, but the complaint refers to the document, and the document is central to the

plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss." GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1327, at 438-39 (4th ed. Oct. 2020)("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading, the defendant may be permitted to introduce the document as an exhibit to a motion attacking the sufficiency of the pleading if the plaintiff has referred to the item in the complaint and it is central to the affirmative case.").

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x. 24, 24 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x. 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x. at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000),

abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).  In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  Gee v. Pacheco, 627 F.3d at 1186-87.

The Court has previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired, in the Court's ruling. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, **22–23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the content's sufficiency alone, as the complaint did not incorporate the documents by reference, or refer to the documents. See 2012 WL 3656500, at **22–23; Mocek v. City of Albuquerque, No. CIV 11-1009, 2013 WL 312881, at *50 (D.N.M. 2013)(Browning, J.)(refusing to consider statements that were not "central to [the Plaintiff's] claims").

On the other hand, in a securities class-action, the Court has found that a defendant's operating certification, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs' adequately alleged a loss, falls within an exception to the general rule, and the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty Emps.' Retirement Sys.

v. Thornburg Mortg. Secs. Trust 2006–3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259-60 (D.N.M. 2017)(Browning, J.).

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment of the United States of America states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth,

408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 [(1970)]. See Flemming v. Nestor, 363 U.S. 603, 611 [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what

process is due." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985)(citing <u>Morrissey</u>

<u>v. Brewer</u>, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case."  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands."  <u>Mathews</u>

<u>v. Eldridge</u>, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings.  In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

<u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542, 545 (footnote omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process."  <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507,
> [529] (2004)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335).  A court must
> carefully balance these competing concerns, analyzing "'the risk of an erroneous
> deprivation' of the private interest if the process were reduced and the 'probable
> value, if any, of additional or substitute safeguards.'"  <u>Id.</u> (quoting <u>Mathews v.
> Eldridge</u>, 424 U.S. at 335).

<u>United States v. Abuhamra</u>, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  See e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").   For example, in Youngers, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").   See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its

inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

More recently, in Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071, 1122 (D.N.M. 2020)(Browning, J.)("Lee I"), the Court, on a motion to dismiss, concluded that a student had alleged facts sufficient to state a procedural due process against the University of New Mexico based on the procedures the university used in its sexual misconduct investigation. The Court concluded that a student has a property interest in his or her continued enrollment at a university, but the student did not have a liberty interest in his reputation, where the student did not allege that false statements were publicized. See Lee I, 449 F. Supp. 3d at 1122. The Court explained that, under Supreme Court and Tenth Circuit precedent, "'a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause,'" Lee I, 449 F. Supp. 3d at 1122 (quoting Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975)), but that

> damage to "reputation alone, apart from some more tangible interest such as employment," is insufficient to invoke the Due Process Clause's protections. Paul v. Davis, 424 U.S. 693, 701 (1976). Instead, a plaintiff "must show that as a result of the defamation, 'a right or status previously recognized by state law was distinctly altered or extinguished.'" Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th Cir. 2019)(quoting Paul v. Davis, 424 U.S. at 711). This is the "stigma-plus" claim sufficient to implicate a constitutionally-protected liberty interest. See Gwinn v. Awmiller, 354 F.3d 1211, 1216, 1223-24 (10th Cir. 2004). The Tenth Circuit recognizes deprivation "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause.

Lee I, 449 F. Supp. 3d at 1122. Based on the student's property interest in his continued education at university and the university's "limited interest in not providing many of the procedural safeguards" in a sexual assault investigation, the Court then concluded, under the Mathews v. Eldridge, 424 U.S. at 335, balancing test, that the student's allegations that

> UNM's investigator made a determination against him without ever holding a formal hearing, and that he was not allowed to learn the witnesses' identities, attend any witness interviews, acquire the interview recordings, question witnesses regarding factual assertions, or get an opportunity to cross-examine . . . [were

> sufficient to] state[] a claim that UNM's hearing procedures do not comply with
> Due Process.

Lee I, 449 F. Supp. 3d at 1124.  Next, the Court addressed the issue of notice, and concluded that

(i) allegations that "UNM failed to inform [the student] that he faced expulsion" did not indicate a

risk of erroneous deprivation where "UNM had already informed [the student] that he was banned

from campus"; (ii) UNM failed to provide the student with adequate notice that the university

"would raise underage drinking claims at his sanctions hearing"; and (iii) UNM "heightened the

risk of erroneous deprivation by informing [the student] that he could not bring in any new

evidence at the sanctions hearing."  Lee I, 449 F. Supp. 3d 1071, 1133-34 (citing Watson ex rel.

Watson v. Beckel, 242 F.3d 1237, 1241 (10th Cir. 2001) and Mathews v. Eldridge, 424 U.S. at

349).

    Subsequent to Lee I, in Lee v. Univ. of New Mexico, No. CIV 17-1230 JB/LF, 2020 WL

6743295, at *40 (D.N.M. Nov. 16, 2020)(Browning, J.)("Lee II"), the Court, on a motion for

summary judgment, concluded that UNM did not violate the student's due process rights on several

grounds.  First, the Court concluded that UNM afforded the student "'some kind of hearing,'" Lee

II, 2020 WL 6743295, at *40 (quoting Goss v. Lopez, 419 U.S. 565, 584 (1975)), because (i) the

Dean of Students "held an administrative hearing when it decided whether to expel" the student;

(ii) "[a]t the administrative hearing, [the student] had 'the opportunity to present witnesses and

evidence,' and have counsel present"; and (iii) at the hearing, a Student Conduct Officer with the

Dean of Students "allowed [the student's] counsel to pass 'notes' and have 'whispered

conversations' with [the student] during the hearing, although [the Student Conduct Officer] did

not permit [the student's] counsel to 'make arguments on [the student's] behalf.'"  Lee II, 2020

WL 6743295, at *40 (quoting the evidentiary record).  Second, the Court concluded that

"[s]tudents accused of violating university policy do not have an unfettered due process right to

cross-examination in all disciplinary proceedings." Lee II, 2020 WL 6743295, at *40 (citing

cases).  The Court determined that, "despite [having a] substantial interest in his education,"

denying the student the right to cross-examine witnesses "creates little risk of erroneous

deprivation," because the student had admitted to engaging in the alleged misconduct to the police

after being Mirandized.[6]  Lee II, 2020 WL 6743295, at *40 (citing Doe v. Baum, 903 F.3d 575,

581 (6th Cir. 2018)("[C]ross-examination is unnecessary if a student admits to engaging in

misconduct," because "there is a little to be gained by subjecting witnesses to adversarial

questioning when the accused student has already confessed.")).  The Court explained that,

because the student had admitted to having non-consensual sexual contact with another student

while the alleged victim was incapacitated, the witness' "credibility was not at issue" and allowing

the student to cross-examine the witness "would be a 'fruitless exercise.'"  Lee II, 2020 WL

6743295, at *41 (quoting Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972)).  The Court also

concluded that (i) the student was not entitled to a witness' identity, where the witness' statement

---

[6]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court of the United States provides the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

"[did] not prejudice [the student] unfairly because that statement had virtually no impact on the [UNM's] decision" to expel him; (ii) the student was not entitled to access all the evidence, because UNM gave him "detailed summaries of . . . the relevant evidence" and provided him an opportunity to respond to the witness' statements; (iii) UNM's decision-making process does not violate the student's due process rights, because the "inquisitorial model"[7] was not inherently biased; (iv) the university's application of the "preponderance-of-the-evidence standard" in student disciplinary proceedings did not violate the student's due process rights, because the Due Process Clause does not require universities to apply a higher evidentiary standard in student disciplinary proceedings; and (v) UNM did not violate the student's due process rights by considering alcohol as a sanctions factor, because the Court determined that it would not "impose a higher notice requirement on the sanctioning stage of a university than it imposes at the sentencing phase of a criminal trial." Lee II, 2020 WL 6743295, at *41-49.

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197)(1989). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195. The Due Process Clause is not a

---

[7]The "inquisitorial system" is a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry." Inquisitorial System, Black's Law Dictionary (11th ed. 2019).

guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.     Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special- relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.     Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine.  A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g.

when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

   **3.      Danger-Creation Exception.**

   The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

   In determining whether the danger-creation exception applies, the Tenth Circuit has

focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.    **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process

rights when they did not take sufficient action to prevent a student at the school from "racking"[8]

the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct

did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING § 1983 LIABILITY

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

[8]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("'The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.'")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has stated that there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens")[9] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell, 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[9]In Bivens, the Supreme Court held that a violation of the Fourth Amendment of the Constitution "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

1.      **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-

of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the

fundamental goals of preserving an area of individual freedom by limiting the reach of federal

law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for

which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The

traditional definition of acting under color of state law requires that the defendant in a § 1983

action have exercised power 'possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting

United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is

allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.

Accordingly, at a base level, to find that an action was taken under color of state law, the court

must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly

attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting

Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the public-employee context, the Tenth Circuit has directed that, while "'state

employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it

is 'well settled that an otherwise private tort is not committed under color of law simply because

the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v.

Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d

Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action

'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of

their authority as a public employee, and the violation allegedly committed by the defendant."

Jojola v. Chavez, 55 F.3d at 493.   What constitutes the required real nexus, however, is not completely clear.   As the Tenth Circuit has stated, whether there is a real nexus in a case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another actor committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.   Trask v. Franco, 446 F.3d at 1046.   The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"   Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).   "Thus, Defendants are liable for the harm proximately caused by their conduct."   Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).   As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.   The recovery should be guided by common-law tort principles

-- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[10]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there is not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment of the Constitution of the United States of America, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

---

[10]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis and left open the possibility that there might be some greater, undefined causation requirement. See 41 F. Supp. 3d at 1281.

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.     **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).

Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but it stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal does not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right.  In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such

misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

    **4.**    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  See Bivens, 403 U.S. at 392.  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir.

1997), <u>overruled on other grounds as recognized by</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and <u>Bivens</u>, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.   To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "'hazy border[s]'" of the law.  <u>Saucier v. Katz</u>, 533 U.S. 194, 206 (2001)(quoting <u>Priester v. Riviera Beach</u>, 208 F.3d 919, 926 (11th Cir. 2000)). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009).  <u>See also</u> <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

1.       **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, <u>Saucier v. Katz</u>' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  <u>See Pearson v. Callahan</u>, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  <u>See Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[11] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[11]In <u>Camreta v. Greene</u>, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts."

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).   Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[12]  "Courts should think carefully before expending 'scarce

---

Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

    [12]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified

immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief

shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for

judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[13]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.   **Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327

---

violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[13]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz worked better.

(10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Currier v. Doran, 242 F.3d at 923.   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Ashcroft v. al-Kidd, 563 U.S. at 741.   "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v. Howards, 556 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."

Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742.   The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1188.  In Kerns v. Bader, the Tenth Circuit explained that the relevant question concerning a police search of a home "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning," Hope v. Pelzer, 536 U.S. 730, 741 (2002), "but 'in light of pre-existing law the unlawfulness must be apparent,'" White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at  640)

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit has since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II").  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba

I") that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).  In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741[]. This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).  As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. at 551 (vacating Pauly v. White, 814 F.3d 1060 (10th Cir. 2016)).  In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct.

at 552 (quoting Anderson v. Creighton, 483 U.S. at 640).  With that principle in mind, the Supreme

Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established'

analysis: It failed to identify a case where an officer acting under similar circumstances as Officer

White was held to have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. at 552.  See

District of Columbia v. Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the

partygoers have identified a single precedent -- much less a controlling case or robust consensus

of cases -- finding a Fourth Amendment violation under similar circumstances.").  Although the

Supreme Court noted that "we have held that [Tennessee v.] Garner[, 471 U.S. 1 (1985)] and

Graham  do  not  by  themselves  create  clearly  established  law  outside  'an  obvious  case,'"  it

concluded "[t]his is not a case where it is obvious that there was a violation of clearly established

law under Garner and Graham."  137 S. Ct. at 552.[14]

_____

[14]If the Court is trying -- as it does diligently and faithfully -- to receive and read the
unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through
its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be
clearly established.  As former Tenth Circuit judge, and now Stanford law school professor,
Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs
that the superior courts send them through their opinions.  See Michael W. McConnell, Address at
the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions
to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  Although still stating
that there might be an obvious case under Graham that would make the law clearly established
without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the
Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly
similar factual case is required for the law to be clearly established, and the Tenth Circuit is now
sending those unwritten signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty.
of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the
Court's judgment that the case should proceed where a deceased plaintiff was backing away from
the police and was not raising his gun when shot, because "the parties do not cite, nor could we
find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the
circumstances presented here to establish clearly the Fourth Amendment law that applies").
     Factually identical or highly similar factual cases are not, however, the way the real world
works.  Many cases have so many facts that are unlikely to ever occur again in a significantly
similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However,
[the clearly established prong] does not mean that there must be a published case involving
identical facts; otherwise we would be required to find qualified immunity wherever we have a

new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New

**LAW REGARDING LAW OF THE CASE**

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)(quoting Dobbs v. Anthem, 600 F.3d 1275, 1279 (10th Cir. 2010)).  The Tenth Circuit has "acknowledged, however, that 'the rule [of law of the case] is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007)(internal citation omitted)(citing Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)).  The Tenth Circuit has stated that this flexibility means "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chicago, Inc., 49 F.3d 1219, 1227 (7th Cir. 1995), and citing Homans v. City of

---

Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 2018 WL 3660248, at *4-10 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colo. Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

Albuquerque, 366 F.3d 900, 904 (10th Cir. 2004)("[T]he doctrine is discretionary rather than mandatory.")).  "If the original ruling was issued by a higher court, a district court should depart from the ruling only in exceptionally narrow circumstances."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).

Only "final judgments may qualify as law of the case."  Poche v. Joubran, 389 F. App'x at 774 (quoting Unioil, Inc. v. Elledge (In re Unioil, Inc.), 962 F.2d 988, 993 (10th Cir. 1992)("In Re Unioil, Inc.").  The doctrine is inapplicable where "a ruling remains subject to reconsideration."  Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(quoting In re Unioil, Inc., 962 F.2d at 993; other citations omitted).  This means that "district courts generally remain free to reconsider their earlier interlocutory orders."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case)).

Similarly, this Court has stated that "[l]aw of the case is a doctrine that binds the trial court after an appeal."  Lane v. Page, 727 F. Supp. 2d, 1214, 1230 (D.N.M. 2010)(Browning, J.)(citing Clark v. State Farm Mut. Auto. Ins., 590 F.3d 1134, 1140 (10th Cir. 2009)).  In Clark v. State Farm Mutual Automobile Insurance, the Tenth Circuit stated:

> Under the law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

590 F.3d at 1140.

## ANALYSIS

The Court concludes that Caldwell has not alleged facts sufficient to state a Fourteenth Amendment due process claim against Nuñez.  The Court will dismiss Caldwell's due process

claim against Nuñez, because even though Caldwell alleges sufficiently that Nuñez banned Caldwell from campus, UNM afforded Caldwell sufficient process and Nuñez is entitled to qualified immunity, because Nuñez did not violate any clearly established constitutional right.  As for his substantive due process claim, Caldwell conceded that his substantive due process claim does not apply to Nuñez at the hearing, see Tr. at 21:2-25:10;[15] nonetheless, the Court concludes that Nuñez did not violate Caldwell's substantive due process rights, because Nuñez' actions do not shock the judicial conscience.  Accordingly, the Court will grant Nuñez' request for judgment on the pleadings.

I.   **CALDWELL HAS ALLEGED FACTS SUFFICIENT TO STATE A FOURTEENTH AMENDMENT DUE PROCESS LIBERTY INTEREST IN HIS CONTINUED ENROLLMENT AT UNM; BUT NOT FOR A PROPERTY INTEREST IN PLAYING BASKETBALL FOR UNM OR A LIBERTY INTEREST IN HIS REPUTATION AND HIS FUTURE PROFESSIONAL BASKETBALL CAREER.**

"The Fourteenth Amendment provides that a state shall 'not deprive any person of life, liberty, or property, without due process of law.'"  Lauck v. Campbell Cty., 627 F.3d 805, 811 (10th Cir. 2010)(quoting the Fourteenth Amendment).  Courts follow a two-step inquiry to evaluate procedural due process claims: "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?"  Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J, 464 F.3d 1182, 1189 (10th Cir. 2006).  See Mathews v. Eldridge, 424 U.S. at 334-35.  Caldwell contends that (i) he has a property interest in his continued enrollment at UNM; (ii) he has a property interest in playing basketball

---

[15]At the hearing, Caldwell admitted that he is only "really raising a procedural due process claim, so I'm not going to get into details of argument of substantive due process.  I concede that this is really a procedural due process claim."  Tr. at 21:20-23 (Fox-Young).  The Court clarified: "So you're not bringing a substantive due process claim?"  Tr. at 25:8-9 (Court).  Caldwell responded: "No."  Tr. at 25:10 (Fox-Young).

for UNM; and (iii) he has a liberty interest in his reputation and his future professional basketball career.  See First Amended Complaint ¶ 83, at 13.  Caldwell contends that Nuñez "under color of law within the meaning of 42 U.S.C. § 1983, deprived Plaintiff of rights and privileges secured by the United States Constitution and are liable for his injuries."  First Amended Complaint ¶ 84, at 13.  See First Amended Complaint ¶¶ 82-93, at 13-15.  The Court concludes (i) that Caldwell alleges sufficiently that Nuñez was involved in the decision to ban Caldwell from campus, which has deprived him of his property interest in his continued education at UNM;[16] (ii) that Caldwell does not have a property interest in playing collegiate basketball; and (iii) Caldwell's allegations do not support a liberty interest in his reputation or in a future career as a professional basketball player.

> ### A.   THE FIRST AMENDED COMPLAINT ALLEGES SUFFICIENTLY THAT NUÑEZ HAS DEPRIVED CALDWELL OF HIS PROPERTY INTEREST IN HIS CONTINUED EDUCATION, BECAUSE CALDWELL ALLEGES A CAUSAL PARTICIPATORY CONNECTION BETWEEN NUÑEZ' ACTIONS AND THE CAMPUS BAN.

Caldwell contends that that he "enjoys a property interest in his status as a student at the University, [and] in the education he has undertaken to receive."  First Amended Complaint ¶ 83, at 13.  In the Tenth Circuit, "a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause."  Gaspar v. Bruton, 513 F.2d at 850 (concluding that a student in a public vocational-technical school's nursing program had a protected property interest).  See Goss v. Lopez, 419 U.S. at 576 (explaining that students have a property interest in educational benefits).  See, e.g., Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181 (stating that a student "had a property interest in his place in

---

[16]Even though Caldwell alleges sufficient facts that Nuñez was involved in the decision to ban Caldwell, the Court concludes that UNM afforded Caldwell sufficient process, see Analysis § II, infra, and that Nuñez is entitled to qualified immunity, see Analysis § III, infra.

the Nursing School program that is entitled to due process protection under the Constitution"); Harris v. Blake, 798 F.2d at 422 (concluding that a part-time graduate psychology student "had a property interest in his [graduate program] enrollment which entitled him to procedural due process"). See also Brown v. Univ. of Kansas, 16 F. Supp. 3d 1275, 1288 (D. Kan. 2014)(Melgren, J.)(collecting cases in the Tenth Circuit and concluding that a law student who had paid tuition had a property interest in his continued enrollment at law school), aff'd, 599 F. App'x 833 (10th Cir. 2015); Assenov v. Univ. of Utah, 553 F. Supp. 2d 1319, 1327 (D. Utah 2008)(Campbell, J.)(concluding that a graduate student's interest in his "continued enrollment in the [University of Utah College of Engineering's Nuclear Engineering Program] is a property interest entitled to constitutional due process protections"); Siblerud v. Colorado State Bd. of Agric., 896 F. Supp. 1506, 1512-13 (D. Colo. 1995)(Kane, J.))(same). Caldwell was enrolled at UNM throughout 2019.[17] See First Amended Complaint ¶ 4, 11, at 2, 3. Accordingly, the Court concludes that Caldwell has a property right in his continued education at UNM. See Gaspar v. Bruton, 513 F.2d at 850; Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181.

Nuñez argues that, although Caldwell has a property right in his continued education at UNM, Caldwell does not allege sufficiently well-pleaded facts to establish that Nuñez caused Caldwell to be banned from the campus, see Motion at 2; Nuñez contends that "he was just a messenger," Tr. at 11:22-12:10 (Marcus). To state a claim under § 1983, Caldwell must allege Nuñez' direct personal responsibility for the claimed deprivation of a constitutional right. See 42

---

[17]UNM is a public institution that the New Mexico Legislature established to provide its citizens with post-secondary education. See N.M. Stat. Ann. § 21-7-1 ("The university of New Mexico is intended to be the state university, and as such is entitled to all the donations of land and all other benefits under all acts of congress enacted for the benefit of such educational institutions in the state."). See also N.M. Stat. Ann. §§ 21-7-1 to -32.

U.S.C. § 1983 (imposing liability on any person who, acting under color of law, "subjects, or causes to be subjected" another person to the deprivation of his or her constitutional rights)(emphasis added); Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006)("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established"); Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)(affirming the dismissal for failure to state a cause of action, because "'[p]ersonal participation is an essential allegation in a § 1983 claim'")(quoting Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)); Coleman v. Turpen, 697 F.2d 1341, 1346 n.7 (10th Cir. 1982)("*Respondeat superior* generally does not apply to § 1983 cases.  Thus, [the defendant], to be liable, must have been personally involved in the deprivation.").  Personal participation does not require that the defendant was physically present when the specific violation occurred, because "direct participation is not necessary" to impose § 1983 liability.  Mink v. Knox, 613 F .3d 995, 1001 (10th Cir. 2010).  To allege sufficiently a § 1983 claim, however, Caldwell must allege a "causal connection" between Nuñez' participation and the deprivation of his rights; to allege causation, Caldwell must "show[] an affirmative link between the constitutional deprivation and the officer's exercise of control or direction."   Mink v. Knox, 613 F.3d at 1001 (citing Poolaw v. Marcantel, 565 F.3d 721, 732 (10th Cir. 2009)).  "'The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"   Mink v. Knox, 613 F.3d at 1001-1002 (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990))(concluding that a complaint that alleges that a deputy district attorney, who reviews and approves an affidavit in support of a warrant, "plausibly asserted the requisite casual connection between [the deputy district attorney's] conduct and the search and seizure that occurred at [the plaintiff's] home").

Here, Caldwell's First Amended Complaint alleges sufficiently that Nuñez participated in the decision to ban Caldwell from campus, because Nuñez chaired a meeting with other administrators and informed Caldwell that he was banned.  See First Amended Complaint ¶¶ 9, 22-23, at 3, 5; Mitchell v. Maynard, 80 F.3d at 1441  Caldwell explains his allegation that Nuñez' "directives absolutely banned Plaintiff from campus," by alleging that Nuñez (i) "is . . . the Athletic Director at the University"; (ii) "[o]n the evening of December 19th, 2019, Plaintiff was called to a meeting chaired by Defendant Nuñez and involving several other individuals from the athletic department and from UNM administration"; and (iii) "Nuñez ran the meeting and informed Plaintiff that he was banned from campus indefinitely and also banned from playing or practicing with the basketball team."  First Amended Complaint ¶¶ 9, 22-23, 91, at 3,  5, 14.  Although Caldwell's allegations are not as robust as the Court would like to see, because Caldwell does not allege that Nuñez authorized, directed, or otherwise caused the campus ban,[18] the Court concludes

_____

[18]Caldwell's use of the indirect phrase "Nuñez informed Plaintiff that he was banned," First Amended Complaint ¶ 23, at 5, as opposed the causal "Nuñez banned Plaintiff," does Caldwell no favors, because Caldwell's phrasing does not state who enacted the ban.  Rather, the inference from the word "informed" as opposed "banned" could be that Nuñez is conveying a message from the authority figures who promulgated that ban, something Caldwell's other allegations support: Caldwell alleges that Dean of Students emailed him that day, expressly "banning" Caldwell and explains that the Dean of Students has the authority to do so.  First Amended Complaint ¶ 19, at 4 (alleging that the Dean of Students' Office emailed Caldwell "banning him from the University campus"); First Amended Complaint ¶ 21, at 4 (alleging that the email from the Dean of Students' Office stated "that [Caldwell] was 'hereby interim banned from all of UNM Campus, except for UNM Hospitals and Clinics for the purpose of seeking medical care and except for [his] in-person courses for Spring 2020 semester'")(quoting alleged email sent by the Dean of Students); First Amended Complaint  ¶ 35, at 6 (attributing the ban to "Kelly Davis, the UNM Student Conduct Officer in the Office of the Dean of Students who promulgated the 'ban letter'"); First Amended Complaint  ¶ 41, at 7 ("Defendant Torrez stated that the Student Conduct Officer, an employee in her office, had imposed the ban . . . .").  Given that the complaint is evaluated under a notice pleading standard, however, Caldwell only must articulate a "reasonable inference" that Nuñez participated in the ban.  Ashcroft v. Iqbal, 556 U.S. at 678.  The Court concludes there is a reasonable inference that Nuñez participated in the ban, because he chaired a meeting with other administrators and informed Caldwell that he was banned.  See First Amended Complaint ¶¶ 22-23, at 5.

that chairing a meeting "involving several other individuals from the athletic department and from UNM administration," First Amended Complaint ¶ 22, at 5, puts him knee-deep in the alleged constitutional violations, and thus, is sufficient to establish some "'[p]ersonal participation'" in the decision to ban Caldwell.  Mitchell v. Maynard, 80 F.3d at 1441 (quoting  Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)).  See Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006).  Although Caldwell does not explain what authority an Athletic Director has to ban a student from campus,[19] the allegation that Nuñez chaired a meeting with other administrators and informed Caldwell that he was banned, see First Amended Complaint ¶¶ 22-23, at 5, is sufficient to create the "reasonable inference," Ashcroft v. Iqbal, 556 U.S. at 678, that Nuñez had some influence on whether to ban Caldwell from campus, even if Caldwell does not allege that Nuñez met with or worked with the Dean of Students,  see Bell Atl. Corp. v. Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

The next issue is whether a campus ban interferes with Caldwell's property right in his continued education at UNM.  Neither party addresses the constitutional distinction between a suspension and a campus ban.  See Motion at 1-9; Response at 1-10.  UNM's Code of Student Conduct defines "suspension" as "losing student status for a period of time specified in the terms

---

[19]Caldwell does not explain the role of an Athletic Director or how such a position confers authority to ban students from campus.  See First Amended Complaint ¶¶ 9, 22-23, at 3, 5.  In contrast, Caldwell offers more specific allegations regarding the Dean of Students, explaining that the Dean of Students has the power to "impose an interim ban or suspension and may also lift such a ban pursuant to Section 4.3 of UNM's Student Grievance Procedure."  Complaint ¶ 39, at 7. See Complaint ¶¶ 75-76, at 12 (alleging that "the Dead of Students has the authority to implement interim measures" and that "the Dean of Students may suspend a student indefinitely . . ."); Complaint ¶¶ 64-81, at 10-13 (describing UNM's Disciplinary Process).

of the suspension.  A suspension may commence immediately upon a finding of a violation or it

may be deferred to a later time."  <u>Student Code of Conduct § 4.2.4</u>,  The Pathfinder - UNM Student

Handbook,  https://pathfinder.unm.edu/code-of-conduct.html (last visited December 24, 2020);[20]

First Amended Complaint ¶ 66, at 10.  In contrast, UNM's Code of Student Conduct defines

"barred from campus" as "being barred from all or designated portions of the University property

or activities."  Student Code of Conduct § 4.2.7.  Caldwell does not allege plausibly that Nuñez

suspended him, Caldwell only alleges plausibly that Nunez barred him from campus.  <u>See</u> First

Amended Complaint ¶¶ 22-23, at 5 ("Nuñez . . . informed Plaintiff that he was banned from campus

indefinitely and also banned from playing or practicing with the basketball team.").[21]  Because a

---

[20]District courts may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court takes judicial notice of UNM's Student Code of Conduct, which Caldwell discusses, but does not quote, the Student Code of Conduct in the First Amended Complaint, because it comes from UNM's official website and cannot reasonably be questioned. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002)("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").  Nuñez does not dispute the UNM's Student Code of Conduct's authenticity.

[21]Caldwell alleges in the First Amended Complaint's "Factual Background":

On the evening of December 19th, 2019, Plaintiff was called to a meeting chaired by Defendant Nuñez and involving several other individuals from the athletic department and from the UNM administration.

. . .

Defendant Nuñez ran the meeting and informed Plaintiff that he was banned from campus indefinitely and also banned from playing or practicing with the basketball team.

"suspension" means a loss of student status, there is an interference with a student's constitutional

right to a continued education.  Student Code of Conduct § 4.2.4.  See Goss v. Lopez, 419 U.S. at

---

First Amended Complaint ¶¶ 22-23, at 5.  These are the only specific allegations related to Nuñez; later on, in his First Amended Complaint under the claims for relief, Caldwell contends that (i) the "Defendants violated Plaintiff's clearly established rights secured by the Fourteenth Amendment, including but not limited to the right to procedural and substantive due process, by suspending Plaintiff, banning him from campus and evicting him from his residence"; (ii) the "Defendants acted contrary to the Fourteenth Amendment in failing to afford Plaintiff any due process protections whatsoever before suspending him"; and (iii) the "Defendants' directives absolutely banned Plaintiff from campus, thereby denying him property interests and liberty interests that are subject to constitutional protection."  First Amended Complaint ¶¶ 83, 86, 87, 91, at 13, 14. Beyond alleging that the Defendants, without specifying which, suspended him, none of the suspension allegations in the factual background relate Nuñez.  See First Amended Complaint ¶¶ 11-81, at 3-13.  Furthermore, nowhere in the First Amended Complaint's Factual Background does Caldwell allege that Nuñez or anyone else revoked his status as a student.  See First Amended Complaint ¶¶ 11-81, at 3-13; UNM Student Handbook § 4.2.4.  Rather, the only factual allegations related to his status as a student at UNM demonstrate that he was not suspended: Caldwell alleges that the Dean of Students emailed him, stating that, "other than the single course Plaintiff had previously registered for, he was only permitted to register for and/or pursue online courses going forward."  First Amended Complaint ¶ 21, at 4.  Caldwell's allegations that he was allowed to take the class for which he was already registered and online classes shows that Caldwell's status as a student was not revoked, but only that he was banned from campus property.  See Student Code of Conduct § 4.2.4.  In the Response, Caldwell further argues that that Nuñez banned him:

> Plaintiff clearly alleges that Defendant Nunez was the individual who informed him he was banned from campus and that he was therefore evicted from his on-campus apartment, banned from attending classes, and otherwise unable to avail himself of any other UNM facilities.  Plaintiff alleges that although other UNM administration personnel were present for this meeting, Defendant Nunez chaired the meeting. These allegations clearly support the natural inferences that Defendant Nunez was involved in the prior discussions and decisions to ban Plaintiff from campus.

Response at 4.  Later in the Response, Caldwell argues that the "Plaintiff has in fact clearly alleged that Nunez had a much broader and more central role in the activities around Plaintiff's suspension"; however, Caldwell appears to use the word "suspension" interchangeably with "ban," and Caldwell provides not factual allegation that Nuñez suspended him or somehow revoked Caldwell's status as a student.  Response at 4-5.  The Court concludes that the allegation that Nuñez suspended Caldwell is conclusory, because there is no alleged factual basis for the allegation that Nuñez or indeed anyone else suspended Caldwell.  See Ashcroft v. Iqbal, 556 U.S. at 678.  As the Court has explained, Caldwell does plausibly allege that Nuñez banned Caldwell from campus property.

576.   A campus ban, however, does not mean that a student loses their status as a student or the

ability to enroll in classes, only that the student cannot enter onto UNM property or participate in

school activities, see Student Code of Conduct § 4.2.7; nonetheless, the Court concludes a campus

ban interferes with a student's right to education, because it interferes with the "educational

process," such as the ability to attend classes, and university activities including lectures, student

groups, and athletic events.   Goss v. Lopez, 419 U.S. at 576.   As the Tenth Circuit has explained:

> The educational process is a broad and comprehensive concept with a variable and
> indefinite meaning.   It is not limited to classroom attendance but includes
> innumerable separate components, such as participation in athletic activity and
> membership in school clubs and social groups, which combine to provide an
> atmosphere of intellectual and moral advancement.

Albach v. Odle, 531 F.2d 983, 985 (10th Cir. 1976)(citing Goss v. Lopez, 419 U.S. at 576).   Cf.

Sword v. Fox, 446 F.2d 1091, 1096 (4th Cir. 1971)(concluding, in the context of the First

Amendment, that, "[w]hile a flat ban on campus demonstrations [by students] would be manifestly

invalid, 'It is equally clear, however, that students do not have an unlimited right to demonstrate

on university property.'")(quoting Developments in the Law of Academic Freedom, 81 Har. L.

Rev. 1045, 1131 (1968)).   But see Collins v. Univ. of New Hampshire, 746 F. Supp. 2d 358, 370

(D.N.H. 2010), aff'd, 664 F.3d 8 (1st Cir. 2011)(concluding that a professor's "campus ban, . . .

did not work a sufficiently serious harm to plaintiff to rise to the level of the deprivation of a liberty

interest").   Caldwell alleges that he "has been barred from all on-campus activities, including

exercising at the gymnasium, visiting the library, walking across campus and otherwise engaging

in the activities of a student-athlete."   First Amended Complaint ¶ 32, at 6.   Accordingly, the Court

concludes that Caldwell plausibly has alleged that Nuñez, by banning Caldwell from campus,

interfered with Caldwell's property interest in his continued education.

B.    **CALDWELL DOES NOT HAVE A PROPERTY INTEREST IN PLAYING COLLEGIATE BASKETBALL, BECAUSE PARTICIPATING IN INTERCOLLEGIATE SPORTS IS NOT CONSTITUTIONALLY PROTECTED.**

Caldwell contends that that he has a property interest "as a player on the University basketball team." First Amended Complaint ¶ 83, at 13. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985)(quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). To have a property interest, an individual "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colleges v. Roth, 408 U.S. at 577.

In the context of high school sports, the Tenth Circuit has concluded that "[p]articipation in interscholastic athletics is not a constitutionally protected civil right." Albach v. Odle, 531 F.2d 983, 984-85 (10th Cir. 1976)(citing Oklahoma High Sch. Athletic Ass'n v. Bray, 321 F.2d 269, 273 (10th Cir. 1963); Mitchell v. Louisiana High School Athletic Ass'n, 430 F.2d 1155, 1158 (5th Cir. 1970)). And, in Colorado Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, the Tenth Circuit concluded that "the interest of the student athletes in participating in intercollegiate sports [is] not constitutionally protected." 570 F.2d 320, 321 (10th Cir. 1978). Caldwell cites no cases to the contrary. See Response at 1-10. In Albach v. Odle, high school students were barred from "high school athletic competition for one year," if "any student . . . transfers from his home district to a boarding school or from a boarding school to his home district." Albach v. Odle, 531 F.2d at 984. The Tenth Circuit explained that the students failed to state a claim under § 1983, because school interscholastic athletics is not a "constitutionally protected right." Albach v. Odle, 531 F.2d at 985. The Tenth Circuit reasoned that the "constitutionally protected right" to the

> educational process is a broad and comprehensive concept with a variable and indefinite meaning.  It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement.  We do not read Goss [v. Lopez] to establish a property interest subject to constitutional protection in each of these separate components.

Albach v. Odle, 531 F.2d at 985 (citing Goss v. Lopez, 419 U.S. at 576)).  See Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996)("In Albach [v. Odle] we explained that the innumerable separate components of the educational process, such as participation in athletics and membership in school clubs, do not create a property interest subject to constitutional protection.").  The Tenth Circuit is not alone in holding that there is no property in playing school sports.  See, e.g., Burrows by Burrows v. Ohio High Sch. Athletic Ass'n, 891 F.2d 122, 125 (6th Cir. 1989); Niles v. Univ. Interscholastic League, 715 F.2d 1027, 1031 (5th Cir. 1983)("A student's interest in participating in interscholastic athletics falls 'outside the protection of due process.'")(quoting Mitchell v. Louisiana High School Athletic Assn., 430 F.2d 1155, 1158 (5th Cir. 1970)).  Accordingly, the Court concludes that Caldwell does not have a property right "as a player on the University basketball team."  First Amended Complaint ¶ 83, at 13.

## C.   CALDWELL'S ALLEGATIONS DO NOT SUPPORT A LIBERTY INTEREST IN HIS REPUTATION OR IN A FUTURE CAREER AS A PROFESSIONAL BASKETBALL PLAYER.

Caldwell contends that he has "a liberty interest in his reputation and future professional career."  First Amended Complaint ¶ 83, at 13.  Caldwell's allegations do not support a liberty interest in his reputation, because he has not alleged that UNM published any defamatory statements resulting in a loss of legal status.  See Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th Cir. 2019).  The Supreme Court has stated that damage to "reputation alone, apart from some more tangible interest such as employment," is insufficient to invoke the Due Process Clause's protections.  Paul v. Davis, 424 U.S. 693, 701 (1976).  See Martin Marietta, 810 F.3d 1161, 1184

(10th Cir. 2016)("Damage to reputation alone . . . is not sufficient."); Gwinn v. Awmiller, 354 F.3d 1211, 1216 (10th Cir. 2004)("Damage to one's reputation alone . . . is not enough to implicate due process protections."); Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1268-69 (10th Cir. 1989). Instead, "[w]hat is needed in addition to stigma, according to the Supreme Court, is some change in legal status.  The plaintiff must show that as a result of the defamation, 'a right or status previously recognized by state law was distinctly altered or extinguished.'"  Al-Turki v. Tomsic, 926 F.3d at 617 (quoting Paul v. Davis, 424 U.S. at 711).  This test is the "stigma-plus" claim sufficient to implicate a constitutionally-protected liberty interest.  See Gwinn v. Awmiller, 354 F.3d 1211, 1216, 1223-24 (10th Cir. 2004).  "If the plaintiff establishes that the alleged defamation would significantly change the plaintiff's legal status, then the plaintiff is entitled to a name-clearing hearing to prove the falsity of the defamatory information."  Al-Turki v. Tomsic, 926 F.3d at 617 (citing Codd v. Velger, 429 U.S. 624, 627 (1977)).

The Tenth Circuit does not recognize the right to play scholastic sports as something more that triggers the Due Process Clause.  See Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996); Colorado Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, 570 F.2d at 321. Analysis § I(B), supra.  The Tenth Circuit recognizes deprivation, however, "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause.  Al-Turki v. Tomsic, 926 F.3d at 617.  Nevertheless, Caldwell has not suggested that the allegations that he assaulted someone are false, that any false statements were publicized,[22] nor that there is a

_____

[22]Caldwell alleges that, "[i]n a public release, UNM representatives subsequently stated that Plaintiff was 'being withheld from competition and team activity[] indefinitely' or 'until further notice.'"  First Amended Complaint ¶ 28, at 5 (quoting Goeff Grammar, Lobo Starters Carlton Bragg, J.J. Caldwell Suspended, Albuquerque Journal (December 22, 2019), https://www.abqjournal.com/1403561/lobo-starters-carlton-bragg-j-j-caldwellsuspended.html ("Albuquerque Journal Article")).  Caldwell does not dispute these statement's veracity, allege that the statements are defamatory, or allege that UNM representatives made a public statement about

significant change in his legal status as a result of the defamation.  See First Amended Complaint

¶¶ 11-81, at 3-13;  Brown v. Univ. of Kan., 16 F. Supp. 3d at 1288.  Caldwell alleges only that the

campus ban "will severely further damage his reputation," and that the "allegations of physical

---

the campus ban.  See First Amended Complaint ¶ 28, at 5.  The Albuquerque Journal Article quotes
a UNM press release and UNM head basketball coach Paul Weir, neither of which reference the
reasons for the sports ban or discuss a campus ban:

> The UNM Lobos have suspended senior starter and team captain Carlton
> Bragg Jr. and junior starting point guard J.J. Caldwell indefinitely.

> The university confirmed the Journal's initial report of the suspensions prior
> to Sunday's game against Houston Baptist, but would not say why or for how long
> the suspensions will last.  The Journal has confirmed the suspensions are not related
> to one another.

> "Carlton Bragg and JJ Caldwell will not participate in today's game versus
> Houston Baptist," UNM released in an email prior to the game.  "They are being
> withheld from competition and team activity until further notice.  The athletic
> department has received information that requires further review.  In the meantime,
> there will be no additional comments from anyone at UNM until that process is
> complete."

> Neither were in the arena for the game and were not made available for
> comment but are, as of Sunday, still considered on the team.

> After the game, UNM head coach Paul Weir said he would let the school's
> statement stand and he would comment further.

> "Honestly I will probably refer all questions to Eddie," Weir said.  "Eddie
> is in charge of this right now.  I'm the basketball coach I'm gonna coach the guys
> that I have and I'll pretty much forward everything directly to him. And you guys
> know I've always been a very forthcoming, transparent person. If that moment
> presents itself, I have no problem commenting but at this very moment I am going
> to refuse to comment."

> He also did not comment when asked about his recruiting approach to
> giving so many transfers with troubled pasts at previous schools a second chance
> to play at UNM.

Albuquerque Journal Article at 1.

violence impugn the student's reputation and integrity."  First Amended Complaint ¶¶ 44, 87, at

7, 14.  Caldwell does not explain how any harm to his reputation has resulted in a change in his

legal status.  See First Amended Complaint ¶¶ 44, 87, at 7, 14.  The Due Process Clause does not

protect Caldwell's situation, where there is no alleged public dissemination of the reputation-

harming statements that resulted in a change of legal status.[23]  See McDonald v. Wise, 769 F.3d

1202, 1212 (10th Cir. 2014)(concluding that a public employee "sufficiently pled a deprivation of

his liberty interest" where (i) his employer had "confirmed at press conferences that he was in fact

'fired *for* serious misconduct,'" and (ii) the public employee had "been unable to find employment

because of the media reports of his misconduct")(emphasis in the original); Asbill v. Hous. Auth.

of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984)(concluding no harm to

reputation where the statements were not "stigmatizing"); Siegert v. Gilley, 500 U.S. 226, 228

(1991).  See also James L. Buchwalter, Application of Stigma-Plus Due Process Claims to

Education Context, 41 A.L.R. 6th 391 § 2 (Originally published in 2009)("In order to fulfill the

requirements of a 'stigma-plus' due process claim arising out of the termination from government

employment, a plaintiff must show that the government made stigmatizing statements, i.e., those

that call into question the plaintiff's good name, reputation, honor, or integrity.").

Next, the Court concludes that Caldwell's allegations do not support a liberty or property

interest in a future career as professional basketball player, because the interest of a student-athlete

in his or her future professional athletic career is too speculative.  See Butler v. Nat'l Collegiate

Athletic Ass'n, No. CIVA 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15,

2006)(Vratil, J.)("As for the loss of an opportunity for a professional football career, such harm is

speculative.").  Caldwell argues, without citation to caselaw, that he has "a liberty interest in his

---

[23]See note 21, supra.

. . . future professional career."  Response at 8.  Then, at the hearing, Caldwell contended again

without citation to caselaw that his situation "is similar to a medical student whose career cut short

[and] his education is cut short, because they are suspended on Title 9 [meaning] they can't

complete medical school.  His ability to play basketball and this year of eligibility deprives him of

that interest as well."  Tr. at 26:7-12 (Fox-Young).  The Honorable Stephen Murray Orlofsky,

United States District Judge for the District of New Jersey, explained why a student-athlete's

interest in a future professional athletic career as a football player is too speculative to create a

constitutionally protected interest:

> I agree that damages for the loss of a potential future professional athletic
> career are speculative because the possibility that such damages would ever occur
> is too conjectural for determination.  Many contingencies must occur before [the
> student-athlete] could enjoy a professional athletic career.  Those contingencies
> include, but are not limited to, whether [the student-athlete] would escape injury,
> whether [the student-athlete] would excel at college football and whether any
> professional team would show an interest in [the student-athlete].  In short, the road
> to a professional football career is long and circuitous, and [the student-athlete] has
> not gone down that road far enough to submit such a fanciful damage claim to a
> fact finder.

Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F. Supp. 2d 494, 509-10 (D.N.J. 2000)(Orlofsky,

J.), opinion amended on reargument, 130 F. Supp. 2d 610 (D.N.J. 2001).  The Court agrees with

Judge Orlofsky that there are many contingencies that must occur for a collegiate athlete to become

a professional athlete, and Caldwell makes no factual allegations as to his prospects of obtaining

a professional contract.  See Response at 1-10; Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F.

Supp. 2d at 509-10.  The view that no constitutionally protected interest in a professional sport

arises out of participation in scholastic sports is the consensus among courts, including the Tenth

Circuit.  See, e.g., Butler v. Nat'l Collegiate Athletic Ass'on, No. CIVA 06-2319 KHV, 2006 WL

2398683, at *4; Mattison v. E. Stroudsburg Univ., No. 3:12-CV-2557, 2013 WL 1563656, at *5

(M.D. Pa. Apr. 12, 2013)(Mariani, J.)(stating that "nor is there a 'guarantee' that Plaintiff will be

a professional baseball player[;] . . . predictions concerning possible harm to the future career of a college athlete do not rise to the level of concrete constitutional injury necessary to form the basis for a preliminary injunction"); Knapp v. Northwestern Univ., No. 95 C 6454, 1996 WL 495559, at *2 (N.D. Ill. August 28, 1996)(Zagel, J.)(describing that "the possibility of obtaining [a] professional basketball career is too speculative" to establish an economic interest that the court could act to protect); Hawkins v. Nat'l Collegiate Athletic Ass'n, 652 F. Supp. 602, 610-11 (D. Ill. 1987)(Nihm, J.)(concluding that the Constitution does not protect the right to secure a professional career in athletics); Haverkamp v. Unified Sch. Dist. No. 380, 689 F. Supp. 1055, 1058 (D. Kan. 1986)(Saffels, J.)("Any potential opportunities for the future derived from participation in interscholastic athletics amounts only to mere expectations and are insufficient for the creation of a constitutionally-protected property interest."); Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 368 (D. Ariz. 1983)(Kelleher, J.)("flatly reject[ing] . . . the plaintiffs' interests in participating in post-season competition or on television[; because they] are not constitutionally protected, plaintiffs were not entitled to procedural due process safeguards prior to or upon imposition of the sanctions"); Colo. Seminary v. Nat'l Collegiate Athletic Ass'n, 417 F. Supp. 885, 895-96 (D. Colo. 1976)(Arraj, J.)(concluding that "the interest in future professional careers must nevertheless be considered speculative and not of constitutional dimensions"). Cf. Colorado Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, 570 F.2d at 321 (concluding that "the interest of the student athletes in participating in intercollegiate sports [is] not constitutionally protected"). The Court sees no reason to depart from the prevailing view, where Caldwell cites no case law and points to no factual allegations showing that his prospects in a future professional basketball career are more than fancy.

## II.     UNM'S PROCEDURES COMPORTED WITH PROCEDURAL DUE PROCESS WHEN UNM BANNED CALDWELL FROM CAMPUS.

"The fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner." Turney v. FDIC, 18 F.3d 865, 868 (10th Cir. 1994). See Goldberg v. Kelly, 397 U.S. at 267. Caldwell alleges that, within twenty-five days of Nuñez banning him,[24] he had not received: (i) "[a] written complaint from any office of the University detailing the allegations against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (iii) "[a]ny information as to the identities and statements of adverse witnesses"; (iv) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights"; and (v) he "has had no opportunity to appeal any . . . findings, as there are none to appeal." First Amended Complaint ¶¶ 22-23, 45, 50, at 5, 7-8. The Court analyzes three factors to determine whether Nuñez provided Caldwell with adequate procedures under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335. See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240; Lee I, 449 F. Supp. 3d at 1124-35. The Supreme Court has counseled that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v.

---

[24]Caldwell filed the First Amended Complaint on January 13, 2020, and Caldwell alleges that on December 19, 2019 -- twenty-five days earlier -- (i) he had a meeting with Nuñez, where Nuñez "informed Plaintiff he was banned from campus," First Amended Complaint ¶ 23, at 5, and (ii) the Dean of Students emailed him, stating that "Plaintiff was 'hereby interim banned from all of UNM Campus . . . ,'" First Amended Complaint ¶ 21, at 4. See First Amended Complaint ¶¶ 11-51, at 3-8.

Brewer, 408 U.S. 471, 481 (1972).  Although neither party briefed the due process contours as

they relate to Caldwell's alleged facts,[25] applying Mathew v. Eldridge's balancing test, the Court

concludes that Caldwell's First Amended Complaint does not state a claim that UNM's hearing

procedures do not comply with procedural due process, because although the campus ban

constitutes more than a de minimis taking of Caldwell's interest in his continued education, none

of UNM's hearing procedures placed Caldwell at an unacceptable risk of erroneous deprivation

and UNM has an interest in maintaining a safe campus and conserving academic resources.  See

Mathews v. Eldridge, 424 U.S. at 335.

### A.   THE CAMPUS BAN IS MORE THAN A DE MINIMIS TAKING OF CALDWELL'S INTEREST IN HIS CONTINUED EDUCATION.

As the Court has already concluded, Caldwell has an interest in his continued education,

and a campus ban interferes with that interest.  See Analysis § I, supra.   A campus ban does not

revoke Caldwell's student status, however, it only limits his access to campus property and school

activities, see Student Code of Conduct § 4.2.4; First Amended Complaint ¶ 66, at 10; and

Caldwell does not allege that he faces expulsion for the alleged off-campus assault; he will face

expulsion only if he fails to comply with the campus ban, see First Amended Complaint ¶ 21, at

4.  Further, the campus ban included the holiday break, which ended on January 2, 2020, during

which Caldwell could not take any classes.  See First Amended Complaint ¶ 31, at 6.  Nevertheless,

Caldwell alleges that the "Plaintiff will be unable to attend in person classes other than the one

---

[25]The Motion focuses on the causation prong of § 1983 liability and qualified immunity, and does not address whether Caldwell's allegations are procedurally adequate under the Due Process Clause.  See Motion at 1-9.  Neither the Response nor the Reply delves into the issue.  See Response at 1-10; Reply at 1-4.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  Although neither party addressed the first prong, the Court will address both prongs in sequential order.

course he registered in advance of the school's ban" and that the ban "will altogether prevent Plaintiff from completing his coursework."  First Amended Complaint ¶¶ 43-44, at 7.  Because the campus ban limits the manner in which Caldwell can engage in his education without depriving him of it entirely -- Caldwell can still take some classes: online classes and the in-person class he already registered for -- Caldwell's interest is not necessarily "exceptionally robust," Siblerud v. Colorado State Bd. of Agric., 896 F. Supp. 1506, 1516 (D. Colo. 1995)(Kane, J.)("[The student] faced expulsion; therefore, his private interest was exceptionally robust."), or "high," Lee I, 449 F. Supp. 3d at 1124.  Although Caldwell's interest is not exceptionally robust or high, it is more than de minimis, because a multi-week campus ban interferes more with the educational process than, for instance, a temporary "timeout," Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1257 (10th Cir. 2008)(concluding that a timeout is a de minimis taking), or an "one-day in-school suspension," Laney v. Farley, 501 F.3d 577, 583 (6th Cir. 2007)(concluding that a "one-day in-school suspension does not implicate a property interest in public education").  See Hassan v. Lubbock Independent School Dist., 55 F.3d 1075, 1080-81 (5th Cir. 1995)("De minimis or trivial deprivations of liberty in the course of the disciplining of a student do not implicate procedural due process requirements.").  The Tenth Circuit explained that a timeout is de minimis:

> Timeouts, unlike suspensions or expulsions, are intended to settle down a child while keeping him within close proximity to the classroom; this way, he can resume his education as soon as he has calmed.  This method balances the need for punishment and discipline with the important goal of preserving access to public education.  While the child is temporarily removed from the classroom, any loss of a property right is de minimis and not subject to procedural protections.

Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d at 1257.  See Dickens v. Johnson County Bd. of Educ., 661 F. Supp. 155 (E.D. Tenn. 1987)(Hull, C.J.)(distinguishing Goss v. Lopez, and concluding that a "temporary isolation in 'timeout' was a *de minimis* interference with his property and liberty interests")(emphasis in the original).  Here, the campus ban is more serious

than a timeout, because Caldwell alleges that "Nuñez . . . informed Plaintiff that he was banned from campus indefinitely," First Amended Complaint ¶ 23, at 5; but see First Amended Complaint ¶¶ 10-11, 20, 39, 40, at 3, 4, 7 (repeatedly describing the campus ban as "interim"),[26] and there is no provision that the campus ban will expire if Caldwell changes his behavior or "calm[s]" down as in Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d at 1257.  Likewise, Caldwell's campus ban is also unlike a one-day in-school suspension, because although Caldwell can take on-line classes, the ban has lasted for at least twenty-five days and he cannot participate in regular school activities.  See Laney v. Farley, 501 F.3d at 581-83.  The United States Court of Appeals for the Sixth Circuit reasoned: "An in-school suspension could, but does not necessarily, deprive a student of educational opportunities in the same way an out-of-school suspension would," but a "one-day in-school suspension does not implicate a property interest in public education," because "[u]nlike students in out-of-school suspensions, students under in-school suspensions [a]re not denied all educational opportunities, even though they are removed from their classrooms."  Laney v. Farley, 501 F.3d at 581-83.   See Fenton v. Stear, 423 F. Supp. 767, 771-772 (W.D. Pa. 1976)(Marsh, J.)(concluding that a multi-day in-school suspension "is de minim[i]s" where the "Plaintiff was not deprived of any in-school education" and only missed a "one day sight-seeing trip").  Here, although the campus ban does not amount to a "total exclusion from the educational process" as the ten-day out-of-school suspension did in Goss v. Lopez, 419 U.S. at 576, the campus ban still interferes with his "educational process," id. at 576, which the Tenth Circuit explained

> is a broad and comprehensive concept with a variable and indefinite meaning. [The educational process] is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an

---

[26]Even if the campus is not indefinite, it has lasted twenty-five days as of the filing of the First Amended Complaint, much longer than a one- or two-day suspension.  See First Amended Complaint ¶¶ 19-21, at 4.

> atmosphere of intellectual and moral advancement.   We do not read <u>Goss</u> to establish a property interest subject to constitutional protection in each of these separate components.

<u>Albach v. Odle</u>, 531 F.2d at 985.   Caldwell's campus ban interferes with the entirety of the educational process, and not just a single component, because Caldwell can attend only one in-person class,[27] and cannot participate in school athletics, school clubs, or social groups.   See First Amended Complaint ¶ 21, at 4; <u>Albach v. Odle</u>, 531 F.2d at 985; <u>Seamons v. Snow</u>, 84 F.3d at 1235 (concluding that where a student is denied one of the "innumerable separate components of the educational process, such as participation in athletics and membership in school clubs," that student has not been denied "a property interest subject to constitutional protection").   Because the campus ban is more than de minimis, Caldwell is entitled to some degree of due process.

### B.   NONE OF UNM'S HEARING PROCEDURES PLACED CALDWELL AT RISK OF ERRONEOUS DEPRIVATION.

Even if Caldwell's allegations are true, none of UNM's hearing procedures placed Caldwell at an unacceptable risk of erroneous deprivation.   See <u>Mathews v. Eldridge</u>, 424 U.S. at 334-35; <u>Goss v. Lopez</u>, 419 U.S. at 579-80.   Caldwell argues that Nuñez and other UNM administrators did not give him sufficient notice of the charges against him, because he "has had

---

[27]Although online learning is the new reality during the COVID-19 pandemic, the Court recently has concluded that, where

> some students have been deprived of all in-person learning for an indefinite period of time, . . . this deprivation amounts to more than a de minimis taking, because in-person learning is an integral part of the educational process enshrined in <u>Goss</u>.   See <u>Goss</u>, 419 U.S. at 576. . . .   Although students deprived of in-person education is not a "total exclusion from the educational process," <u>Goss</u>, 419 U.S. at 576, as they still have access to online learning, the lack of in-person education still goes to the heart of educational process by "provid[ing] an atmosphere of intellectual and moral advancement," <u>Albach v. Odle</u>, 531 F.2d at 985.

<u>Hernandez v. Lujan</u>, No. CIV 20-0942 JB\GBW, 2020 WL 7481741, at *51 (D.N.M. Dec. 18, 2020)(Browning, J.).

not had the benefit of": (i) "[a] written complaint from any office of the University detailing the allegations against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (iii) "[a]ny information as to the identities and statements of adverse witnesses." First Amended Complaint ¶ 45, at 7.  For students facing short term suspension, "due process requires . . . that the student be given oral or written notice of the charges against him."  Goss v. Lopez, 419 U.S. at 581.  See Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001)("[A] student may be provided with either oral or written notice of the charges against him.")(citing Goss v. Lopez, 419 U.S. at 581).   "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."  Goss v. Lopez, 419 U.S. at 584.  "[T]he timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved."  Goss v. Lopez, 419 U.S. at 579.   Although Caldwell was not suspended, he alleges that the campus ban was "indefinite[]," First Amended Complaint ¶ 23, at 5, but see First Amended Complaint ¶¶ 10-11, 20, 39, 40, at 3-4, 7 (repeatably describing the campus ban as "interim");[28] the Court concludes, based on the alleged length of the campus ban, that Caldwell is entitled to the notice requirements that Goss v. Lopez, 419 U.S. at 579, establishes.  Here, Caldwell had constructive notice, oral notice, and written notice: Caldwell alleges: (i) "[o]n or about December 16, 2019, the Albuquerque Police Department took a report of allegations of battery against Plaintiff"; (ii) on December 19, 2020, the Dean of Student's Office emailed him, "banning him from the University campus," and "stat[ing] that allegations recently made against Plaintiff were being considered"; (iii) on the evening of December 19, 2020, Caldwell "was called to a meeting chaired by Defendant

---

[28]Even if the campus is not indefinite, it has lasted twenty-five days as of the filing of the First Amended Complaint, much longer than a few day suspension.  See First Amended Complaint ¶¶ 19-21, at 4.

Nuñez and involving several other individuals from the athletic department and from UNM administration"; (iv) Nuñez "informed Plaintiff that he was banned from campus indefinitely"; and (v) "[n]obody at this meeting informed Plaintiff of the specific allegations against him." First Amended Complaint ¶¶ 17, 19-20, 22-24, at 3-5. Although Caldwell alleges that Nuñez did not tell him "the specific allegations against him," First Amended Complaint ¶ 24, at 5, by his own admission, Caldwell knew of the subject of the allegations against him, namely that the police had received a report that Caldwell had committed battery and that the DOS was investigating these allegations. See First Amended Complaint ¶¶ 17, 20, at 3-4. In an analogous situation, where the student "already knew the allegations he faced" -- that he had assaulted his roommate -- the Tenth Circuit concluded that the student

> would have received little or no additional benefit from a written notice that specified the charges against him. While the burden of requiring schools to provide written notice specifying charges is slight, in this case, requiring such notice in addition to oral and constructive notice was not necessary to ensure a fair proceeding.

Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1241 (10th Cir. 2001). Here, as in Watson ex rel. Watson v. Beckel, Caldwell knew the allegations that he faced; moreover, Caldwell received both written and oral notice on the day that the campus ban was imposed. See First Amended Complaint ¶¶ 17, 19-20, 22-24, at 3-5; Goss v. Lopez, 419 U.S. at 582 ("In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred."). "In order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure." Watson ex rel. Watson v. Beckel, 242 F.3d at 1242. Caldwell does not allege any procedural detriment because of lack of notice; to the contrary, he was able to obtain counsel to assist him at a meeting with administrators on January 10, 2020. See First Amended Complaint ¶ 40, at 7. Caldwell argues that the notice should have "detail[ed] the allegations against him"; due process does not, however, require such specificity,

because Caldwell "already knew the allegations he faced, he would have received little or no

additional benefit from a written notice that specified the charges against him."  Watson ex rel.

Watson v. Beckel, 242 F.3d at 1241 (concluding also that due process does not require that "notice

. . . include all suspected motives for a student's actions[;] [s]uch extensive notice is not even due

in a criminal trial")(footnotes omitted)(citing Mathews v. Eldridge, 424 U.S. at 348).  The Tenth

Circuit has explained:

> The notice given to [the student] satisfied [the due process] requirement because it
> allowed [the student] to prepare for the hearing and defend against the charges. . . .
> While the burden of requiring schools to provide written notice specifying charges
> is slight, in this case, requiring such notice in addition to oral and constructive
> notice was not necessary to ensure a fair proceeding

Watson ex rel. Watson v. Beckel, 242 F.3d at 1241. The Court concludes that Caldwell received

sufficient notice of the allegations against him.  See Goss v. Lopez, 419 U.S. at 581.

Next, because the campus ban was imposed before any hearings or meetings were held, the

issue is not the adequacy of the hearing, but rather when Caldwell is entitled to "some kind of

hearing."  Goss v. Lopez, 419 U.S. at 579.  See First Amended Complaint ¶¶ 19-23, at 4-5 (alleging

that Caldwell received notice of the campus ban, on December 19, 2019, and had a meeting with

Nuñez and other UNM administrators later that evening).  In situations where there is a threat to

safety,

> prior notice and hearing cannot be insisted upon.  Students whose presence poses a
> continuing danger to persons or property or an ongoing threat of disrupting the
> academic process may be immediately removed from school.  In such cases, the
> necessary notice and rudimentary hearing should follow as soon as practicable.

Goss v. Lopez, 419 U.S. at 582-83. The Court concludes that Caldwell was not entitled to notice

or to a hearing before the campus ban was imposed, because Caldwell's campus ban was premised

on allegations that he had committed battery.  See Goss v. Lopez, 419 U.S. at 582-83.  Although

Caldwell alleges that the "Plaintiff's accuser is not a UNM student, and, upon information and

belief, not even a resident of New Mexico," First Amended Complaint ¶ 18, at 3, the Court concludes that UNM can ban a student from campus property based on allegations of battery before it holds a hearing, because the student's interest in "unfair or mistaken exclusion from the educational process" must be balanced against the school's interest in "discipline and order," Goss v. Lopez, 419 U.S. at 579. Even though UNM's actions are based only on allegations of battery, at such an early stage, UNM's interest in other students' safety outweighs the necessity of a hearing before the "interim" campus ban was imposed, First Amended Complaint ¶ 21, at 4, as long as UNM provides Caldwell with "some kind of hearing," post hoc, that allows him to be heard and challenge the ban, Goss v. Lopez, 419 U.S. at 579; Butler v. Rio Rancho Pub. Sch. Bd., 341 F.3d 1197, 1201 (10th Cir. 2003)(concluding that "[t]here is no doubt the School has a legitimate interest in providing a safe environment for students and staff"); West v. Derby Unified Sch. Dist., 206 F.3d 1358, 1364 (10th Cir. 2000)(concluding that "'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures'")(quoting New Jersey v. T. L. O., 469 U.S. 325, 340 (1985))

Last, Caldwell alleges that he has not, as of filing his First Amended Complaint twenty-five days after the ban was imposed, received an adequate hearing or the opportunity to appeal such a hearing. See First Amended Complaint ¶ 25, at 7-8. According to Goss v. Lopez, if a student "denies . . . [the] charges against him," the student should be afforded an "rudimentary hearing" with "an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss v, Lopez, 419 U.S. at 579, 581-82 ("[S]tudents facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."). "[T]he nature of the hearing will depend on appropriate accommodation of the competing interests involved." Goss v, Lopez, 419 U.S. at 579. The

students' interest in "unfair or mistaken exclusion from the educational process" must be balanced against the school's interest in "discipline and order." Goss v. Lopez, 419 U.S. at 579. "[T]he risk of error should be guarded against if that may be done without prohibitive costs or interference with the educational process." Goss v. Lopez, 419 U.S. at 580. Even for a student facing expulsion -- a much more serious deprivation than a campus ban -- due process does not entitle the student always to the right to counsel at a hearing, to personally or have counsel cross-examine witnesses at a hearing, to have a transcript of the hearing, or to have investigating officials excluded from the deliberation process. See Watson ex rel. Watson v. Beckel, 242 F.3d at 1243 (stating that "precedent [does not] indicate that due process does not require all of these rights"); Lee II, 2020 WL 6743295, at *40 (concluding that "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings")(citing cases); Lee I, 449 F. Supp. 3d at 1126-27 (concluding, in the context of sexual assault allegations, that "in light of [the student's] substantial interest and UNM's weaker interests, not permitting any cross-examination violates Due Process").[29] "In the great majority of cases the disciplinarian may

---

[29]Due process is situation dependent: for instance, in the context of a student facing expulsion because of allegations of sexual assault, where credibility is crucial, the Court has stated:

> The Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," Davis v. Alaska, 415 U.S. 308, 316, (1974), and called it the "'greatest legal engine ever invented for the discovery of truth,'" California v. Green, 399 U.S. 149, 158 (1970)(quoting 5 Wigmore, Evidence § 1367 (3d ed. 1940)). In the context of student disciplinary proceedings, "courts appear to recognize that denial of *any* opportunity to challenge the credibility of adverse witnesses may deprive an accused university student of due process if the witness's credibility is in issue and the witness is testifying on facts critical to the case." Marie Reilly, Due Process in Public University Discipline Cases, 120 Penn. St. L. Rev. 1001, 1014 (2016)(emphasis in original). See Haidak v. Univ. Mass.-Amherst, 933 F.3d 56, 59 (1st Cir. 2019)("[W]e agree with a position taken by the Foundation for Individual Rights in Education, as amicus in support of the appellant -- that due process in the university disciplinary setting requires 'some opportunity for real-

informally discuss the alleged misconduct with the student minutes after it has occurred." Goss v. Lopez, 419 U.S. at 582.

The Court concludes that UNM afforded Caldwell "some kind of hearing." Goss v. Lopez, 419 U.S. at 584. Although Caldwell alleges that he has not had the benefit of (i) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (ii) "[a]ny information as to the identities and statements of adverse witnesses"; (iii) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights," or (iv) or an opportunity to appeal the hearing or its findings, First Amended Complaint ¶¶ 45, 48, at 7-8, Caldwell has had four meetings with UNM

----

time cross-examination, even if only through a hearing panel.[29]'""); Doe v. Baum, 903 F.3d 575 (6th Cir. 2018)("Due process requires cross-examination in circumstances like these . . . ."); Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972)("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 604-05 (D. Mass. 2016)(Saylor, J.). Credibility is an issue here; Lee alleges that he has continued to deny the Complainant's accusations. See Complaint ¶ 74, at 13. Lee's opportunity to point out flaws in the Complainant's statement is not sufficient. See Doe v. Baum, 903 F.3d at 582 ("Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives. Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.").

. . . .

In light of [the student's] substantial interest and UNM's weaker interests, not permitting any cross-examination violates Due Process. See Doe v. Purdue Univ., 928 F.3d at 664 ("[I]t is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness -- in fact, that she was credible at all -- without ever speaking to her in person."); Doe v. Baum, 903 F.3d at 583 (holding that, for sexual misconduct disciplinary proceedings, Due Process requires the university to have "some form of *live* questioning *in front of* the fact-finder" (emphasis in original)).

Lee I, 449 F. Supp. 3d at 1126-27.

administrators regarding the campus ban, see First Amended Complaint ¶¶ 22-23, 29, 30, 40, at 5, 7.  Caldwell admits that he had (i) a meeting with Nuñez on December 19, 2020, where Nuñez "informed Plaintiff that he was banned from campus indefinitely"; (ii) a "brief conference with staff at the Office of Equal Opportunity on or about December 20, 2019," where Caldwell "denied the charges against him"; (iii) a "brief meeting with [Torrez] during which she reiterated that he was suspended and that she would make the decision whether or not to continue his indefinite suspension at some unknown later date," and "Torrez informed Plaintiff that the campus ban would remain in place with no opportunity for redress or appeal over the holiday break, which continues until January 2, 2020"; and (iv) on January 10, 2020, Caldwell and his "counsel attended a meeting with Defendant Torrez at which time Defendant Torrez refused to provide any basis whatsoever for the interim ban" and when Caldwell requested the campus ban be lifted, Torrez "responded that she would consider this request but could not say how long it would take her to decide whether or not to lift the ban or portions thereof."  First Amended Complaint ¶¶ 22-23, 29, 30, 40-42 at 5, 7.  The Court concludes that four meetings and conferences with UNM administrators, including employees from the DOS and the OEO, within twenty-five days after the ban was imposed satisfies Goss v. Lopez's "rudimentary hearing" requirement, where Caldwell was able to deny the charges against him, request that the ban be lifted, and have counsel present for one meeting, and receive several emails from the DOS outlining the parameters of the campus ban and informing him which administrators to contact.  Goss v. Lopez, 419 U.S. at 581.  See First Amended Complaint ¶¶ 22-23, 29, 30, 35, 40-42, at 5-7; Lee II, 2020 WL 6743295, at *40 (concluding that "UNM satisfied its obligations under the Due Process Clause to provide [the student] with an opportunity to be heard," because, "[a]ll told, the record indicates that [the student] had at least four meetings with persons from UNM's Title IX Office, the OEO, and the DOS")(citing Goss v. Lopez, 419 U.S. at

579-80).   See also Keough v. Tate Cty. Bd. of Educ., 748 F.2d 1077, 1080 (5th Cir.

1984)(concluding that an "informal give-and-take . . . allows the student an opportunity to state

his case as he sees it").   Furthermore, all of these meetings, conferences, and emails took place

before the spring semester was set to begin, see First Amended Complaint ¶ 43, at 7 (alleging that

the "spring semester begins January 21, 2020"); therefore, if the ban is lifted before the semester

begins, Caldwell would still be able to register for in-person classes, and Caldwell will not have

suffered "substantial prejudice from the allegedly inadequate procedure," Watson ex rel. Watson

v. Beckel, 242 F.3d at 1242 ("In order to establish a denial of due process, a student must show

substantial prejudice from the allegedly inadequate procedure.").   Accordingly, the Court

concludes that none of UNM's hearing procedures place Caldwell at an unacceptable risk of

erroneous deprivation.   See Mathews v. Eldridge, 424 U.S. at 334-35; Goss v. Lopez, 419 U.S. at

579-80.[30]

---

[30]Although the Court concludes that Caldwell received "some kind of hearing" in accordance with due process, Goss v. Lopez, 419 U.S. at 579, the Court emphasizes that "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor," Bracy v. Gramley, 520 U.S. 899, 904 (1997), and UNM may need to provide prompt process to students banned from campus in other circumstances, because a campus ban interferes with the student's right to the educational process.   Based on Caldwell's allegations of UNM's disciplinary procedures there is an issue whether UNM followed its own procedures, because the procedures described in the First Amended Complaint, in the Student Code of Conduct, and in the Student Handbook, are not clear as to the timing of the process required for a student saddled with an interim campus ban.   See First Amended Complaint ¶¶ 64-81, at 10-13; Student Code of Conduct §§ 1-5; UNM Student Handbook at 1-23.   To the extent Caldwell alleges that UNM failed to comply with its own procedures, however, "even in the disciplinary context, a school's failure to comply with its own rules 'does not, in itself, constitute a violation of the Fourteenth Amendment.'"   Brown v. University of Kansas, 599 Fed. Appx. 833, 838 (10th Cir. 2015)(quoting Hill v. Trs. of Ind. Univ., 537 F.2d 248, 252 (7th Cir. 1976)).   Cf. White v. Salisbury Tp. Sch. Dist., 588 F. Supp. 608, 614 (E.D. Pa. 1984)(Troutman, J.)("[W]here a state has issued regulations requiring school districts to promulgate and publish specific procedural rules and safeguards governing suspensions, a failure to comply with those regulations would violate state law only and would not rise to the level of a constitutional violation.")(emphasis in original).   "The Due Process Clause . . . does not require the University to follow any specific set of detailed procedures as long as the procedures the University actually follows are basically fair ones . . . ."   Newman v. Burgin,

C.  **UNM HAS A LEGITIMATE INTEREST IN MAINTAINING A SAFE LEARNING ENVIRONMENT AND PRESERVING ITS LIMITED ADMINISTRATIVE RESOURCES.**

Applying the third <u>Mathews v. Eldridge</u> factor, the Court concludes that UNM "has a strong interest in the 'educational process,' including maintaining a safe learning environment for all of its students, while preserving its limited administrative resources." <u>Plummer v. Univ. of Houston</u>, 860 F.3d 767, 773 (5th Cir. 2017), <u>as revised</u> (June 26, 2017)(citing <u>Goss v. Lopez</u>, 419 U.S. at 583). <u>See</u> <u>Gorman v. Univ. of R.I.</u>, 837 F.2d 7, 14-15 (1st Cir. 1988)("Although the protection of such a vital interest would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education."). The Tenth Circuit has stated that "[t]here is no doubt the School has a legitimate interest in providing a safe environment for students and staff," <u>Butler v. Rio Rancho Pub. Sch. Bd.</u>, 341 F.3d at 1201, and "'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures . . . ,'" <u>West v. Derby Unified Sch. Dist.</u>, 206 F.3d at 1364 (quoting <u>New Jersey v. T. L. O.</u>, 469 U.S. 325, 340 (1985)). <u>See</u> <u>Goss v. Lopez</u>, 419 U.S. at 580 (noting that in schools, "[e]vents calling for discipline are frequent occurrences and sometimes require immediate, effective action."). Further, "[a] school is an academic institution, not a courtroom or administrative hearing room." <u>Bd. of Curators of Univ. of Mo. v. Horowitz</u>, 435 U.S. 78, 88 (1978). Therefore, "further formalizing the [disciplinary] process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." <u>Goss v. Lopez</u>, 419 U.S. at 580. <u>See</u>  <u>Goss v. Lopez</u>, 419 U.S. at 583 (concluding that the administrative burden of affording

---

930 F.2d 955, 960 (1st Cir. 1991). What matters is whether "the procedures afforded to [the student] were fair as a matter of law." <u>Brown v. University of Kansas</u>, 599 Fed. Appx. at 838.

students maximum process in all circumstances prevented it from holding that "hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."); Gorman v. Univ. of R.I., 837 F.2d at 15 ("[I]t is no exaggeration to state that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive."); Lee II, 2020 WL 6743295, at *36; Marie T. Reilly, Due Process in Public University Discipline Cases, 120 Penn. St. L. Rev. 1001, 1025 (stating that increasing "procedural safeguards" in university disciplinary proceedings "will impose significant costs on universities")(citing Osteen v. Henley, 13 F.3d 221 (7th Cir. 1993)(Posner, J.)).[31]  Requiring UNM to impose heightened

---

[31]In the context of requiring schools to allow students to cross-examine witness, the Sixth Circuit reasoned:

> School boards and administrators are charged with a variety of responsibilities critical to the effective operation of our public schools. These responsibilities include, not only meting out disciplinary punishment for student infractions of school rules, but also hiring and firing teachers and other school personnel, planning curricula, meeting the dietary and health needs of the student population, assisting in college and vocational placement, supplying and maintaining the school buildings, providing challenging and rewarding extra-curricular activities, and doing all the above often within the framework of an increasingly tighter budget.  School boards and administrations are not quasi-judicial in the sense that, for example, state officials who determine the continued entitlements of individuals to welfare benefits are.  To saddle them with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform.  The detriment that will accrue to the educational process in general by diverting school board members' and school administrators' attention from their primary responsibilities in overseeing the educational process to learning and applying the common law rules of evidence simply outweighs the marginal benefit that will accrue to the fact-finding process by allowing cross-examination.

Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 925-26 (6th Cir. 1988)

procedural safeguards in student disciplinary proceedings, therefore, could hamper UNM's efforts to protect its students' safety and drain its limited administrative resources.  See Butler v. Rio Rancho Pub. Sch. Bd., 341 F.3d at 1201; Plummer v. Univ. of Houston, 860 F.3d at 773.

The Court concludes that, under the three Mathews v. Eldridge factors, even though the campus ban interferes with Caldwell's interest in his continued education, Caldwell is not at an unacceptable risk of erroneous deprivation and that UNM has a strong interest in the safety of its students.  See Mathews v. Eldridge, 424 U.S. at 334-35.  Accordingly, the Court concludes that UNM has satisfied its obligations under the Due Process Clause to afford Caldwell notice and an opportunity to be heard.  See Mathews v. Eldridge, 424 U.S. at 334-35; Goss v. Lopez, 419 U.S. at 579-80.

## III. CALDWELL CANNOT SUCCESSFULLY SUE NUÑEZ FOR DAMAGES UNDER § 1983, BECAUSE CALDWELL'S PROCEDURAL DUE PROCESS RIGHTS WERE NOT CLEARLY ESTABLISHED.

Even if Caldwell had stated a claim for relief under the Due Process Clause, Caldwell cannot successfully sue Nuñez for damages under § 1983; Nuñez is entitled to qualified immunity, because Caldwell's Due Process rights were not clearly established at the time they were violated. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d at 1107.  See also Lee v. Univ. of New Mexico, 449 F. Supp. 3d at 1135; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.  Qualified immunity shields officers who have "reasonable, but mistaken beliefs" and operates to protect them from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.  The Court already has concluded that Caldwell has stated a plausible claim that the Defendants violated his constitutional rights by depriving him of his right to continued education without Due Process.  See Analysis § II, supra. The next question is then

whether Caldwell's constitutional right to Due Process was clearly established.  See Riggins v.
Goodman, 572 F.3d at 1107.  Qualified immunity protects government officials from personal
liability so long as they have not violated a "clearly established" right.  Harlow v. Fitzgerald, 457
U.S. at 18.  The Court now concludes, however, that Caldwell's constitutional rights were not
clearly established at the time.

Proving that the law was clearly established is a high burden for a plaintiff.  See Ashcroft
v. al-Kidd, 563 U.S. at 741 ("A Government official's conduct violates clearly established law
when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every
reasonable official would have understood that what he is doing violates that right.").  "Ordinarily,
in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit
decision on point, or the clearly established weight of authority from other courts must have found
the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  There are no Supreme
Court or Tenth Circuit opinions clearly establishing the appropriate level of procedural safeguards
for students accused of off-campus assault.

The Supreme Court has addressed, however, the adequacy of due process afforded students
in disciplinary proceedings in Goss v. Lopez, where students were suspended from various public
high schools without hearings and argued that this procedure violated due process.  See Goss v.
Lopez, 419 U.S. at 567.   The Supreme Court agreed with the students, concluding that "due
process requires, in connection with a suspension of 10 days or less, that the student be given oral
or written notice of the charges against him and, if he denies them, an explanation of the evidence
the authorities have and an opportunity to present his side of the story."  Goss v. Lopez, 419 U.S.
at 581.  The Supreme Court noted that "[t]here need be no delay between the time 'notice' is given
and the time of the hearing," and that, although there are exceptions, "as a general rule, notice and

hearing should precede removal of the student from school." Goss v. Lopez, 419 U.S. at 582. The Supreme Court also observed that the administrative burden of affording students maximum process in all circumstances prevented it from holding that "hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Goss v. Lopez, 419 U.S. at 583. Finally, the Supreme Court emphasized its holding's narrowness, stating that "we have addressed ourselves solely to the short suspension, not exceeding 10 days," and that longer suspensions "may require more formal procedures," while shorter suspensions may require less. Goss v. Lopez, 419 U.S. at 584.

The Supreme Court addressed a tangential issue in Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 87-89, in which it reviewed the procedural safeguards to which students facing academic dismissal are entitled. The Supreme Court distinguished disciplinary dismissals from academic dismissals, and noted that the Constitution "may call for hearings in connection with the former but not the latter." Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 87. See id. at 88-89. It observed that even Goss v. Lopez "stopped short of requiring a *formal* hearing" in a disciplinary setting, Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 89 (emphasis in original), and that whether to dismiss a student for academic reasons is not "readily adapted" to determination via hearing, Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 90. The Supreme Court also noted that Goss v. Lopez concludes that "the value of some form of hearing in a disciplinary context outweighs any harm to the academic environment." Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 90.

The Tenth Circuit has addressed the procedural safeguards to which students are entitled

on several occasions, most notably and thoroughly in Watson ex rel. Watson v. Beckel, 242 F.3d at 1238-39.  See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181-82; West v. Derby Unified Sch. Dist. No. 260, 206 F.3d at 1363-65; Edwards For and in Behalf of Edwards v. Rees, 883 F.2d at 885; Harris v. Blake, 798 F.2d 419, 422-24.  In Watson ex rel. Watson v. Beckel, the New Mexico Military Institute ("NMMI") expelled a student after NMMI's investigation revealed that the student had assaulted his roommate, in part because the roommate was Hispanic.  Watson ex rel. Watson v. Beckel, 242 F.3d at 1238-39.  The Tenth Circuit noted that, while the Supreme Court has not answered what additional processes long-term suspensions or expulsions require, it had given some guidance in Goss v. Lopez.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240.  The Tenth Circuit then held that the Mathews v. Eldridge balancing test "is appropriate for determining when additional procedure is due."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1240 (citing Mathews v. Eldridge, 424 U.S. at 334-35).  Applying this test, the Tenth Circuit concluded that NMMI's failure to provide written notice specifically listing the charges against the student did not violate due process.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240-41.  Even though the burden of providing greater notice was "slight," the Tenth Circuit stated that written notice was unnecessary where the student had already received oral and constructive notice.  Watson ex rel. Watson v. Beckel, 242 F.3d at 1241.  It further concluded that NMMI did not need to notify the student that it suspected that the assault was racially motivated, because it could not find "any precedent for the proposition that notice must include all suspected motives for a student's actions," and because the burden of providing such notice would be great. Watson ex rel. Watson v. Beckel, 242 F.3d at 1241-42.  Finally, the Tenth Circuit rejected the student's request that, for the "'proposed expulsion or long-term suspension of any student attending a state-supported educational institution,' the student must be afforded written notice

specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and independent review of the decision." Watson ex rel. Watson v. Beckel, 242 F.3d at 1242-43 (quoting the student's request).  The Tenth Circuit concluded that "precedent indicates that due process does not require all of these rights," and the student lacked standing to request them, "because he has not demonstrated that he will be subject to future disciplinary procedures."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1243 (citing Gorman v. Rhode Island, 837 F.2d at 16; Newsome v. Batavia Local Sch. Dist., 842 F.2d at 924).

Caldwell relies heavily on his arguments that he has a property interest in his continued education -- qualified immunity's first prong -- to support his contention that Nuñez violated his clearly established rights -- qualified immunity's second prong.  See Response at 8-10.  As a general matter, that Caldwell is entitled to due process before Nuñez can ban him from campus is clearly established, see Goss v. Lopez, 419 U.S. at 576; Albach v. Odle, 531 F.2d at 985; Harris v. Blake, 798 F.2d at 422, but "the clearly established law must be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640).  Caldwell cites only to Goss v. Lopez and an out-of-Circuit case, Doe v. Purdue University, 928 F.3d 652, 663 (7th Cir. 2019),[32] to support his contention that Nuñez violated his clearly established rights.  Caldwell's reliance on Doe v. Purdue University is of no help, because the United States Court of Appeals for the Seventh Circuit "affirm[ed] the dismissal of [the student's]

---

[32]Even if Doe v. Purdue Univ. were to speak to the specific issue of a campus ban, it alone would not be of much use, because to be clearly established, the case must typically come from the Tenth Circuit or the Supreme Court. See Currier v. Doran, 242 F.3d at 923 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

individual-capacity claims against" university officials, because they were entitled to qualified immunity.  Doe v. Purdue Univ., 928 F.3d at 666.  The Seventh Circuit explained that the university officials were entitled to qualified immunity, (i) because, in the Seventh Circuit, students do not "have a property interest in their public university education"; and (ii) "[b]ecause this is our first case addressing whether university discipline deprives a student of a liberty interest, the relevant legal rule was not 'clearly established,' and a reasonable university officer would not have known at the time of [the student's] proceeding that her actions violated the Fourteenth Amendment."  Doe v. Purdue Univ., 928 F.3d at 665-66 (emphasis in the original).  Furthermore, none of the cases that Caldwell cites deal with a campus ban imposed because of allegations of an off campus-assault, see Goss v. Lopez, 419 U.S. at 567-70 (temporary suspension of high school students for disruptive behavior); Doe v. Purdue Univ., 928 F.3d at 656-57 (suspension from university for sexual assault);  Gaspar v. Bruton, 513 F.2d 843, 845 (10th Cir. 1975)(dismissal from nursing program for academic deficiencies); Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1175 ("involuntary withdrawal" because of alleged gender discrimination); and the discussions in Albach v. Odle, 531 F.2d at 985, and Goss v. Lopez, 419 U.S. at 576, about the right to an "educational process" are highly generalized, and not particularized to the facts of Caldwell's campus ban.

Next, Caldwell argues that "it may be appropriate for the Court to stay consideration of its ruling on qualified immunity and allow for additional briefing after the parties have an opportunity to conduct discovery rather than rule on a motion where 'material facts are in dispute.'"  Response at 6. n.2 (citing Pearson v. Callahan, 555 U.S. 223, 238-39 (2009)(noting that, "at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify")).  The Federal Rules of Civil Procedure do not require a plaintiff to include all the factual details in a

complaint, see Fed. R. Civ. P. 8 (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); the implication is not, however, that courts should wait to address qualified immunity until a motion for summary judgment, but rather that district courts "should deny relief exclusively based on the second element" of qualified immunity analysis, Kerns v. Bader, 663 F.3d at 1180-81 (citing Pearson v. Callahan, 555 U.S. 238-39), because addressing the first element of qualified immunity "may depend on a kaleidoscope of facts not yet fully developed,'" Pearson v. Callahan, 555 U.S. at 239 (quoting Dirrane v. Brookline Police Dept., 315 F.3d 65, 69-70 (C.A.1 2002)).  Here, the Court has already concluded that under the first prong of qualified immunity, there was no constitutional violation, and even if Caldwell were allowed to conduct additional discovery or amend his First Amended Complaint, additional factual allegations as to Nuñez' involvement with the decision to ban Caldwell from the campus[33] would be of no aid, because even though Caldwell has plausibly alleged that Nuñez deprived Caldwell of his right to a continued education, Caldwell was provided with sufficient process and UNM has a legitimate interest in the safety of its students and preserving scarce administrative resources.  See Analysis §§ I-II, supra. The Court concludes, therefore, that it need not wait for additional briefing or discovery to rule on whether Nuñez

---

[33]Caldwell argues that "[t]o the extent that the Court finds Plaintiff's due process claim against Defendant Nuñez deficient, the proper remedy is amendment and not dismissal." Response at 9. However, in his Response, Caldwell does not explain what additional factual allegations he would add, and at the hearing, Caldwell stated that he would "amend the complaint to add" that Nuñez was "very involved in the suspension. . . . Nuñez had a far greater role we allege than the Court might expect an Athletic Director to have." Tr. at 23:7-16 (Fox-Young).  Such an amendment would be futile, see Foman v. Davis, 371 U.S. at 182 ("In the absence of . . . futility of amendment . . . the leave sought should, as the rules require, be 'freely given.'")(quoting Fed. R. Civ. P. 15(a)), because (i) the Court has already concluded that Caldwell has alleged sufficiently that Nuñez was involved in the decision to ban Caldwell from campus, see Analysis § I(A), supra; and (ii) Caldwell's rights were not clearly established -- what Caldwell needs is on point case law, not additional facts.

violated Caldwell's clearly established procedural due process right.

Here, the precise contours of Caldwell' procedural due process rights are not clearly established.  The Tenth Circuit has prescribed Mathews v. Eldridge's balancing test to determine whether procedural safeguards are constitutionally adequate.   See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240.  This mandate necessarily requires an intensely fact-specific analysis, which limits predictability and doctrinal development.   See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 987 (9th Cir. 1998)(O'Scannlain, J.)("Justice Brennan lamented the proliferation of so-called 'balancing tests' in constitutional jurisprudence, warning that the freewheeling multifactor inquiries would pave the road to 'doctrinally destructive nihilism.' Nowhere is Justice Brennan's observation more apropos than in the realm of qualified immunity, in which 'clearly established' law reigns supreme."); White v. Pauly, 137 S. Ct. at 552 ("reiterat[ing] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'")(quoting Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011)).  "[T]he interpretation and application of the Due Process Clause are intensely practical matters and . . . 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'"  Goss v. Lopez, 419 U.S. at 578 (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)).  Caldwell alleges that within twenty-five days of Nuñez banning him, he has not received: (i) "[a] written complaint from any office of the University detailing the allegations against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (iii) "[a]ny information as to the identities and statements of adverse witnesses"; (iv) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights"; and (v) he "has had no opportunity to appeal any . . . findings, as there are none to appeal." First Amended Complaint ¶¶ 22-23, 45, 50, at 5, 7-8.  The Court could not find any Supreme Court

or Tenth Circuit case law addressing the contours of procedural due process afforded a student

banned from a college or university campus after an alleged assault.  More broadly, the Tenth

Circuit's one case thoroughly discussing "the requirements of due process in cases of long-term

suspension or expulsion" because of an alleged on-campus assault, Watson ex rel. Watson v.

Beckel, 242 F.3d at 1240, is not sufficiently "particularized," Anderson v. Creighton, 483 U.S. at

640, to Caldwell's facts for the Court to conclude that Nuñez violated Caldwell's clearly

established rights.  That case rejects some of his alleged due process violations based on its own

unique facts, see Watson ex rel. Watson v. Beckel, 242 F.3d at 1241-42 (rejecting the student's

right to written notice of charges against him and to cross-examine witnesses), and does not address

the others.  The Court's recent decision on due process in the context of expulsion because of

allegations of sexual assault in Lee I, 449 F. Supp. 3d at 1122-34, is of no aid to Caldwell, because

Lee I also is not sufficiently "particularized," Anderson v. Creighton, 483 U.S. at 640, to

Caldwell's facts.  The Court concluded in Lee I, under the Mathews v. Eldridge balancing test,

that the student's allegations that

> UNM's investigator made a determination against him without ever holding
> a formal hearing, and that he was not allowed to learn the witnesses' identities,
> attend any witness interviews, acquire the interview recordings, question witnesses
> regarding factual assertions, or get an opportunity to cross-examine . . . [were
> sufficient to] state[] a claim that UNM's hearing procedures do not comply with
> Due Process,

Lee I, 449 F. Supp. 3d at 1124 (citing Mathews v. Eldridge, 424 U.S. at 335).  Here, in contrast,

the issue is an "interim" campus ban, First Amended Complaint ¶ 21, at 4, not an expulsion, and

in Lee I the administrative process took many months to unfold, see Lee I, 449 F. Supp. 3d at

1081-85, whereas here, the administrative process is incomplete only twenty-five days after

Caldwell had a meeting with Nuñez and the DOS emailed him, informing him he was banned.  See

First Amended Complaint at ¶¶ 11-51, 3-8 (filed January 13, 2020 and alleging Caldwell met with

Nuñez on December 19, 2019 and was emailed by the Dean of Students that same day).  Caldwell's

contention that the lack of process within twenty-five day violates due process implicates different

considerations under the Mathews v. Eldridge balancing test than the issues in Lee I, 449 F. Supp.

3d at 1124.  See Plummer v. Univ. of Houston, 860 F.3d 767, 777 (5th Cir. 2017), as revised (June

26, 2017)("Whether a state university has provided an individual student sufficient process is a

fact-intensive inquiry and the procedures required to satisfy due process will necessarily vary

depending on the particular circumstances of each case.").  Without clear precedent suggesting

that any of Caldwell's specific procedural due process rights were clearly established, qualified

immunity operates here to protect the individual defendants from the "hazy border[s]" in this area

of law.  Saucier v. Katz, 533 U.S. at 205.

## IV.   NUÑEZ' ACTIONS DO NOT SHOCK THE JUDICIAL CONSCIENCE, BECAUSE NUÑEZ' CONDUCT IS NEITHER EGREGIOUS NOR OUTRAGEOUS.

In the First Amended Complaint, Caldwell "mak[es] . . . substantive due process claims

under the Fourteenth Amendment to the United States Constitution," First Amended Complaint at

1,[34] but at the hearing Caldwell conceded that he was not bringing a substantive due process

claim.[35]  The Court will nonetheless address Caldwell's substantive due process claim and the

---

[34]Caldwell asserts that the Defendants, including Nuñez, violated Caldwell's

clearly established rights secured by the Fourteenth Amendment, including but not
limited to the right to procedural and substantive due process, by suspending
Plaintiff, banning him from campus and evicting him from his residence, without
making any findings whatsoever of wrongdoing on his part and without providing
him with a formal complaint or charging document, evidence against him, a live
hearing, or an opportunity to cross-examine witnesses against him.

First Amended Complaint ¶ 86, at 13

[35]At the hearing, Caldwell admitted that he is only "really raising a procedural due process
claim, so I'm not going to get into details of argument of substantive due process.  I concede that
this is really a procedural due process claim."  Tr. at 21:20-23 (Fox-Young).  The Court clarified:

Court concludes that Nuñez' actions -- allegedly banning Caldwell from campus property -- do not violate Caldwell's substantive due process rights, because a campus ban does not shock the Court's conscience.  See Rochin v. California, 342 U.S. 165, 172 (1952); Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.  "A substantive due process claim can take one of two forms.  One form may involve the violation of an individual's fundamental liberty interests, and the other form may arise from governmental conduct that shocks the conscience."  Milner v. Mares, No. CV 17-254 KG/LF, 2017 WL 5151311, at *5 (D.N.M. Nov. 3, 2017)(Browning, J.)(citing Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008)), aff'd, 754 F. App'x 777 (10th Cir. 2019).  See Chavez v. Martinez, 538 U.S. 760, 775 (2003).  "[T]he 'shocks the conscience' and 'fundamental liberty' tests are but two separate approaches to analyzing governmental action under the Fourteenth Amendment.  They are not mutually exclusive, however[,] [b]oth approaches may well be applied in any given case."  Seegmiller v. LaVerkin City, 528 F.3d 769.  For the first strand of substantive due process, only fundamental rights and liberties which are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty'" qualify for such protection.  Seegmiller v. LaVerkin City, 528 F.3d at 767 (quoting Chavez v. Martinez, 538 U.S. at 787).  A right that is "deeply rooted" and "implicit in the concept of ordered liberty" requires objective, substantive standards mandating particular outcomes, Castanon v. Cathey, 402 F. Supp. 3d at 1253, which is a requirement that the allegations in the Complaint do not meet.  Although, Caldwell has a property right in his continued education, see Goss v. Lopez, 419 U.S. at 581-82; Analysis § I(A), supra, education is not a fundamental right or liberty.  See Plyler, 457 U.S. 202, 223 (1982); San Antonio Indep. Sch. Dist. v. Rodriguez, 411

---

"So you're not bringing a substantive due process claim?"  Tr. at 25:8-9 (Court).  Caldwell responded: "No."  Tr. at 25:10 (Fox-Young).

U.S. 1, 35 (1973)(Powell, J.)("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is implicitly so protected."); Bivens By & Through Green v. Albuquerque Pub. Sch., 899 F. Supp. 556, 561 (D.N.M. 1995)(Campos, J.)("[T]here is no constitutional right to an education at public expense . . . ."); Petrella v. Brownback, 787 F.3d 1242, 1261 (10th Cir. 2015).

Turning to the second strand of substantive due process, "[e]xecutive action that shocks the conscience requires much more than negligence." Doe v. Woodard, 912 F.3d at 1300.  Rather, "[c]onduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).  "The behavior complained of must be egregious and outrageous." Hernandez v. Ridley, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432, 435 (1957)).   Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 ("The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.")(internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).  "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227.

The Tenth Circuit, for example, recently held that a social worker's behavior was judicially conscience-shocking where the social worker removed a child from his mother's home to place him in his father's home and: (i) withheld information about the father's criminal history, including his conviction for attempted sexual assault against a minor in his care; (ii) withheld concerns about his father "for fear of being fired"; and (iii) was aware of, and failed to "investigate evidence of potential abuse," including the child's report that his father "had hit him with a wooden mop and

school official's reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father . . . ."  T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017).  Ultimately, the child "suffered severe physical and sexual abuse at the hands of his father," and the Tenth Circuit concluded that the social worker had violated the child's substantive due process rights "by knowingly placing" the child "in a position of danger and knowingly increasing" his "vulnerability to danger."  T.D. v. Patton, 868 F.3d at 1212.  By contrast, the Court has held that school officials' conduct did not shock the conscience, where the plaintiffs alleged that the defendants did not take action to protect students at the school from being kicked and punched in the testicles on at least three occasions.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.

In Martinez v. Uphoff, 265 F.3d 1132-35, the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d at 1135.

Nuñez alleged actions -- "banning [Caldwell] from campus . . . without making any

findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against him," First Amended Complaint ¶ 86, at 13 -- are not "egregious and outrageous." Hernandez v. Ridley, 734 F.3d at 1261.  Here there are no allegations that Nuñez' actions were "intended to injure," see Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."), and there are no allegations of emotional or physical abuse, only deprivation of a property right without adequate procedures, see T.D. v. Patton, 868 F.3d at 1212; First Amended Complaint ¶¶ 11-81, at 3-12. See also James v. Chavez, 830 F. Supp. 2d at 1276 (concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"); Camuglia v. City of Albuquerque, 448 F.3d at 1222 ("'[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'")(quoting Moore v. Guthrie, 438 F.3d at 1040)).  The Court concludes therefore that Nuñez allegedly banning Caldwell from campus  actions are not egregious or outrageous and do not shock the judicial conscience.  See Hernandez v. Ridley, 734 F.3d at 1261.

    **IT IS ORDERED** that Nunez' Motion for Judgment on the Pleadings, filed February 14, 2020 (Doc. 23), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Justine Fox-Young
Justine Fox-Young, P.C.
Albuquerque, New Mexico

--and--

Paul J. Kennedy
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Patrick J. Hart
Office of University Counsel, University of New Mexico
Albuquerque, New Mexico

--and--

Alfred A. Park
Lawrence M. Marcus
Park & Associates, L.L.C.
Albuquerque, New Mexico

      *Attorneys for Defendants University of New Mexico Board of Regents, and Nasha Torrez,*

Alfred A. Park
Lawrence M. Marcus
Park & Associates, L.L.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Eddie Nuñez*