## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOSEPH CALDWELL,

      Plaintiff,

vs.                                                                          No. CIV 20-0003 JB/JFR

UNIVERSITY OF NEW MEXICO
BOARD OF REGENTS; NASHA TORREZ;
LOBO DEVELOPMENT CORPORATION;
ACC OP (UNM SOUTH) LLC and EDDIE
NUÑEZ,

      Defendants.

### <u>MEMORANDUM OPINION[1]</u>

**THIS MATTER** comes before the Court on Defendant Nasha Torrez's Motion for

Judgment on the Pleadings, filed April 29, 2020 (Doc. 43)("Motion").  The Court held a hearing

on the Motion on March 26, 2021.  See Clerk's Minutes, filed March 26, 2021 (Doc. 61).  The

primary issues are: (i) whether Plaintiff Joseph Caldwell has alleged facts sufficient to state a due

process interest in (a) his continued enrollment at Defendant University of New Mexico ("UNM");

(b) playing basketball for UNM; (c) his reputation; (d) his future professional basketball career;

and (e) his housing and meals; (ii) whether UNM's actions comported with procedural due process

under the Constitution of the United States of America when Defendant Nasha Torrez, UNM's

Dean of Students, banned Caldwell from campus while UNM classes were not in session;

---

[1]On March 29, 2021, the Court entered an Order granting Defendant Nasha Torrez's Motion for Judgment on the Pleadings, filed April 29, 2020 (Doc. 43).  See Order at 1-2, filed March 29, 2021 (Doc. 60).  In the Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

(iii) whether Caldwell states properly a claim against Torrez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were clearly established; (iv) whether Torrez violated Caldwell's right to substantive due process, because Torrez' actions -- banning Caldwell temporarily from campus, while UNM classes were not in session -- shock the judicial conscience; and (v) whether the Court should grant Caldwell leave to amend his First Amended Complaint for Injunctive Relief and Damages, filed January 31, 2020 (Doc. 10)("First Amended Complaint") rather than granting the Motion.  The Court concludes that: (i) Caldwell alleges sufficiently that he has a due process property interest in his continued education at UNM, and that Torrez interfered with this interest by temporarily banning Caldwell from certain campus property, including on-campus classes and his housing; (ii) Caldwell does not allege sufficiently that he has a due process interest in (a) playing basketball for UNM; (b) his reputation; (c) his future professional basketball career; or (d) his housing and meals; (iii) UNM's actions comported with procedural due process when Torrez banned temporarily Caldwell from campus, because, although the campus ban is more than a de minimis taking of Caldwell's interest in his continued education, the ban took place while UNM's classes were not in session, none of UNM's hearing procedures placed Caldwell at risk of erroneous deprivation, and UNM has a legitimate interest in maintaining a safe learning environment and preserving its limited administrative resources; (iv) Caldwell did not allege adequately a claim against Torrez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were not clearly established; (v) Torrez did not violate Caldwell's substantive due process rights, because banning temporarily Caldwell from campus does not shock the judicial conscience; and (vi) it is futile to allow Caldwell to amend the First Amended Complaint, because Caldwell's rights were not clearly established at the time of the campus ban, and more allegations detailing Caldwell's status as basketball player would not

change the Court's analysis.  See Caldwell v. Univ. of N.M. Bd. of Regents, 510 F. Supp. 3d 982, 982 (D.N.M. 2020)(Browning, J.)("Caldwell")(reaching similar conclusions for Defendant Eddie Nuñez, UNM's athletic director, relating to the same incident).[2]  Accordingly, the Court will grant Torrez' request for judgment on the pleadings, because Caldwell does not state a claim against Torrez upon which relief can be granted.

## FACTUAL BACKGROUND

The Court takes the facts from Caldwell's First Amended Complaint.  The same standards for evaluating a rule 12(b)(6) motion apply to a motion for a judgment on the pleadings.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000)("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6).").  Thus, the Court accepts "'all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings' in that party's favor."  Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(quoting Park Univ. Enters. Inc. v. Am. Cas. Co., 442 F.3d 1239, 1244 (10th Cir. 2006)).

Caldwell enrolled at UNM in January 2019.  See First Amended Complaint ¶ 11, at 3.  In January, 2019, Caldwell moved into the Lobo Village development,[3] and his lease agreement had an end date of July 31, 2020.  See First Amended Complaint ¶¶ 12-13, at 3.  In April, 2019,

---

[2]The Court's opinion also is available on this case's docket, see Memorandum Opinion, filed December 31, 2020 (Doc. 52).

[3]Lobo Village is a UNM student housing development in Albuquerque.  See Lobo Village, https://www.americancampus.com/student-apartments/nm/albuquerque/lobo-village (last visited June 24, 2023).  "Lobo Development Corporation ("LDC") is a UNM Regent-owned non-profit corporation organized for charitable and educational purposes which manages and rents out the properties at Lobo Village, where [Caldwell] resides."  First Amended Complaint ¶ 6, at 2.

Caldwell agreed to play as a point guard with the UNM Men's Basketball program.  See First Amended Complaint ¶ 16, at 3.  UNM's fall 2019 finals period ended on December 13, 2019.  See 2019-2020 Academic Calendar, filed June 29, 2020 (Doc. 48-2).  See also UNM Academic Calendar, UNM Events, https://unmevents.unm.edu/site/academic/?view=grid&search=y (last visited May 19, 2022).[4]  UNM classes were not in session from December 15, 2019, to January 21, 2020.  See 2019-2020 Academic Calendar.  UNM's official winter break is from December 23, 2019, to January 21, 2020.  See 2019-2020 Academic Calendar.

On December 16, 2019, "the Albuquerque Police Department took a report of allegations of battery against" Caldwell.  First Amended Complaint ¶ 17, at 3.  The person who accused Caldwell of battery is not a UNM student.  See First Amended Complaint ¶ 18, at 4.  On December 19, 2019, UNM's Dean of Students ("DOS") Office emailed Caldwell ("December 19 Email"), informing him that, based on the recent allegations, he was: (i) "hereby interim banned from all of UNM Campus, except for UNM Hospitals and Clinics for the purpose of seeking medical care and except for [his] in-person courses for Spring 2020 semester"; (ii) banned from Lobo Village and all on-campus housing facilities; (iii) banned from the Johnson Gym, except for attendance of a class for which he was registered, and banned from any other portion of campus without express

_____

[4]The Court takes judicial notice of the UNM 2019-2020 Calendar.  See O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1224 (10th Cir. 2007)(taking judicial notice of a website's posting of historical retirement fund earnings).  "It is not uncommon for courts to take judicial notice of factual information found on the world wide web."  O'Toole v. Northrop Grumman Corp., 499 F.3d at 1225.  At the hearing, the parties discussed whether the Court could take judicial notice of UNM's winter break dates.  See Draft of Transcript of Hearing at 10:13-11:25, taken March 26, 2021 (Court, Narvaez)("Tr."); id. at 19:7-20:21 (Court, Harrison).  The Court takes judicial notice here because the academic calendar is needed to determine the extent of Caldwell's educational experience that he was deprived of during his twenty-nine day suspension.

permission from the DOS; (iv) permitted to register for or attend only online courses, except for a class for which he was already registered; and (v) informed that failure to comply with the campus ban and the Code of Conduct charges would result in criminal charges for trespass that could lead to possible expulsion.  First Amended Complaint ¶¶ 19-21, at 4.  The DOS also informed Caldwell in the December 19 Email that he would not be able to contact anyone at the DOS from December 21, 2019, through January 1, 2020, because UNM would be closed.  See First Amended Complaint ¶ 19, at 4.  The December 19 Email stated that the recent allegations were "under the jurisdiction of the Office of Equal Opportunity."  First Amended Complaint ¶ 20, at 4.

On December 19, 2019, Caldwell attended a meeting chaired by Nuñez ("December 19 Meeting").  See First Amended Complaint ¶ 22, at 5.  Several other people from the UNM athletic department and from UNM administration were present at the December 19 Meeting.  See First Amended Complaint ¶ 22, at 5.  Nuñez ran the December 19 Meeting and "informed [Caldwell] that he was banned from campus indefinitely" and that he was also banned from playing or practicing with the basketball team.  First Amended Complaint ¶ 23, at 5.

That same day, Caldwell received an eviction notice from Defendant Lobo Development Corporation, stating that he had to move out within three days or face eviction proceedings.  See First Amended Complaint ¶ 25, at 5.  The eviction notice stated that Caldwell was "[b]anned from the University of New Mexico, Residence Life and Student Housing, and American Campus Communities."  First Amended Complaint ¶ 26, at 5.  The eviction notice explained that Caldwell had violated his lease agreement, because of his "unlawful action causing serious physical harm to another person."  First Amended Complaint ¶ 26, at 5.

On December 20, 2019, Caldwell met with the UNM Office of Equal Opportunity ("OEO"), where he denied the allegations against him.  See First Amended Complaint ¶ 29, at 5.

Sometime after his meeting with the OEO, Caldwell met with Torrez, who reiterated that Caldwell was suspended, and that she would decide whether to extend his suspension.  See First Amended Complaint ¶ 30, at 5.  Torrez told Caldwell that the campus ban would remain in place until January 2, 2020, the end of the holiday break, and that Caldwell had no opportunity to appeal the ban.  See First Amended Complaint ¶ 31, at 6.

On December 30, 2019, Greg Golden, UNM Assistant Dean of Students, emailed Caldwell. See First Amended Complaint ¶ 35, at 6.  In the email, Golden informed Caldwell that if he wanted to discuss UNM's campus ban, Caldwell would have to reach out to Kelly Davis, a UNM Student Conduct Officer in the DOS Office, who had "promulgated the 'ban letter.'"  First Amended Complaint ¶ 35, at 6.

On January 10, 2020, Caldwell and his counsel had a meeting with Torrez.  See First Amended Complaint ¶ 40, at 7.  At the meeting, Torrez told Caldwell that a Student Conduct Officer, an employee in Torrez' office, "had imposed the ban and that [Torrez] was entirely uninvolved in that process."  First Amended Complaint ¶ 41, at 7.  When Caldwell asked Torrez to lift the ban entirely, Torrez stated that, although she would consider his request, she could not say how long it would take her to decide whether to lift the ban or to what extent it would be lifted. See First Amended Complaint ¶ 42, at 7.

UNM has a Code of Student Conduct ("CSC"), an Administrative Policies and Procedures Manual ("APP"), and a Student Grievance Procedure ("SGP").  See First Amended Complaint ¶ 64, at 10.  The APP states that the OEO "shall receive inquiries regarding issues involving civil rights issues; counsel claimants; evaluate claims; receive and process formal claims; prepare written investigative reports which contain findings of fact; and conciliate meritorious claims separately or jointly with the parties."  First Amended Complaint ¶ 68, at 10.  Under UNM's

polices, an accused student may seek "a discretionary review of [OEO's] determination through the Office of the President . . . and/or the Board of Regents."  First Amended Complaint ¶ 71, at 11.  UNM's policies also state:

> Should the Dean of Students Office take action based on the investigation's findings, both parties will have equal rights to appeal the action . . . [,] will have equal access to the information upon which the findings are based, have an equal opportunity to present evidence and witnesses (subject to the limitations in the statement of complainant's rights []), and will receive equal notification of the results of the procedure. Both parties also will have the equal right to appeal the results of the grievance of the Dean of Students Office's decision . . . .

First Amended Complaint ¶ 72, at 11.  The APP states that UNM may impose "interim measures" on accused students, which

> may include, but are not necessarily limited to, the following . . . : (1) directives . . . that the parties have no contact with each other; (2) that one or more parties be moved to another office or location, be placed on paid administrative leave, or removed from a class; or (3) have a registration hold placed on a student account.

First Amended Complaint ¶ 74, at 11-12.  Under the APP, the DOS has the authority to implement interim measures and these measures "stay in place until the end of any review or appeal process." First Amended Complaint ¶ 75, at 12.  Under the APP, the DOS may suspend a student indefinitely, without making any findings of wrongdoing and without providing any of the above-described process.  See First Amended Complaint ¶ 76, at 12.  The APP states:

> [T]he Dean of Students Office can impose a "no contact" order, which typically directs the complainant and respondent not to have contact with each other, either in-person or through electronic communication, pending the investigation and resolution of a complaint.  The Dean of Students Office can arrange for changes in academic and/or on-campus living situations as needed. Other interim measures, as appropriate, can be implemented by the Dean of Students Office before the final outcome of the investigation and afterwards as needed.

First Amended Complaint ¶ 79, at 12.  As of January 13, 2020, the date Caldwell filed his First

Amended Complaint, Caldwell had received no written explanation from Torrez detailing her reasons for imposing the campus ban, and Caldwell has had no opportunity to appeal the decision. See First Amended Complaint ¶ 81, at 13.

## PROCEDURAL BACKGROUND

On January 2, 2020, Caldwell filed his Complaint for Injunctive Relief and Damages, filed January 2, 2020 (Doc. 1).  On January 13, 2020, Caldwell filed his First Amended Complaint, asserting two claims.  See First Amended Complaint ¶¶ 82-102, at 13-16.  For Count I, Caldwell asserts that the Defendants violated his right to substantive and procedural due process under the Fourteenth Amendment to the Constitution of the United States of America, U.S. Const. amend. XIV. See First Amended Complaint ¶ 83, 86, at 13.  Caldwell alleges that the

> Defendants, under color of law within the meaning of 42 U.S.C. § 1983, deprived Plaintiff of rights and privileges secured by the United States Constitution and are liable for his injuries . . . by suspending Plaintiff, banning him from campus and evicting him from his residence, without making any findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against him.

First Amended Complaint ¶¶ 84, 86, at 13.  For Count II, Caldwell asserts that UNM, Lobo Development, and Defendant ACC OP (UNM SOUTH) LLC breached their contractual obligations. See First Amended Complaint ¶¶ 94-102, at 15-16.  Torrez and Nuñez answered the First Amended Complaint on January 29, 2020. See Defendant Nasha Torrez's and Eddie Nuñez's Answer to Plaintiff's First Amended Complaint for Injunctive Relief and Damages, filed January 29, 2020 (Doc. 16)("Torrez and Nuñez Answer").  The parties stipulated to dismiss without prejudice Lobo Development, Defendant UNM Board of Regents, and ACC OP.  See Plaintiff's Rule 41(a)(1)(A)(ii) Stipulation of Dismissal as to Lobo Development Corporation, filed January 30, 2020 (Doc. 18); Stipulation of Dismissal with Prejudice of University of New Mexico Board

of Regents, filed March 10, 2020 (Doc. 26); Stipulation of Dismissal with Prejudice of ACC OP

(UNM SOUTH) LLC, filed August 26, 2020 (Doc. 50).

      1.      **Torrez' Motion For Judgment On The Pleadings**.

On April 29, 2020, Torrez moved for Judgment on the Pleadings under rules 12(c) and

12(h)(2) of the Federal Rules of Civil Procedure.  See Motion at 1.  In the Motion, Torrez argues

that, because Caldwell's alleged criminal activity "constituted an immediate threat to the safety of

other students and a disruption of the academic process, no pre-suspension hearing was necessary."

Motion at 2.  Torrez contends that Caldwell "was provided with the opportunity to present his side

at a later time."  Motion at 2.  Torrez argues that there "was no violation of Due Process."  Motion

at 2.  Additionally, Torrez contends that she is "protected by qualified immunity."  Motion at 6.

Torrez contends that a motion for judgment on the pleading is equivalent to a motion to dismiss

for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion

at 6.  Torrez argues that the standards of review for these two types of motions are identical,

meaning that the Court assumes the truth of all well-pleaded facts in the First Amended Complaint,

and draws reasonable inferences therein in the light most favorable to the plaintiff.  See Motion at

6.  Torrez argues that she is entitled to a judgment on the pleadings, because Caldwell "has not

stated a plausible claim that Dean Torrez violated his right to due process, and has certainly not

stated a plausible claim that Dean Torrez violated his clearly established rights."  Motion at 8.

First, Torrez argues that Caldwell's interim removal from campus "was an emergency

measure for the purpose of protecting the health and safety of the student body."  Motion at 9.

Torrez contends that Caldwell was "not actually suspended from UNM" and that Caldwell was

"permitted to attend the class for which he had registered" in addition to being permitted to register

for online classes.  Motion at 9.  Torrez argues that, even if Caldwell "had a liberty or property

interest in his continued presence on campus, the actions by UNM were based on an emergency decision to protect the health and safety of the student body."  Motion at 9.  Torrez states that the United States Court of Appeals for the Second Circuit has held that "[i]t is settled that an emergency justifies an administrator's taking temporary action without a hearing even in cases where due process requires on before final action is taken."  Motion at 9 (citing Carrion v. Yeshiva Univ., 535 F.2d 722, 730 (2d Cir. 1976)(citing Fahey v. Malonee, 332 U.S. 245 (1947))).  Torrez argues that, "[i]n the context of a student suspension, even where the suspension is long enough to require a hearing, a pre-suspension hearing is not required in an emergency situation."  Motion at 9.  Torrez also states that the Supreme Court of the United States of America has noted "'that there are recurring situations in which prior notice and hearing cannot be insisted upon.  Students whose presence poses a continuing danger to persons of property or an ongoing threat of disrupting the academic process may be immediately removed from school.'"  Motion at 10 (quoting Goss v. Lopez, 419 U.S. 565, 582 (1975)).

Furthermore, Torrez argues that the Supreme Court has held that "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process."  Motion at 10 (citing Parratt v. Taylor, 451 U.S. 527, 539 (1981)).  Accordingly, Torrez argues that Caldwell's suspension from UNM "qualifies as an emergency situation, in which a pre-suspension hearing is unnecessary."  Motion at 10.  Torrez contends "the email received by [Caldwell] stated that the suspension was the result of a violent assault alleged to have been carried out by [Caldwell]."  Motion at 10.  Torrez argues that the email gave Caldwell the right to appeal, thus, "all of the requirements for Due Process were met."  Motion at 10.  Torrez

contends that Caldwell's "presence posed a continuing threat to persons at the University and was a potential disruption of the academic process."  Motion at 10.  Torrez argues that, "[u]nder such a circumstance, a hearing prior to the suspension was clearly impractical, and the University provided a means by which Plaintiff could challenge the propriety of the actions, by means of an appeal to the Dean of Students."  Motion at 10.  Additionally, Torrez contends that Caldwell's continued presence on campus "could have resulted in hesitance by other victims of sexual harassment to bring complaints."  Motion at 11.  Torrez argues that "an emergency suspension, with an ability to appeal within a reasonable amount of time, is further justified."  Motion at 11.  For these reasons, Torrez contends that that she is entitled to judgment on the pleadings, because Caldwell "has not stated a plausible claim that his right to Due Process was violated."  Motion at 11.

Next, Torrez argues that, even if Caldwell has stated a plausible claim that she committed a constitutional violation, she is entitled to qualified immunity.  See Motion at 11.  Torrez contends that "[w]hen targeted by an action brought under 42 U.S.C § 1983, a government official can assert the defense of qualified immunity."  Motion at 11.  Torrez argues that the Supreme Court has held that, "[w]hen acting in the scope of their duties, officials are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Motion at 11 (citing Davis v. Scherer, 468 U.S. 183, 191 (1984)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982))).  Torrez contends that, "for liability to attach to an official act, the act must not only violate one of a person's rights, but '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Motion at 12 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)(alteration in original)).  Torrez contends that, to state a claim, Caldwell "must not only

show that Torrez's actions violated [his] right to Due Process, but that it was clearly established that these actions violated his Due Process rights."  Motion at 12.  Torrez adds that, for Caldwell to show his due process rights were clearly established, "there must be a case in which it was determined that a person in Plaintiff's position, who had been credibly accused of a serious assault, could not be subjected to an emergency interim suspension, with a hearing offered at the earliest possible time."  Motion at 13.  Torrez contends that "there is no Tenth Circuit or Supreme Court case that shows that it is unconstitutional for a student to be suspended from a university pending a hearing, when that student has been credibly accused of a serious, violent crime."  Motion at 13. Torrez argues that a "reasonable official" would not realize that "he or she was violating the law by implementing the bans."  Motion at 14.  Torrez concludes that "qualified immunity is therefore appropriate."  Motion at 14.

> ### 2.   Caldwell's Response.

Caldwell responds to the Motion.  See Plaintiff's Response in Opposition to Defendant Nasha Torrez's Motion for Judgment on the Pleadings (Doc. 43), filed June 15, 2020 (Doc. 47)("Response").  Caldwell invokes the Court's prior decision in Mata v. Anderson, 760 F. Supp. 2d 1068, 1082 (D.N.M. 2009)(Browning, J.) for the proposition that a "'[j]udgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" Response at 7 (quoting Mata v. Anderson, 760 F. Supp. 2d at 1082 (quoting Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006))).  Caldwell contends that he adequately states a claim against Torrez for violations of his procedural due process rights.  See Response at 9.  Caldwell argues that the procedural protections required in a situation hinge on the following three factors:

- The interests of the individual in retaining their property and the injury threatened by the official action;

- The risk of error through the procedures used and probable value if any, of additional or substitute procedural safeguards; and

- The costs and administrative burden of the additional process, and the interests of the government in efficient adjudication.

Response at 9-10 (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).

Caldwell contends that the Court "need only evaluate whether Mr. Caldwell has a plausible claim that these three factors will weigh in his favor." Response at 10 (citing Doe v. Alger, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016)(Dillon, J.)). Caldwell argues that he "is entitled to heightened procedural due process protections because he faces dismissal or other sanctions for disciplinary, rather than academic, reasons." Response at 10 (citing Brown v. Univ. of Kan., 599 F. App'x 833, 837 (10th Cir. 2015)(unpublished)). [5] Caldwell cites to Doe v. DiStefano, 16-cv-

_____

[5]Brown v. University of Kansas is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Brown v. University of Kansas; Nard v. City of Oklahoma City, 153 F. App'x 529 (10th Cir. 2005); Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006); Gossett v. Barnhart, 139 F. App'x 24 (10th Cir. 2005); Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004); Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707 (10th Cir. 2011); Routt v. Howry, 835 F. App'x 379 (10th Cir. 2020); Poche v. Joubran, 389 F. App'x 768 (10th Cir. 2010); Wallace v. United States, 372 F. App'x 826 (10th Cir. 2010); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Board of County Commissioners for the County of Dona Ana, No. 16-2222, 2017 WL 3951706 (10th Cir. September 8, 2017); and Brown v. City of Colorado Springs, No. 16-1206, 2017 WL

1789-WJM-KLM, 2019 WL 2372685 (D. Colo. June 5, 2019)(Martinez, J.), in which the Honorable William J. Martinez, United States District Judge for the United States District Court for the District of Colorado, poses, but does not fully consider, the question of whether a plaintiff who is "accused of conduct which may form the basis for criminal prosecution" is entitled to "more than minimal notice and an opportunity to respond."  Response at 10.

Next, Caldwell argues that he alleges properly  both property and liberty interests in his uninterrupted education.  See Response at 10.  Caldwell contends that "[o]nce provided, public education becomes 'a property interest which may be protected by the Due Process Clause.'"  Response at 10 (citing Goss v. Lopez, 419 U.S. at 574).  Caldwell argues that the United States Court of Appeals for the Tenth Circuit Nuñez "ha[s] expanded the interest to encompass a more generalized interest in secondary and post-secondary education, with a concomitant procedural due process right."  Response at 11 (citing Harris v. Blake, 798 F.2d 419, 422 (10th Cir. 1986); Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001); Lee v. Kan. State Univ., No. 12-cv-2638-JAR-DJW, 2013 WL 2476702, at *6 (D. Kan. June 7, 2013)(Robinson, J.)).

Next, Caldwell argues that his First Amended Complaint adequately alleges a procedural due process claim against Torrez.  See Response at 11.  Caldwell contends that "a public university must provide the accused notice of the violation and an opportunity to be heard in the context of disciplinary proceedings."  Response at 11 (citing Goss v. Lopez, 419 U.S. at 579). Caldwell argues that he "did not receive constructive notice prior to his suspension and he will almost

---

4511355 (10th Cir. October 10, 2017), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

certainly be subject to future discipline." Response at 12.  Caldwell contends that his suspension "fell short [even] of what a high school must provide to a student facing a days-long suspension." Response at 12 (quoting Doe v. Purdue Univ., 928 F.3d 652, 663 (7th Cir. 2019))(alteration in original).

Caldwell argues that Torrez committed "multiple procedural due process violations in connection with his interim suspension."  Response at 13.  First, Caldwell contends he was provided insufficient notice and that there was no investigation.  See Response at 13.  Caldwell argues that Torrez provided "none of the details of the alleged victim's complaint and withheld information as to the date or location of the alleged incident, the identity of the alleged victim, the nature of the alleged assault and all other pertinent details."  Response at 14.  Caldwell asserts that Torrez was required "to advise him of the information she had indicating that he had engaged in violent behavior and give him an opportunity to respond at some kind of hearing prior to any suspension."  Response at 14.  Caldwell contends that he was suspended without "so much as a phone call in advance" and was notified of this suspension by email before Torrez's office shut down for winter break.  Response at 14.  Caldwell argues that UNM "had done no investigation whatsoever prior to suspending him."  Response at 14.

Next, Caldwell argues that Torrez denied him discovery and a hearing before an impartial tribunal, because Torrez does not constitute a tribunal and was not impartial.  See Response at 15. Caldwell contends that "he received no evidence or even a summary of evidence" from Torrez and "no hearing prior to his suspension."  Response at 15.  Caldwell argues that "'[a] fundamental principle of procedural due process is a hearing before an impartial tribunal.'"  Response at 15 (quoting Tonkovich v. Kan. Bd. Of Regents, 159 F.3d 504, 518 (10th Cir. 1998)). Caldwell contends that he "properly alleged that Torrez was incapable of being impartial as a result of the

politically charged nature of the allegations."  Response at 15.

Next, Caldwell argues that Torrez denied him due process.  See Response at 15.  Caldwell contends that "Torrez and the University had no definable interest in limiting the very basic procedural safeguards to which Mr. Caldwell is constitutionally entitled."  Response at 16. Caldwell argues that, had Torrez afforded him due process, "the infringement on his property and liberty interests could easily have been avoided, and the resources required to provide [him] with this basic notice, the evidence against him and an opportunity to defend himself would have been negligible."  Response at 16 (citing Mathews v. Eldridge, 424 U.S. at 335)).  Caldwell contends that UNM "has 'little interest in not providing other basic procedural safeguards . . . .'"  Response at 16 (quoting Lee v. Univ. of N.M., 440 F. Supp. 3d 1071, 1125 (D.N.M. 2020)(Browning, J.) ("Lee I")).

Caldwell argues that Torrez' arguments regarding why the interim ban did not violate his due process rights fail.  See Response at 17-19.  He argues that "Torrez was not permitted to limit the classes he attended or the means by which he attended them."  Response at 17.  He also argues that Torrez has made only conclusory representations that Caldwell's presence on campus posed an emergency, but has not demonstrated any facts to support her argument.  See Response at 18. Finally, he argues that, because he did not receive proper notice regarding the allegations, Torrez' statement that Caldwell had the right to appeal was illusory.  See Response at 19.

Next, Caldwell contends that Torrez is not entitled to qualified immunity.  See Response at 19.  Caldwell argues that "every reasonable official would have realized that it was contrary to due process to suspend Mr. Caldwell without any explanation as to the charges and without giving him an opportunity to marshal evidence in his defense."  Response at 21.  Caldwell contends that "'[a]s a general rule notice and hearing should precede removal of the student from school.'"

Response at 22 (quoting <u>Goss v. Lopez</u>, 419 U.S. at 581)).

Finally, Caldwell asserts that the Court should grant him leave to amend his First Amended Complaint rather than dismissing his due-process claim against Torrez.  <u>See</u> Response at 23. Caldwell contends that, "[u]nder Federal Rule of Civil Procedure 15(a)(2), the Court should freely give leave to amend 'when justice so requires.'"  Response at 23 (quoting Fed. R. Civ. P. 15(a)(2)). Caldwell states that "[a] motion to amend should be granted absent 'undue delay, bad faith or dilatory motive on the part of the movant . . . [or] undue prejudice to the opposing party.'" Response at 23 (quoting <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962))(second alteration and ellipsis in Response, but not in <u>Forman v. Davis</u>).

   **3.    <u>Torrez' Reply.</u>**

Torrez replies in support of her Motion.  <u>See</u> Defendant Nasha Torrez's Reply in Support of Her Motion for Judgment on the Pleadings, filed June 29, 2020 (Doc. 48)("Reply").   In the Reply, Torrez asserts that the Court should grant the Motion, because the facts in Caldwell's First Amended Complaint show that Caldwell was not deprived of a liberty or property interest.  <u>See</u> Reply at 3.   Torrez argues that Caldwell "received the letter announcing the campus ban on December 19, 2020, after the Fall Semester ended, and was fully reinstated on January 17, 2020, before the Spring Semester began."  Reply at 5.   Torrez contends that Caldwell "did not miss a single class as a consequence of the campus ban" and that "he could not have been deprived of the property interest in his education."  Reply at 5.  Additionally, Torrez contends that she "did not make any public statements" about Caldwell "of any kind, let alone any that could be considered defamatory."  Reply at 5.  Torrez argues that UNM's press release "did not go into detail regarding the reasons for his suspension" and that Caldwell thus "has not stated a claim for violation of his right to Due Process."  Reply at 5.

Next, Torrez argues that, even if Caldwell "had a liberty or property interest in his continued presence on campus during a school break, Dean Torrez acted appropriately."  Reply at 6.  Torrez argues that "'the Due Process Clause requires, not an "elaborate hearing" before a neutral party, but simply "an informal give-and-take between student and disciplinarian" which gives the student "an opportunity to explain his version of the facts."'"  Reply at 6 (quoting Ingraham v. Wright, 430 U.S. 651, 693 (1977)(quoting Goss v. Lopez, 419 U.S. at 693)).

Finally, Torrez argues that, even if Caldwell "stated a plausible claim that Dean Torrez committed a constitutional violation, she is still entitled to qualified immunity."  Reply at 10. Torrez contends that, "[w]hen acting in the scope of their duties, 'officials "are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'"  Reply at 10 (quoting Davis v. Scherer, 468 U.S. 183, 191 (1984)(quoting Harlow v. Fitzgerald, 457 U.S. at 818)).  Torrez concludes that none of her alleged actions violate Caldwell's rights and they do not violate "any of his clearly established rights."  Reply at 12.  Additionally, Torrez concludes that Caldwell "received all of the process to which he is entitled, and if there is an ongoing investigation, there is no reason to believe he will not receive ample process in the future."  Reply at 12.

### 4.    The Court's Memorandum Opinion and Order Granting Nuñez' Motion for Judgment on the Pleadings.

On December 31, 2020, the Court granted Defendant Eddie Nuñez's Motion for Judgment on the Pleadings, filed February 14, 2020 (Doc. 23)("Nuñez Motion").   See Caldwell, 510 F. Supp. 3d at 982.  In the Nuñez Motion, Nuñez, UNM's Athletic Director, moves for judgment on the pleadings for similar reasons as Torrez, namely that Caldwell does not state a claim for

violations of procedural or substantive due process, and that Nuñez is entitled to qualified immunity.  See Nuñez Motion at 1-8.  In Caldwell, the Court concludes:

> (i) Caldwell has a due process property interest in his continued education at UNM, and Caldwell alleges sufficiently that Nuñez interfered with this interest by banning Caldwell from campus property, but Caldwell does not have a due process interest in playing basketball for UNM; his reputation; or his future professional basketball career; (ii) UNM's actions comported with procedural due process when Caldwell was banned from campus, because, although the campus ban is more than a de minimis taking of Caldwell's interest in his continued education, none of UNM's hearing procedures placed Caldwell at risk of erroneous deprivation and UNM has a legitimate interest in maintaining a safe learning environment and preserving its limited administrative resources; (iii) Caldwell cannot sue Nuñez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were not clearly established; and (iv) Nuñez did not violate Caldwell's substantive due process rights, because banning Caldwell from campus does not shock the judicial conscience.

Caldwell, 510 F. Supp. 3d at 994.  The Court then grants the Nuñez Motion and concludes that Caldwell does not state a claim against Nuñez upon which relief can be granted.  See Caldwell, 510 F. Supp. 3d at 994.

## 5.   **The Hearing.**

The Court held a hearing on the Motion on March 26, 2021.  See Clerk's Minutes at 1; Draft Transcript of Hearing at 2:19 (taken March 26, 2021)(Court)("Tr.").[6]  The Court began the hearing by stating that it wants to ensure that the only claim against Torrez is a procedural due process claim and not a substantive due process claim.  See Tr. at 3:17-20 (Court).  Torrez agreed and explained that nothing about this case shocked the conscience; thus, substantive due process is not at issue, and the issue is "whether the plaintiff received adequate process . . . connected with his suspension[,] his campus ban in late December of 2019 and early January of 2020."  Tr. at

---

[6]The Court's citation to the transcript of each hearing in this Memorandum Opinion and Order refer to the Courts reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

3:21-4:2 (Marcus).  Torrez stated this issue had been raised earlier and decided when the Court, in

Caldwell, granted the  Nuñez' Motion.  See Tr. at 4:2-4 (Marcus); Caldwell, 510 F. Supp. 3d at

994.  The Court asked what the distinction is among the issues in the Motion, its opinion in

Caldwell, and its decisions in Lee I, 449 F. Supp. 3d at 1071.  See Tr. at 4:5-11 (Court); Caldwell,

510 F. Supp. 3d at 994.  Torrez stated that there is no difference, because, even though the Court

concluded that Caldwell alleges sufficiently that Nuñez was involved in banning Caldwell from

campus, Caldwell received adequate process in connection with the campus ban.  See Tr. at 4:18-

5:6 (Marcus).  Torrez then explained that Caldwell had been banned from campus, because UNM

"received word that the plaintiff had been investigated for a serious violation of domestic assault,

essentially, he was accused of strangling his girlfriend."  Tr. at 5:17-6:21 (Marcus).

Next, the Court asked if the incident occurred off-campus.  See Tr. at 5:23-24 (Court).

Torrez responded that the incident happened in a campus apartment that UNM owns.  See Tr. at

5:25-6:1 (Marcus).  The Court then asked for clarification whether Nuñez is still in the case.  See

Tr. at 6:2-3 (Court).  Torrez responded that the Court had dismissed the case against Nuñez.  See

Tr. at 6:4 (Marcus).

The Court then asked if Caldwell was banned or suspended from campus.  See Tr. at 6:19-

22 (Court).  Torrez replied that it was a suspension, because it was a "temporary measure."  Tr. at

6:23-25 (Marcus).  Torrez then explained: "[A] ban would be considered permanent at that point.

But with a suspension, he was not [allowed to] be on the campus."  Tr. at 7:4-6 (Marcus).  The

Court then asked if there was a legal difference between a ban and a suspension "as it relates to an

inference with [Caldwell's] right to education or his property right in education."  Tr. at 7:9-13

(Court).  Torrez explained that more process would be due if it were a permanent ban.  See Tr. at

7:14-17 (Marcus).  Torrez further explained: "There would have to be process due before there is

a suspension because he would have the property [right] but because it was an emergency situation, there is no pre-deprivation process required [and] no pre-deprivation hearing.  Notice is required, but he received notice."  Tr. at 7:21-8:1 (Marcus).  Torrez continued:

> He had a meeting[,] I believe it was on January 10th with his [lawyers] and Ms. Torrez, and he had a hearing [where] he was able to present his side of the story, and[,] as a result[,] the ban was overturned and on the 17th the Plaintiff received word that it was overturned, and that he could return to his normal [routine].  He was still suspended from the basketball team[,] but we've established [that] there is no property interest there[,] but [with] everything else he could return to his normal student life at UNM[.  A]nd significantly . . . , the entirety of the ban was during [winter] break.  The offices were closed between December 21 and January 2 but the winter break was between December 14 and January 21.

Tr. at 8:6-19 (Marcus).  The Court interjected, asking if Caldwell missed any classes or only basketball games.  See Tr. at 8:20-22 (Court).  Torrez responded that Caldwell missed no classes and only missed a couple of basketball games, and, therefore, Caldwell's ban is de minimis.  See Tr. at 8:23-9:12 (Marcus).

The Court then asked if the UNM academic calendar is attached to the First Amended Complaint.  See Tr. at 9:13-14 (Court).  Torrez clarified that the calendar is attached to the motion to dismiss, and, because the academic calendar is a matter of public record, the Court can take judicial notice of it, and concluded the calendar is proper in evaluating a motion to dismiss.  See Tr. at 9:16-22 (Marcus).  Torrez then further argued:

> So essentially, according to the case, there is due process required but as long as there is notice prior to the suspension, which there was, he received both oral and written notice stating he was suspended and explaining why he was suspended, and then as long as there is some sort of a post-hearing.  He had four different meetings with UNM officials, with Mr. Nuñez, with the office of equal opportunity, and twice with Ms. Torrez, the second time was more of a full hearing, at least he was able to present his side of the story and his lawyer was apparently able to do enough presenting of his side of the story that the campus ban was overturned prior to his missing of a single class . . . as this Court ruled in as far as Nuñez is concerned, these meetings were sufficient.

Tr. at 9:22-10:15 (Marcus).  Torrez continued by arguing that Caldwell received sufficient process

under the Fourteenth Amendment, because "he got four different meetings, and he got notice prior

to the incident."  Tr. 10:17-20 (Marcus).  Torrez argued that "generally it is considered better to

have notice prior to the suspension.  However, in this case, this was an emergency situation, given

the violent nature of the crime that he was accused of committing."  Tr. at 10:21-24 (Marcus).

Torrez argued that the incident of which Caldwell was accused was "clearly a risk of disrupting

the educational environment and the safety of the student at UNM."  Tr. at 10:25-11:2 (Marcus).

Next, Torrez explained why the Defendants are entitled to qualified immunity:

> Even if it is held that he required more process [from] UNM, . . . all of the
> Defendants are entitled to qualified immunity in this case because of the fact that
> the Plaintiff has not raised any authority that would indicate the plaintiff is entitled
> to any more process than he got.  And the Goss v. Lopez case is controlling.  It does
> say that he is entitled to process, but the process could be some sort of hearing post
> notice . . .  He got the process to which he was entitled.  Secondly, this emergency
> suspension was consistent with and authorized by a settlement that UNM entered
> into with the Department of Education regarding this type of issue.

Tr. at 11:4-22 (Marcus).  See Goss v. Lopez, 419 U.S. at 575.  Torrez argued that no one at UNM

violated Caldwell's constitutional rights and that "given the Nuñez decision, this Court, using its

usual thoroughness, determined Eddie Nuñez did not violate a clearly established right, [and, here,]

[i]t's [essentially] the same fact pattern between Mr. Nuñez and Ms. [Torrez]."  Tr. at 13:7-12

(Marcus).  Torrez then requested that the "Court dismiss all claims against her."  Tr. at 14:6-8

(Marcus).

The Court then asked Caldwell how this case is any different from the Court's opinions in

dismissing Nuñez and from those in Lee I.  See Tr. at 14:15-17 (Court).  Caldwell responded that

"the contours of the protected interest that were at issue with those defendants [were] fairer."  Tr.

at 14:20-21 (Harrison).  Caldwell continued that the campus ban in this case was more significant

than those at issue in the other cases, because it applied to attending class and housing.  See Tr. at 14:23-15:1 (Harrison).  The Court then asked Caldwell what arguments are different from its opinion in Caldwell dismissing Nuñez from this case.  See Tr. at 15: 3-5 (Court).  Caldwell argued that, when he "signed to play at UNM[,] there were certain benefits and rights attached to that, it wasn't just a matter of playing basketball."  Tr. at 15:12-14 (Harrison).  Caldwell stated that UNM "provided two meals a day; as a result of his involvement with the basketball program . . . [;] he's given scholarship benefits[;] he's given funding on a car."  Tr. at 15:20-24 (Harrison).  Additionally, Caldwell argued that, although playing basketball itself is not a protected property interest, "he has all these things that [he] agreed with UNM [and] has more than an expectation of an entitlement that implicates every part of his life."  Tr. at 16:1-12 (Harrison).

The Court then asked that, if Caldwell "did not really miss any classes, then that other little bundle is considerably smaller, correct?"  Tr. at 16:16-18 (Court).  Caldwell replied that "the opposite" is true: "the implication of not having housing and meals [is] huge.  That's far more [important] than not being able to attend a class or being able to attend it only online."  Tr. at 16:19-23 (Harrison).  Caldwell argued that Colo. Seminary (Univ. of Denver) v. Nat'l Coll. Athletic Ass'n, 570 F.2d 320 (10th Cir. 1978), connects "all of these opportunities in the educational experience."  Tr. at 16:24-17:1 (Harrison).  Additionally, Caldwell argued:

> [A]ll of these things viewed together certainly can and do create an interest, and it's the access to the educational process which includes that moral advancement, the academic advancement, the professional advancement that is discussed in those opinions that create this holistic view . . . so there is [significantly] more at stake and at risk for having those taken away.
>
> . . . .
>
> There is a property interest in continued enrollment at a university and continued enrollment means more than whether or not [a student] missed a class . . . . [I]n the case of basketball . . . he can't attend practice, he can't attend home games, he's

barred from a lot of these activities that other[s] have rights and agreements to [attend].

Tr. at 17:5-18:6 (Harrison).

The Court asked Caldwell if "I can take judicial notice of the UNM's calendar for the purpose [of] making my decision." Tr. at 18:7-9 (Court). Caldwell responded that he "thought it was a little bit outside of the scope of the pleadings." Tr. at 18:10-11 (Harrison). Caldwell argued that UNM's academic calendar does not reflect UNM basketball games, three of which Caldwell missed. See Tr. at 19:10-12 (Harrison). Caldwell also questioned the accuracy of UNM's academic calendar but had "no reason to think it is not [accurate]." Tr. at 19:16-17 (Harrison). Caldwell pointed out that Torrez attached the calendar to her Reply, and that Caldwell did not have an "opportunity to say in the response whether or not there might be any issues with it." Tr. at 19:17-21 (Harrison).

The Court then asked if Caldwell believes that he was banned or suspended from campus. See Tr. at 19:22-25 (Court). Caldwell responded:

> [A] ban from campus has implications that are a lot broader [than] a suspension from classes . . . . [The ban letter] has a whole list of things that he is no longer allowed to do, resources he is no longer allowed to access, and housing that he can [not] go back to. So, a campus ban is broader and has broader property interests than a suspension from [classes].

Tr. at 20:3-12 (Harrison).

The Court then asked if Caldwell believes there is any legal difference between a ban and suspension. See Tr. at 20:16-18 (Court). Caldwell responded that a ban "entirely subsumes a suspension from certain academic opportunities and processes . . . [;] he was not allowed to change the classes for which he was registered." Tr. at 20:21-21:1 (Harrison). The Court interjected, stating that Caldwell was never entirely banned from campus. See Tr. at 21:2-3 (Court). Caldwell

- 24 -

responded that he could not go back to campus or his housing, and was threatened with criminal

trespass if he did come back.  See Tr. at 21:4-10 (Harrison).

    The Court then asked again what the legal difference between a ban and suspension is.  See

Tr. at 21:15-16 (Court).  Caldwell explained:

> When you [are] looking at someone who is living on campus in sort of [a] hybrid
> model, not only is this their educational opportunity, but it's where they live, how
> they eat, and how they maintain their livelihood.  [T]here is more of a protected
> interest . . . [than students] only barred from attending those classes [have] . . . .
> [T]here is a larger more substantial interest here than G[]oss represents but even in
> G[]oss . . . you can [not] take those classes away for ten days without a pre-
> deprivation hearing, and that's exactly what was not afforded here.

Tr. at 21:25-22:24 (Harrison).  Caldwell then began to explain that his arguments on the second

prong relate to the "actual process that was provided."  Tr. at 22:25-23:3 (Harrison).  Caldwell

argued: "[W]hen you look at the scope of the property interest that's at stake here . . . incorporated

[with] all of the things that the educational process means . . . you need to provide proportional

process."  Tr. at 23:3-8 (Harrison).  Caldwell continued to argue that the campus ban affected every

part of Caldwell's life, and that, when applying the "balancing test" from Mathews v. Eldridge,

424 U.S. at 319, more process is appropriate.  See Tr. at 23:15-19 (Harrison).

    Caldwell then contended that the general rule for due process is "that there should be notice

and process before deprivation . . . even [of] 10 days of classes."  Tr. at 23:25-24:2 (Harrison).

Caldwell continues that Goss v. Lopez states that the exception to that rule "is if there is a

continuing danger to persons or property or an ongoing threat.  That's the only way that you get

out of that general rule of pre-derivation process."  Tr. at 24:2-6 (Harrison).  Caldwell then

advocates that "the allegations [against him] on the [complaint's face] don't support a conclusion

that he was a continuing danger or an ongoing threat."  Tr. at 24:7-9 (Harrison).  Caldwell

continued to argue that, because Goss v. Lopez protects the due process rights of students who are

deprived of fewer liberties than Caldwell, UNM should have afforded Caldwell a pre-deprivation hearing.  See Tr. at 24:25-25:7 (Harrison).  Caldwell argued that more process was due in Caldwell's situation, because of the "entitlements that are wrapped up in his presence on campus; educational opportunities and being a[ ]signed member of the basketball team."  Tr. at 25:9-12 (Harrison).

The Court then interjected that Caldwell was still allowed to take online classes, and asked what the "real difference between in person and online classes [is] as far as education is concerned?"  Tr. at 25:14-17 (Court).  Caldwell responded that the Tenth Circuit answered that question in 1979.  See Tr. at 25:21-22 (Harrison).  The Court interrupted, noting that the Tenth Circuit did not have computers at that point, so "we're not dealing with a case [on this issue] . . . [about] being online and [not] in person, are we?"  Tr. at 26:2-7 (Court).  Caldwell responded that "the educational process is not limited to attendance [but] there are numerous [activities] to participate in such as school clubs and social groups . . . [which] combine[d] provide intellectual and moral advancement."  Tr. at 26:13-18 (Harrison).

The Court then asked if Caldwell could point to any cases in which there is a constitutional right to live on campus.  See Tr. at 26:19-21 (Court).  Caldwell responded: "I don't know one of the top of my head."  Tr. at 26:22 (Harrison).  Caldwell then argued:

> [T]here is a legitimate entitlement to this educational process in whatever form that may take . . . some people will take classes remotely . . . [Caldwell] was deprived [of] his housing in a meaningful way by being told he was going to be arrested for criminal trespass if he went back home.
>
> . . . .
>
> [N]ot everyone is involved in social clubs [or] is an athlete, but it is all part of that bundle . . . [that] is worthy of constitutional protection . . . .  So [it is not] fair to say that because he was able to take classes online that he got the same experience or

was not deprived [of] anything, especially when he was not able to take those classes from the comfort of his home.

Tr. at 27:8 -28-17 (Harrison).

The Court then asked if a case from the Tenth Circuit "clearly establishes" the law in Caldwell's favor.  Tr. at 28:18-21 (Court).  Caldwell responded that, in Goss v. Lopez, Colorado Seminary (University of Denver) v. National College Athletic Ass'n, and Albach v. Odle, 531 F.2d 983 (10th Cir. 1976), "there is a lot of discussion of what the educational process is and means and what the attendant due processes requirements are."  Tr. at 28:24-29:3 (Harrison).  Caldwell continued, arguing that, in Goldberg v. Kelly, 397 U.S. 254 (1970), the Supreme Court requires pre-deprivation process when there is a denial of certain benefits such as food and housing.  See Tr. at 29:5-10 (Harrison).  The Court then asked if those were all the cases from the Tenth Circuit and the Supreme Court "that you think are the closest and form the basis for your clearly established prong."  Tr. at 29:23-30:1 (Court).  Caldwell responded in the affirmative.  See Tr. at 30:2-4 (Harrison).  Caldwell then argued that, had Caldwell been given a pre-deprivation hearing, his ban could have been lifted before January 17, 2020, and the "harm suffered in the interim could have been avoided."  Tr. at 31:10-19 (Harrison).

Caldwell then contended that, being given a hearing about the ban's details is "not the same thing as being given [a] meaningful opportunity to challenge those operative facts and to dispute whether or not that ban was appropriate in the first place."  Tr. at 32:12-15 (Court).  Caldwell continued by arguing that Goss v. Lopez controls, and that the exception of a threat and continuing danger do not apply in this circumstance, because, once Caldwell got a hearing, they revoked the suspension.  See Tr. at 33:10-19 (Harrison).  Caldwell finished by asking the Court for leave to amend the First Amended Complaint if the First Amended Complaint's allegations are not

sufficient "to what being a signed basketball player means . . . as a property interest . . . [including] financial benefits, the meals that would be provided, and the funding that would be given to him on his student car, and other things mentioned in the last hearing." Tr. at 34:1-25 (Harrison).[7]

The Court then asked if Torrez had anything else to add. See Tr. at 35:11-13 (Court). Torrez argued that the suspension was not a campus ban, because Caldwell was "permitted to go to Johnson gym, take [a] class, and work out [at Johnson gym] with permission[8] . . . . [H]e was allowed to go to [the medical center] if he needed any medical treatment." Tr. at 35:15-21 (Marcus). Torrez then contended that missing class was never an issue, because the entire suspension was during winter break. See Tr. at 35:25-36:2 (Marcus). Torrez then argued that the academic calendar is a relevant issue and reliable evidence, and that the Court can take judicial notice of the academic calendar, contending that it would be "incredibly farfetched" that UNM would have an unexpected class during winter break. Tr. at 36:10-17 (Marcus).

Torrez then stated that, when Caldwell was evicted from his apartment, Caldwell was put in a hotel and provided food at UNM's expense. See Tr. at 37:2-7 (Marcus). Torrez then discussed the Court's opinion dismissing Nuñez and the current issue, arguing that Nuñez was just as involved as Torrez in suspending Caldwell from campus, and that the Court has dismissed Nuñez

---

[7]Although the National Collegiate Athletic Association ("NCAA") allows institutions to "provide reasonable local transportation to student-athletes on an occasional basis," NCAA Division I Manual 16.9.1, the NCAA prohibits student-athletes from receiving any extra benefits, such as "[a]n automobile or the use of an automobile," NCAA Division I Manual 16.11.2.2 (c).

[8]Caldwell states in his pleadings that he was banned from campus entirely "except for attendance at a class for which he is registered which is scheduled to take place at Johnson Gym." First Amended Complaint ¶ 21, at 4.  Johnson Gym "contains Weight/Cardio equipment, an Olympic pool, a Therapy pool and several basketball courts," the facility also offers day passes to the public. See Recreational Services, University of New Mexico, https://recservices.unm.edu/facility-info/day-pass.html (last visited May 24, 2022).

as a Defendant, explaining "that [Caldwell] was provided with sufficient process."  Tr. at 38:12-18 (Marcus).   Torrez then contended that the Caldwell's emergency suspension is justified, because of the accused crimes' violent nature, the campus climate's history, including the settlement that UNM entered with the United States Department of Justice, and the risk that would have been created with the information they had at the time had UNM not taken action.  See Tr. at 38:21-39:5 (Marcus).   Torrez finished by arguing that, because of the assault's violent nature, UNM had

> no option but to . . . temporarily suspend [Caldwell] until they could straighten it out . . . .   [T]hey gave him a hearing, they straightened it [out], then they got the ban rescinded before the spring semester . . . they suspended him as an emergency measure as is permitted in Goss v. Lopez but then managed to take care of it before any harm [occurred].

Tr. at 39:7-16 (Marcus).

The Court then asked for Torrez' thoughts on Caldwell's alternative argument that the Court should grant him leave to amend the First Amended Complaint.  See Tr. at 39:22-23 (Court). Torrez responded that Caldwell should have amended the First Amended Complaint earlier and the time to do so is not "at a hearing on a motion to dismiss."  Tr. at 40:1-3 (Marcus).  The Court then stated that it would issue a Memorandum Opinion and Order soon but stated: "I am inclined [to rule that] there is not enough difference between this and the Nuñez [decision] for me . . . so I am inclined to rule . . . what I did in [the] Nuñez [opinion]."  Tr. at 40:24-41:2 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d

337, 340 (10th Cir. 1994). The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rts, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility

that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cnty. Board of Cnty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is

permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- whose deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which the plaintiffs refer to in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss

without converting the motion into one for summary judgment.  See Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See also Sec. & Exch. Comm'n v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d at 1101(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING JUDGMENT ON THE PLEADINGS

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d at 1244(quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  The same standards for evaluating a 12(b)(6) motion apply to a motion for a judgment on the pleadings.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1160 ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6).").  Thus, a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor." Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1141.  All of the nonmoving parties' allegations are deemed true, and all of the movants' contrary assertions are deemed false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v.

Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d at 340. A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. A plaintiff must "nudge his claims across the line from conceivable to plausible" to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. at 570. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177. The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.
>
> This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them.

> "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  [*Bell Atl. Corp. v. Twombly*, 550 U.S. at 576] n.3.  *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").  The *Twombly* Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies."  [550 U.S. at 591] n.10.  Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin."  *Id.*

Robbins v. Oklahoma, 519 F.3d at 1247-48.

A court must convert a motion to dismiss or a motion for judgment on the pleadings into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(d).  Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment.  See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A Federal Procedure, Lawyers' Ed. § 62:520 (2003)).  Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d at 568, abrogated on other grounds by McGregor v. Gibson, 248 F.3d at 955.  A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.  See Jacobsen v. Deseret Book Co., 287 F.3d at 941-42.  If, however, a complaint does not reference or attach a document, but the complaint refers to the document, and the document is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss."  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A Charles Alan

Wright & Arthur Miller, Federal Practice & Procedure § 1327, at 438-39 (4th ed. Oct. 2020)(stating that, when a plaintiff does not "introduce a pertinent document as part of her pleading, the defendant may be permitted to introduce the document as an exhibit to a motion attacking the sufficiency of the pleading if the plaintiff has referred to the item in the complaint and it is central to the affirmative case").

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, a complaint's sufficiency must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rts. Ltd., 551 U.S. at 322; (ii)  "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rts. Ltd., 551 U.S. at 322.  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d at 568, abrogated on other grounds by McGregor v. Gibson, 248 F.3d at 955.  In Gee v. Pacheco, 627 F.3d at 1178 the defendants "supported their motion with

numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87.

The Court has previously ruled that, in determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not rely on interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. August 23, 2012) (Browning, J.). The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the content's sufficiency alone, as the complaint did not incorporate the documents by reference, or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50 (D.N.M. January 14, 2013)(Browning, J.)(refusing to consider statements that were not "central to [the Plaintiff's] claims").

On the other hand, in a securities class action, the Court has held that a defendant's operating certification, to which the plaintiffs referred in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, fell within an exception to the general prohibition against reviewing documents outside the pleadings, and that the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cnty Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v.

Anderson, 760 F. Supp. 2d at 1101(relying on documents outside the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d at 1259-60.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment establishes: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a State to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a State cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633 JB/DJS, 2008 WL 5992271, at *6 (D.N.M. October 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms.  They are

among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

Thus, the Court has held that a person receiving welfare benefits under statutory

and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what

process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey

v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands."  Mathews

v. Eldridge, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings.  In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).  The Second Circuit

has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process."  *Hamdi v. Rumsfeld*, 542 U.S. 507,
> [529] (2004)(quoting *Mathews v. Eldridge*, 424 U.S. at 335).  A court must
> carefully balance these competing concerns, analyzing "'the risk of an erroneous
> deprivation' of the private interest if the process were reduced and the 'probable
> value, if any, of additional or substitute safeguards.'"  *Id.* (quoting *Mathews v.
> Eldridge*, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

- 41 -

valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations on multiple occasions.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. December 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concluded that the New Mexico Department of Health denied a woman with developmental disabilities due process when it deprived her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process whatsoever for the deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also has concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing after the firing, and the employee's due process claim was in reaction to the city's appeal of the hearing board's decision.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1189,  1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M.

2005)(Browning, J.), aff'd, 448 F.3d 1214, 1220-21 (10th Cir. 2006)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

More recently, in Lee I, the Court, on a motion to dismiss, concluded that a student had alleged facts sufficient to state a procedural due process against UNM based on the procedures the university used in its sexual misconduct investigation.  See 449 F. Supp. 3d at 1124.  The Court concluded that a student had a property interest in his or her continued enrollment at a university, but that the student did not have a liberty interest in his reputation, where the student did not allege that false statements were publicized.  See Lee I, 449 F. Supp. 3d at 1122.  The Court explained that, under Supreme Court and Tenth Circuit precedent, "'a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause,'" Lee I, 449 F. Supp. 3d at 1122 (quoting Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975)), but that

> damage to "reputation alone, apart from some more tangible interest such as employment," is insufficient to invoke the Due Process Clause's protections.  Paul v. Davis, 424 U.S. 693, 701 (1976).  Instead, a plaintiff "must show that as a result of the defamation, 'a right or status previously recognized by state law was distinctly altered or extinguished.'"  Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th Cir. 2019)(quoting Paul v. Davis, 424 U.S. at 711).  This is the "stigma-plus" claim sufficient to implicate a constitutionally-protected liberty interest.  See Gwinn v. Awmiller, 354 F.3d 1211, 1216, 1223-24 (10th Cir. 2004).  The Tenth Circuit recognizes deprivation "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause.

Lee I, 449 F. Supp. 3d at 1122.  Based on the student's property interest in his continued education at university and the university's "limited interest in not providing many of the procedural safeguards" in a sexual assault investigation, the Court then concluded, under the Mathews v. Eldridge, 424 U.S. at 335, balancing test, that the student's allegations that

> UNM's investigator made a determination against him without ever holding a formal hearing, and that he was not allowed to learn the witnesses' identities, attend

> any witness interviews, acquire the interview recordings, question witnesses
> regarding factual assertions, or get an opportunity to cross-examine . . . [were
> sufficient to] state[] a claim that UNM's hearing procedures do not comply with
> Due Process.

Lee I, 449 F. Supp. 3d at 1124.  Next, the Court addressed the issue of notice, and concluded that:

(i) allegations that "UNM failed to inform [the student] that he faced expulsion" did not indicate a

risk of erroneous deprivation where "UNM had already informed [the student] that he was banned

from campus"; (ii) UNM failed to provide the student with adequate notice that the university

"would raise underage drinking claims at his sanctions hearing"; and (iii) UNM "heightened the

risk of erroneous deprivation by informing [the student] that he could not bring in any new

evidence at the sanctions hearing."  Lee I, 449 F. Supp. 3d at 1133-34 (citing Watson ex rel.

Watson v. Beckel, 242 F.3d 1237, 1241 (10th Cir. 2001) and Mathews v. Eldridge, 424 U.S. at

349)).

Subsequent to Lee I, in Lee v. Univ. of New Mexico, 500 F. Supp. 3d 1181, 1240 (D.N.M.

2020)(Browning, J.)("Lee II"), the Court, on a motion for summary judgment, concluded that

UNM did not violate the student's due process rights on several grounds.  First, the Court

concluded that UNM afforded the student "'some kind of hearing,'" Lee II, 500 F. Supp. 3d at

1216 (quoting Goss v. Lopez, 419 U.S. at 584), because (i) the Dean of Students "held an

administrative hearing when it decided whether to expel" the student; (ii) "[a]t the administrative

hearing, [the student] had 'the opportunity to present witnesses and evidence,' and have counsel

present"; and (iii) at the hearing, a Student Conduct Officer with the Dean of Students "allowed

[the student's] counsel to pass 'notes' and have 'whispered conversations' with [the student]

during the hearing, although [the Student Conduct Officer] did not permit [the student's] counsel

to 'make arguments on [the student's] behalf,'" Lee II, 500 F. Supp. 3d at 1240 (quoting the

evidentiary record).  Second, the Court concluded that "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings."  Lee II, 500 F. Supp. 3d at 1240 (collecting cases).  The Court determined that, "despite [having a] substantial interest in his education," denying the student the right to cross-examine witnesses "creates little risk of erroneous deprivation," because the student had admitted to engaging in the alleged misconduct to the police after being Mirandized.[9]  Lee II, 500 F. Supp. 3d at 1240 (citing Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018)("[C]ross-examination is unnecessary if a student admits to engaging in misconduct," because "there is a little to be gained by subjecting witnesses to adversarial questioning when the accused student has already confessed.")).  The Court explained that, because the student had admitted to having non-consensual sexual contact with another student while the alleged victim was incapacitated, the witness' "credibility was not at issue" and allowing the student to cross-examine the witness "would be a 'fruitless exercise.'"  Lee II, 500 F. Supp. 3d at 1242 (quoting Winnick v. Manning,

---

[9]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court of the United States provides the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

460 F.2d 545, 550 (2d Cir. 1972)).  The Court also concluded that (i) the student was not entitled

to know a witness' identity, where the witness' statement "[did] not prejudice [the student] unfairly

because that statement had virtually no impact on the [UNM's] decision" to expel him; (ii) the

student was not entitled to access all the evidence, because UNM gave him "detailed summaries

of . . . the relevant evidence" and provided him an opportunity to respond to the witness'

statements; (iii) UNM's decision-making process does not violate the student's due process rights,

because the "inquisitorial model"[10] was not inherently biased; (iv) the university's application of

the "preponderance-of-the-evidence standard" in student disciplinary proceedings did not violate

the student's due process rights, because the Due Process Clause does not require universities to

apply a higher evidentiary standard in student disciplinary proceedings; and (v) UNM did not

violate the student's due process rights by considering alcohol as a sanctions factor, because the

Court determined that it would not "impose a higher notice requirement on the sanctioning stage

of a university than it imposes at the sentencing phase of a criminal trial."  Lee II, 500 F. Supp. 3d

at 1242-55.

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive

any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.

The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process,

which requires a State to employ fair procedures when depriving a person of a protected interest;

and (ii) substantive due process, which guarantees that a State cannot deprive a person of a

---

[10]The "inquisitorial system" is a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry."  Inquisitorial System, Black's Law Dictionary (11th ed. 2019).

protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d at 1136 (citing Cnty. of

Sacramento v. Lewis, 523 U.S. at 845-46).  "Under either form of protection, however, a person

must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of

Santa Fe, , 2008 WL 5992271, at *6.  In Doe v. Woodard, 912 F.3d 1278 (10th Cir. 2019), the

Tenth Circuit explains that there exist two types of substantive due process claims:

> In *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), we recently
> recounted that the Supreme Court recognizes two types of substantive due process
> claims: (1) claims that the government has infringed a "fundamental" right, *see*,
> *e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721-22 . . . (1997)(assessing
> asserted right to assisted suicide); and (2) claims that government action deprived
> a person of life, liberty, or property in a manner so arbitrary it shocks the judicial
> conscience, *see*, *e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 846 . . . (1998)
> (examining a high-speed police chase). *Halley*, 902 F.3d at 1153.  "[W]e apply the
> fundamental-rights approach when the plaintiff challenges legislative action, and
> the shocks-the-conscience approach when the plaintiff seeks relief for tortious
> executive action." *Id.*

Doe v. Woodard, 912 F.3d at 1300.  "[N]othing in the language of the Due Process Clause itself

requires the State to protect the life, liberty and property of its citizens against invasion by private

actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process

Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago

Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.      **Exceptions to the General Rule**.

There are, however, two exceptions to this general rule that States need not protect against

deprivation of liberty or property interests by private actors.  The first exception -- the special-

relationship doctrine -- arises when the state has a custodial relationship with the victim, which

triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of

Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991,

994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a

State may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" <u>Robbins v. Oklahoma</u>, 519 F.3d at 1251 (quoting <u>Currier v. Doran</u>, 242 F.3d at 923). "If either the special- relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" <u>Glover v. Gartman</u>, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

2.     **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. Under this exception, a plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. <u>See Liebson v. N.M. Corr. Dep't</u>, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." <u>Uhlrig v. Harder,</u> 64 F.3d 567, 572 (10th Cir. 1995).

3.     **Danger-Creation Exception.**

Second, the Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." <u>Uhlrig v. Harder,</u> 64 F.3d at 573. The danger-creation exception applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." <u>Currier v. Doran</u>, 242 F.3d at 923. <u>See</u> <u>Estate of B.I.C. v. Gillen</u>, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials

can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima facie case, a plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the State and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk. See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. A defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992). The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

4.      **Government Conduct That Shocks the Conscience**.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d at 1040).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574) (internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir.

2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- a school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[11] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies

---

[11]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING § 1983 LIABILITY

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See

- 52 -

Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("'The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.'")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has stated that there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens")[12] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. December 8, 2011)(Browning, J.)(citing Monell, 436 U.S. at 689). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or

---

[12]In Bivens, the Supreme Court held that a violation of the Fourth Amendment of the Constitution "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing

Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered

the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is

inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft

v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude
> the following basis of § 1983 liability survived it and ultimately resolves this case:
> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who
> creates, promulgates, implements, or in some other way possesses responsibility
> for the continued operation of a policy the enforcement (by the defendant-
> supervisor or her subordinates) of which "subjects, or causes to be subjected" that
> plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "*Iqbal*

may very well have abrogated § 1983 supervisory liability as we previously understood it in this

circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d

at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously

enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d

at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative'

link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or

policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"

Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v.

Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials

liable under § 1983 for constitutional violations that unnamed individual police officers

committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at

- 54 -

371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'"  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. at 818.  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Royal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state officials who have violated his or her constitutional or statutory rights.  42 U.S.C. § 1983.  Under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[13]  The Supreme Court, however, deems it "untenable to draw a distinction

---

[13]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics has been extended, however, to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics into new contexts.

for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987). See Green v. Padilla, 484 F. Supp. 1098, 1129 (D.N.M. 2020)(Browning, J.).

If a government official has not violated a "clearly established" right, the official is shielded from personal liability. Harlow v. Fitzgerald, 575 U.S. at 818. Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws. Saucier v. Katz, 533 U.S. 194, 205 (2001). A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011). A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis: "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their

---

See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

duties." Est. of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).   When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit," not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Est. of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.    The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified-immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), lower courts were directed to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. at 200. The Supreme Court's decision in Pearson v. Callahan, however, made the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz's "'rigid order of battle'" had faced criticism from lower courts on "'practical, procedural, and substantive grounds.'"  Pearson

v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U.L. Rev. 1249, 1275, 1277 (2006)).  Though the Supreme Court recognizes that the Saucier rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  Pearson v. Callahan, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  Pearson v. Callahan, 555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[14] qualified immunity's clearly established prong: when (i) the first, constitutional violation

_____

[14]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts."  Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See

question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07. See Kerns v. Bader, 663 F.3d at 1181.[15]

---

Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

[15]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

———————

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was

constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[16] See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

---

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. February 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[16]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.  The "Saucier two-step" encourages courts to articulate the constitutional rights at issue.  Before Pearson v. Callahan, 555 U.S. at 223, made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice of the United States Supreme Court Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices of the United States Supreme Court Ruth Bader Ginsburg and Stephen Breyer, Associate Justice of the United States Supreme Court John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity."  Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote:  "We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case."  Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opined that "[d]eciding the constitutional question before

should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.  Clearly Established Rights.

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable

---

addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999). The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine."). See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"). See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010). The bottom line is that a trial court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if it was clearly established.

official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202)(alteration in Holland ex rel. Overdorff v. Harrington, but not Saucier v. Katz).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).  In other words, existing precedent must have placed the constitutional or statutory question "beyond debate."  Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'"  White v. Pauly, 280 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).  The Supreme Court refers to this as a "longstanding principle."  White v. Pauly, 280 U.S. at 79.  Nevertheless, the clearly established law must be "particularized" to the case's facts.  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Anderson v. Creighton, 483 U.S. at 639.  "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers.  United States v. Lanier, 520 U.S. 259, 271 (2017).  See White v. Pauly, 137 S. Ct. at 552 (reiterating this principle).  Importantly, the "unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. at 640.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting, in a case where the Eighth Amendment violation was "obvious," that there need not be a materially

similar case for the right to be clearly established)).  A court must, therefore, "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances."  Green v. Padilla, 484 F. Supp. 3d at 1134 (citing City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this is not always required.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggested an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells."  Taylor, 141 S. Ct. at 53.  For example, one cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink because he feared that his food and water would be contaminated.  See 141 S. Ct. at 53.  Correctional officers then moved the plaintiff to a second cell that was "frigidly cold" and was equipped with "only a clogged drain

in the floor to dispose of bodily wastes."  141 S. Ct. at 53.  The plaintiff held his bladder for more

than twenty-four hours before finally involuntarily relieving himself, which caused the clogged

drain to overflow and "raw sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff

was not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in

sewage."  141 S. Ct. at 53.

The Fifth Circuit held that these confinement conditions violated the Eighth Amendment's

ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity

because the law was not clearly established.  See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens,

946 F.3d at 222).  The Fifth Circuit concluded that the corrections officials did not have "fair

warning" that confining the plaintiff in these conditions would be unconstitutional.  Taylor v.

Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  The Supreme Court

reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis.  See

Taylor, 141 S. Ct. at 53.  Although the plaintiff could not identify a case on point, the Supreme

Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable

correctional officer could have concluded that, under the extreme circumstances of this case, it

was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions

for such an extended period of time."  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th

at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made

clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals

of superior courts.[17]  One such unwritten signal is that "a nigh identical case must exist for the law

---

[17]As former Tenth Circuit judge, and now Stanford law school professor, Michael
McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the

to be clearly established." <u>Caldwell</u>, 510 F. Supp. 3d at 1032 n.14.[18]   As numerous Courts of

Appeals have recently noted, however, <u>Taylor</u> clarifies that it is no longer the case that an almost-

––––––––––––––––

superior courts send them through their opinions.  <u>See</u> Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (December 17, 2014).

   [18]The Court notes, as it has elsewhere, <u>see</u>, <u>e.g.</u>, <u>Caldwell</u>, 510 F. Supp. 3d at 1032 n.14, that qualified immunity is a problematic doctrine.  This is particularly true of the Supreme Court's approach before <u>Taylor</u>.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  <u>Caldwell</u>, 510 F. Supp. 3d at 1032 n.14

   Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  <u>See</u> <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in <u>York v. City of Las Cruces</u>?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," <u>Kisela v. Hughes</u>, 138 S. Ct. at 1162 (Sotomayor, J., dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  <u>See</u> <u>Saenz v. Lovington Mun. Sch. Dist.</u>, 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

   In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  <u>See</u> Stephen R. Reinhardt, <u>The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences</u>, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  <u>See also</u> <u>White</u>

v. Pauly, 580 U.S. at 79(criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment"). In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue. As the Honorable Don Willett, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit notes, this creates a Catch-22. See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring dubitante)(opinion withdrawn on rehearing). The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499. In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Calif. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 582 U.S. 120, 159 (2017)(Thomas, J., concurring in part)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 582 U.S. at 159-60(Thomas, J., concurring in part)(internal quotation marks omitted). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that State actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Calif. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online

identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga Cnty., 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does not need to be a case directly on point" when no reasonable officer could have concluded that the challenged action was constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. 2021)(noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. at 199)).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's

---

(2017) -- seems to be in agreement with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir. 2007), the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th Cir. 2016); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana, No. 16-2222, 2017 WL 3951706, at *3 (10th Cir. September 8, 2017)(unpublished); Brown v. City of Colo. Springs, No. 16-1206, 2017 WL 4511355, at *8 (10th Cir. October 10, 2017)(unpublished), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

decision in *Taylor* sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, <u>Defending Qualified Immunity</u>, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of <u>Taylor</u>. First, <u>Taylor</u> could simply clarify that the holding in <u>Hope v. Pelzer</u>, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts. This reading of <u>Taylor</u> would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that only applies in case with "extreme circumstances" or "particularly egregious" facts. Second, <u>Taylor</u> could mean that a court must now ask whether the conduct at issue was particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if so, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation. Nonetheless, there is confusion both between and within the Courts of Appeals about <u>Taylor</u>'s scope. <u>Compare</u> <u>Bates v. Schwarzenegger</u>, 832 F. App'x 509, 511 (9th Cir. 2020)(mem.)(citing <u>Taylor</u> for the proposition that the "Supreme Court has repeatedly, including very recently, reaffirmed and applied the doctrine of qualified immunity"), <u>with</u> <u>Rico v. Ducart</u>, 980 F.3d 1292, 1307 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part)(explaining that, in <u>Taylor</u>, "the Court held that the prisoner's rights were so obvious that 'ambiguity in the caselaw' could not create any doubt" that the officer's conduct was unconstitutional)(citing <u>Taylor</u>, 141 S.Ct. 52, 53 n.2). Since <u>Taylor</u>, courts have asked not just whether the law was clearly established through a factually similar case

from that Circuit or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable officer could have concluded that" their actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at 1236.  In other words, in addition to asking whether the officer was theoretically on notice that they were acting unlawfully,[19] the Court must also ask whether the conduct at issue was "particularly egregious" -- an apparently objective question.  McCoy v. Alamu, 141 S. Ct. 1364,

---

[19]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court has previously noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Det. Ctr., 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

1364 (mem.)(2021)(vacating and remanding in light of <u>Taylor</u> even though the conduct at issue was likely not "particularly egregious").[20]

The United States Court of Appeals for the Third Circuit, for example, notes that <u>Taylor</u> did not affect whether three State legislators who took a public stand against the sale of state-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution." <u>HIRA Educ. Servs. N. Am. v. Augustine</u>, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting <u>Taylor</u>, 141 S. Ct. at 53).  The United States Court of Appeals for the Seventh Circuit, too, concludes that <u>Taylor</u> means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious."  <u>Lopez v. Sherriff of Cook Cnty.</u>, 993 F.3d 981, 991 (7th Cir. 2021).  In <u>Lopez v. Sherriff of Cook County</u>, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the

---

[20]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of <u>McCoy v. Alamu</u>: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in <u>Taylor</u>; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

Constitution notwithstanding the lack of an analogous decision."[21]  993 F.3d at 991.  The United

States Court of Appeals for the Ninth Circuit also distinguishes Taylor on the basis of the conduct's

severity.  See Rico v. Ducart, 980 F.3d at 1300 n.9.  In Rico v. Ducart, the Ninth Circuit held that

correctional officers who performed inmate-welfare checks that, because of the design of the

prison, created loud noises every forty-five minutes were entitled to qualified immunity because

the facts were not "as extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the

Ninth Circuit also has decided that Taylor "only highlights the level of blatantly unconstitutional

conduct necessary to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d 1027, 1044

(9th Cir. 2021).

---

[21]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  Lopez v. Sherriff of Cook Cnty., 993 F.3d 992.  Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as fleshy shield to protect an off-duty officer who had shot that very shield moments earlier.  Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such conduct.  A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields to violate some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

The other Courts of Appeals have, however, have characterized <u>Taylor</u> as only reaffirming an "extreme circumstances" or "obvious clarity" exception.  The Fifth Circuit, for example, has distinguished <u>Taylor</u>, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  <u>Landry v. Laborde-Lahoz</u>, No. 20-20365, 2021 WL 1537455, at * 5 (5th Cir. April 19, 2021).[22]  The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to <u>Taylor</u>.  The Fifth Circuit also has noted that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who did not resist arrest while the man was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped breathing and his lips turned blue -- while officers nearby "milled around" -- would constitute "such a severe tactic against this particular person would be constitutionally proscribed," and that the officer would "have no recourse to qualified immunity."  <u>Aguirre v. City of San Antonio</u>, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit has further cited <u>Taylor</u> to support its assertion that "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant law.'"  <u>Roque v. Harvel</u>, 993 F.3d 325, 335 (5th Cir. 2021)(quoting <u>Brousseau v. Haugen</u>, 542 U.S. 194, 199 (2004)).  In <u>Roque v. Harvel</u>, however, the Fifth Circuit did not say what those "general standards" might be, from where they might come, or where a court might look for them, and then proceeded to characterize

---

[22]The Court does not agree with the Fifth Circuit's reasoning on this point, although it agrees with the case's result.  The Fifth Circuit reasons that <u>Taylor</u> did not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it was "factually distinct."  <u>Landry v. Laborde-Lahoz</u>, 2021 WL 1537455, at * 5.  That <u>Taylor</u> is factually distinct has no bearing on the merits of a deliberate-indifference claim but impacts its applicability to the qualified-immunity question.

qualified-immunity law as requiring a case on point in almost all circumstances.  993 F.3d at 335.[23]

More recently, however, the Fifth Circuit acknowledged that Taylor excuses a plaintiff from "their

obligation to identify an analogous case in 'extreme circumstances' where the constitutional

violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir.  2021)(quoting Taylor, 141

S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this is a "high standard," because the

facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th at 206 (quoting Taylor, 141

S. Ct. at 53-54).

       Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For

example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520

U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may

---

[23]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (5th Cir. 2021), the Fifth Circuit did not cite Taylor, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]."  Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know.")).

998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See 141 S. Ct. at 54.  See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, 835 F. App'x 379, 382 (10th Cir. 2020)(unpublished).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule is applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.'  That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'"  Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d T 1101, then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."  Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The Tenth Circuit continued by noting that the situation before them -- several police officers surrounding a man who asked one of the officers for a statement about the force the officer had just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. at 730.  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat a claim for

qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard.  See Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit held that even without a prior precedent clearly establishing the law, it was "'obvious'" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "'obviously egregious.'"  Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138 S. Ct. at 590, then Pierce v. Gilchrist, 359 F.3d at 1298).  The Tenth Circuit, in Truman v. Orem City, comparing the facts directly to those in Taylor, continued: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."  1 F. 4th at 1241.  In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterated that its qualified-immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."  Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concluded that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it found that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor, see 1 F. 4th at 1244.  This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382

(quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful, Taylor, 141 S. Ct. at 53.

The Court does its best follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[24] The Court will therefore proceed with both lines of analysis. An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54. See Est. of Smart by Smart v. City of Wichita,

_____

[24]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier 520 U.S. at 259 and Hope v. Pelzer, 536 U.S. at 730, and stands for the proposition that an officer is not entitled to qualified immunity when their conduct is "particularly egregious" such that "any reasonable officer should have realized" that their conduct offends the Constitution. Taylor, 141 S. Ct. at 54. See also Moderwell v. Cuyahoga Cnty, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)). The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021). See Ramirez v. Guadarrama, 2 F.4th at 523 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity at 222-23. On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

951 F.3d at 1178 (quoting <u>Perea v. Baca</u>, 817 F.3d at 1202 ("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'"). <u>See also</u> <u>Riggins v. Goodman</u>, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . . the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp. 3d at1079.

## LAW REGARDING LAW OF THE CASE

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" <u>Poche v. Joubran</u>, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)(quoting <u>Dobbs v. Anthem</u>, 600 F.3d 1275, 1279 (10th Cir. 2010)). The Tenth Circuit has "acknowledged, however, that 'the rule [of law of the case] is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d 1217, 1225 (10th Cir. 2007)(internal citation omitted)(citing <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 823 (10th Cir. 2007)). The Tenth Circuit has stated that this flexibility means "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995), and citing <u>Homans v. City of Albuquerque</u>, 366 F.3d 900, 904 (10th Cir. 2004)("[T]he doctrine is discretionary rather than mandatory.")). "If the original ruling was issued by a higher court, a district court should depart from the ruling only

in exceptionally narrow circumstances."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing

McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).

Only "final judgments may qualify as law of the case."  Poche v. Joubran, 389 F. App'x at

774 (quoting Unioil, Inc. v. Elledge (In re Unioil, Inc.), 962 F.2d 988, 993 (10th Cir. 1992)("In Re

Unioil, Inc.").  The doctrine is inapplicable where "a ruling remains subject to reconsideration."

Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(quoting In re

Unioil, Inc., 962 F.2d at 993; other citations omitted).  This means that "district courts generally

remain free to reconsider their earlier interlocutory orders."  Been v. O.K. Indus., Inc., 495 F.3d at

1225 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith,

389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so

long as it retains jurisdiction over the case)).

Similarly, this Court has stated that "[l]aw of the case is a doctrine that binds the trial court

after an appeal."  Lane v. Page, 727 F. Supp. 2d, 1214, 1230 (D.N.M. 2010)(Browning, J.)(citing

Clark v. State Farm Mut. Auto. Ins., 590 F.3d 1134, 1140 (10th Cir. 2009)).  Additionally, in Clark

v. State Farm Mutual Automobile Insurance, the Tenth Circuit stated:

> Under the law of the case doctrine, a legal decision made at one stage of litigation,
> unchallenged in a subsequent appeal when the opportunity to do so existed,
> becomes the law of the case for future stages of the same litigation, and the parties
> are deemed to have waived the right to challenge that decision at a later time.

590 F.3d at 1140.

## ANALYSIS

The Court concludes that Caldwell has not alleged facts sufficient to state a Fourteenth

Amendment due process claim against Torrez.  In its opinion dismissing Nuñez, the Court

addressed many of the same issues that Torrez raises here, including: (i) whether Caldwell has

alleged facts sufficient to state a due process interest in (a) his continued enrollment at UNM; (b) playing basketball for UNM; (c) his reputation; and (d) his future professional basketball career; (ii) whether UNM's actions comported with procedural due process when Nuñez and Torrez banned Caldwell from campus; (iii) whether Caldwell has alleged properly a claim against Nuñez and Torrez for damages under 42 U.S.C. § 1983, because Caldwell's procedural due process rights were clearly established; and (iv) whether Nuñez violated substantive due process, because Nuñez' actions -- banning Caldwell from campus -- shock the judicial conscience. Compare Motion at 1-2, with Caldwell, 510 F. Supp. 3d at 994. The Court reaches the same conclusions on those issues here as it did for Nuñez. Accordingly, the Court will dismiss Caldwell's due process claim against Torrez, because: (i) Caldwell has alleged facts sufficient to state a Fourteenth Amendment Due Process property interest in his continued enrollment at UNM, but has not alleged sufficient facts for a property interest in playing basketball for UNM, or a liberty interest in his reputation and his future professional basketball career; (ii) even though Caldwell alleges sufficiently that Torrez banned Caldwell from campus, UNM procedures comport with due process; (iii) Caldwell cannot sue successfully Torrez for damages under § 1983, because Caldwell's procedural due process rights, if they exist, were not clearly established; and (iv) Torrez did not violate Caldwell's substantive due process rights, because Torrez' actions do not shock the judicial conscience. At the hearing, however, Caldwell emphasized for the first time that his campus ban also implicates potential property interests in his student housing and meals that he obtained through his basketball scholarship, interests that he did not raise in his briefing. Compare Response at 15, with Tr. at 27:18-28:10 (Harrison)("He was deprived of his housing in a meaningful way . . . [which is] all part of that bundle that . . . [is] worthy of constitutional protection."); id. at 16:19-23 (Harrison)(arguing that "the opposite" is true: "the implication of not having housing and meals

[is] huge.  That's far more [important] than not being able to attend a class or being able to attend it only online"); id. at 27:5-28:17 (Harrison)("He was deprived [of] his housing in a meaningful way by being told that he was going to be arrested for criminal trespass if he went back home . . . ."). The Court concludes that Caldwell does not have a property interest in his university-provided housing and meals, and, even if university housing and meals are property interests, Caldwell received adequate notice and process under the Fourteenth Amendment, because he received two eviction notices and four separate hearings before he was evicted.  Accordingly, the Court will grant the Motion.

I.     **CALDWELL HAS ALLEGED FACTS SUFFICIENT TO STATE A FOURTEENTH AMENDMENT DUE PROCESS PROPERTY INTEREST IN HIS CONTINUED ENROLLMENT AT UNM, BUT HAS NOT ALLEGED FACTS SUFFICIENT TO ESTABLISH A PROPERTY INTEREST IN PLAYING BASKETBALL FOR UNM, A LIBERTY INTEREST IN HIS REPUTATION AND HIS FUTURE PROFESSIONAL BASKETBALL CAREER, OR A PROPERTY INTEREST IN HIS HOUSING AND MEALS.**

"The Fourteenth Amendment provides that a state shall 'not deprive any person of life, liberty, or property, without due process of law.'"  Lauck v. Campbell Cnty., 627 F.3d 805, 811 (10th Cir. 2010)(quoting U.S. Const. amend. XIV).  Courts follow a two-step inquiry to evaluate procedural due process claims: "(1) Did the individual possess a protected interest to which due process protection was applicable?   (2) Was the individual afforded an appropriate level of process?"   Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J, 464 F.3d 1182, 1189 (10th Cir. 2006).  See Mathews v. Eldridge, 424 U.S. at 334-35.  Caldwell contends that: (i) he has a property interest in his continued enrollment at UNM; (ii) he has a property interest in playing basketball for UNM; and (iii) he has a liberty interest in his reputation and his future professional basketball career.  See First Amended Complaint ¶ 83, at 13.  Caldwell contends that Torrez, "under color of law within the meaning of 42 U.S.C. § 1983, deprived Plaintiff of rights and privileges secured by

the United States Constitution and are liable for his injuries."  First Amended Complaint ¶ 84, at 13.  See First Amended Complaint ¶¶ 82-93, at 13-15.  The Court concludes that: (i) Caldwell alleges sufficiently that Torrez was involved in the decision to ban Caldwell from campus, which has deprived him of his property interest in his continued education at UNM;[25] (ii) Caldwell does not have a property interest in playing collegiate basketball; (iii) Caldwell's allegations do not support a liberty interest in his reputation or in a future career as a professional basketball player; and (iv) Caldwell does not have a property interest in his student housing.

### A. THE FIRST AMENDED COMPLAINT ALLEGES SUFFICIENTLY THAT TORREZ DEPRIVED CALDWELL OF HIS PROPERTY INTEREST IN HIS CONTINUED EDUCATION, BECAUSE CALDWELL ALLEGES SUFFICENTLY THAT TORREZ INTERFERED WITH THIS INTEREST BY TEMPORARILY BANNING CALDWELL FROM CERTAIN CAMPUS PROPERTY.

Caldwell contends that that he "enjoys a property interest in his status as a student at the University, [and] in the education he has undertaken to receive."  First Amended Complaint ¶ 83, at 13.  In the Tenth Circuit, "a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause."  Gaspar v. Bruton, 513 F.2d at 850 (concluding that a student in a public vocational-technical school's nursing program had a protected property interest).  See Goss v. Lopez, 419 U.S. at 576 (explaining that students have a property interest in educational benefits).  See, e.g., Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181 (stating that a student "had a property interest in his place in the Nursing School program that is entitled to due process protection under the Constitution"); Harris v. Blake, 798 F.2d at 422 (concluding that a part-time graduate psychology student "had a property

---

[25]Even though Caldwell alleges sufficient facts that Torrez was involved in the decision to ban Caldwell, the Court concludes that UNM afforded Caldwell sufficient process, see infra Analysis § II, and that Torrez is entitled to qualified immunity, see infra Analysis § III.

interest in his [graduate program] enrollment which entitled him to procedural due process"). See also Brown v. Univ. of Kan., 16 F. Supp. 3d 1275, 1288 (D. Kan. 2014)(Melgren, J.)(collecting cases in the Tenth Circuit and concluding that a law student who had paid tuition had a property interest in his continued enrollment at law school), aff'd, 599 F. App'x 833 (10th Cir. 2015)(unpublished); Assenov v. Univ. of Utah, 553 F. Supp. 2d 1319, 1327 (D. Utah 2008)(Campbell, J.)(concluding that a graduate student's interest in his "continued enrollment in the [University of Utah College of Engineering's Nuclear Engineering Program] is a property interest entitled to constitutional due process protections"); Siblerud v. Colo. State Bd. of Agric., 896 F. Supp. 1506, 1512-13 (D. Colo. 1995)(Kane, J.))(same).  Caldwell was enrolled at UNM throughout 2019.[26]  See First Amended Complaint ¶¶ 4, 2; id. ¶ 11 at 3.  Accordingly, the Court concludes that Caldwell has a property right in his continued education at UNM.  See Gaspar v. Bruton, 513 F.2d at 850; Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181.

To state a claim against Torrez under § 1983, Caldwell must allege that Torrez was personally responsible for the claimed deprivation of a constitutional right.  See 42 U.S.C. § 1983 (imposing liability on any person who, acting under color of law, "subjects, or causes to be subjected" another person to the deprivation of his or her constitutional rights)(emphasis added); Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006)(stating that, "[i]n order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a

---

[26]UNM is a public institution that the New Mexico Legislature established to provide its citizens with post-secondary education.  See N.M. Stat. Ann. § 21-7-1 ("The university of New Mexico is intended to be the state university, and as such is entitled to all the donations of land and all other benefits under all acts of congress enacted for the benefit of such educational institutions in the state.").  See also N.M. Stat. Ann. §§ 21-7-1 to -32.

constitutional right must be established"); Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)(affirming the dismissal for failure to state a cause of action, because "'[p]ersonal participation is an essential allegation in a § 1983 claim'")(quoting Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)); Coleman v. Turpen, 697 F.2d 1341, 1346 n.7 (10th Cir. 1982)("*Respondeat superior* generally does not apply to § 1983 cases.  Thus, [the defendant], to be liable, must have been personally involved in the deprivation.").  Personal participation does not require that a defendant was physically present when the specific violation occurred, because "direct participation is not necessary" to impose § 1983 liability.  Mink v. Knox, 613 F.3d 995, 1001 (10th Cir. 2010).  To allege sufficiently a § 1983 claim, however, Caldwell must allege a "causal connection" between Torrez' participation and the deprivation of his rights, which creates "an affirmative link between the constitutional deprivation and the officer's exercise of control or direction." Mink v. Knox, 613 F.3d at 1001 (citing Poolaw v. Marcantel, 565 F.3d 721, 732 (10th Cir. 2009)).  "'The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" Mink v. Knox, 613 F.3d at 1001-02 (concluding that a complaint that alleges that a deputy district attorney, who reviews and approves an affidavit in support of a warrant, "plausibly asserted the requisite casual connection between [the deputy district attorney's] conduct and the search and seizure that occurred at [the plaintiff's] home")(quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990)).

Here, Caldwell's First Amended Complaint alleges sufficiently that Torrez, UNM's DOS, participated in the decision to ban Caldwell from campus, because he received an email on behalf of UNM's DOS Office banning him from the University campus.  See First Amended Complaint ¶ 8, at 3; id. ¶ 19, at 4; Mitchell v. Maynard, 80 F.3d at 1441.  Caldwell explains his allegation that

Torrez' "directives absolutely banned Plaintiff from campus," by alleging that Torrez: (i) "is the Dean of Students at the University"; and (ii) "[o]n or about December 19th, 2019, Plaintiff received an email from Defendant Dean of Students' Office banning him from the University campus."  First Amended Complaint ¶ 8, at 3; id. ¶¶ 19-21, at 4.  Caldwell alleges that Torrez' office directed the campus ban, even though Torrez claims she was uninvolved in the process of imposing the ban.[27]  The Court concludes that holding a meeting "during which she reiterated that he was suspended and that she would make the decision whether or not to continue his indefinite suspension at some unknown later date," First Amended Complaint ¶ 30, at 5, puts her knee-deep in the alleged constitutional violations, and thus, is sufficient to establish some "'[p]ersonal participation'" in the decision to ban Caldwell.  Mitchell v. Maynard, 80 F.3d at 1441 (quoting Bennett v. Passic, 545 F.2d at 1262-63).  See Trujillo v. Williams, 465 F.3d at 1227.  Although Torrez claims it was the Student Conduct Officer who imposed the ban, the allegation that Torrez held a meeting with Caldwell reiterating his ban and the fact the Student Conduct Officer serves the DOS Office, see First Amended Complaint ¶ 30, at 5, is sufficient to create the "reasonable

---

[27]Caldwell alleges that DOS Office emailed him that day, expressly "banning" Caldwell and explains that the DOS has the authority to do so.  First Amended Complaint ¶ 19, at 4 (alleging that the DOS Office emailed Caldwell "banning him from the University campus"); First Amended Complaint ¶ 21, at 4 (alleging that the email from the DOS Office stated "that [Caldwell] was 'hereby interim banned from all of UNM Campus, except for UNM Hospitals and Clinics for the purpose of seeking medical care and except for [his] in-person courses for Spring 2020 semester'")(quoting alleged email sent by the DOS); First Amended Complaint  ¶ 35, at 6 (attributing the ban to "Kelly Davis, the UNM Student Conduct Officer in the Office of the Dean of Students who promulgated the 'ban letter'"); First Amended Complaint  ¶ 41, at 7 ("Defendant Torrez stated that the Student Conduct Officer, an employee in her office, had imposed the ban . . . .").  Given that the complaint is evaluated under a notice pleading standard, however, Caldwell only must articulate a "reasonable inference" that Torrez participated in the ban.  Ashcroft v. Iqbal, 556 U.S. at 678.  The Court concludes there is a reasonable inference that Torrez participated in the ban, because she serves as the DOS and it was an email from an employee in her office that informed Caldwell that he was banned.  See First Amended Complaint ¶¶ 22-23, at 5.

inference," Ashcroft v. Iqbal, 556 U.S. at 678, that Torrez had some influence on whether to ban Caldwell from campus, even if Caldwell does not allege that Torrez imposed that ban herself, see Bell Atl. Corp. v. Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

The next issue is whether a campus ban interferes with Caldwell's property right in his continued education at UNM.  Neither party addresses the constitutional distinction between a suspension and a campus ban.  See Motion at 1-16; Response at 1-24.  UNM's Code of Student Conduct defines "suspension" as "losing student status for a period of time specified in the terms of the suspension.  A suspension may commence immediately upon a finding of a violation or it may be deferred to a later time."  Student Code of Conduct § 4.2.4, The Pathfinder -- UNM Student Handbook, https://pathfinder.unm.edu/code-of-conduct.html (last visited May 21, 2022)("Student Code of Conduct").[28]  See First Amended Complaint ¶ 66, at 10.  In contrast, UNM's Code of Student Conduct defines "barred from campus" as "being barred from all or designated portions

---

[28]District courts may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court takes judicial notice of UNM's Student Code of Conduct, which Caldwell discusses, but does not quote, the Student Code of Conduct in the First Amended Complaint, because it comes from UNM's official website and cannot reasonably be questioned. See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Jacobsen v. Deseret Book Co., 287 F.3d at 941 ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").  Torrez does not dispute the UNM's Student Code of Conduct's authenticity.

of the University property or activities."   Student Code of Conduct § 4.2.7.   Caldwell does not

allege plausibly that Torrez suspended him, Caldwell only alleges plausibly that Torrez barred him

from campus.   See First Amended Complaint ¶¶ 31, at 5 ("Torrez informed Plaintiff that the

campus ban would remain in place.").[29]   Because a "suspension" means a loss of student status,

Student Code of Conduct § 4.2.4, there is an interference with a student's property right to a

continued education, see Goss v. Lopez, 419 U.S. at 576.   A campus ban, however, does not mean

that a student loses their status as a student or the ability to enroll in classes, only that the student

cannot enter onto UNM property or participate in school activities.   See Student Code of Conduct

§ 4.2.7.   The Court, nonetheless, concludes that a campus ban interferes with a student's right to

continued education, because it interferes with the "educational process," such as the ability to

attend classes and university activities, including lectures, student groups, and athletic events.

Goss v. Lopez, 419 U.S. at 576.   As the Tenth Circuit has explained:

> The educational process is a broad and comprehensive concept with a variable and
> indefinite meaning.   It is not limited to classroom attendance but includes
> innumerable separate components, such as participation in athletic activity and
> membership in school clubs and social groups, which combine to provide an
> atmosphere of intellectual and moral advancement.

Albach v. Odle, 531 F.2d 983, 985 (10th Cir. 1976)(citing Goss v. Lopez, 419 U.S. at 576).   Cf.

Sword v. Fox, 446 F.2d 1091, 1096 (4th Cir. 1971)(concluding, in the context of the First

---

[29]Caldwell alleges in the First Amended Complaint: "Defendant Nasha Torrez subsequently had a brief meeting with Plaintiff during which she reiterated that he was suspended . . . ."   First Amended Complaint ¶ 30, at 5.   Caldwell appears to use the word "suspension" interchangeably with "ban," and Caldwell provides no factual allegation that Torrez suspended him or somehow revoked Caldwell's status as a student.   Response at 2-7.   The Court concludes that the allegation that Torrez suspended Caldwell is conclusory, because there is no alleged factual basis for the allegation that Torrez or indeed anyone else suspended Caldwell.   See Ashcroft v. Iqbal, 556 U.S. at 678.   As the Court has explained, Caldwell plausibly alleges that Torrez banned him from campus property.

Amendment, that, "[w]hile a flat ban on campus demonstrations [by students] would be manifestly invalid, 'It is equally clear, however, that students do not have an unlimited right to demonstrate on university property.'")(quoting Developments in the Law of Academic Freedom, 81 Har. L. Rev. 1045, 1131 (1968)).  But see Collins v. Univ. of N.H., 746 F. Supp. 2d 358, 370 (D.N.H. 2010)(McCafferty, J.), aff'd, 664 F.3d 8 (1st Cir. 2011)(concluding that a professor's "campus ban . . . did not work a sufficiently serious harm to plaintiff to rise to the level of the deprivation of a liberty interest").  Caldwell alleges that he "has been barred from all on-campus activities, including exercising at the gymnasium, visiting the library, walking across campus and otherwise engaging in the activities of a student-athlete."  First Amended Complaint ¶ 32, at 6.  Over winter break, Caldwell was permitted to attend the class he was registered for at Johnson Gym; however, he was only permitted to register for online classes in spring semester and was otherwise banned from campus.  See First Amended Complaint ¶ 21, at 4.  Accordingly, the Court concludes that Caldwell has alleged plausibly that Torrez, by banning Caldwell from campus, interfered with Caldwell's property interest in his continued education.

### B.   CALDWELL DOES NOT HAVE A PROPERTY INTEREST IN PLAYING COLLEGIATE BASKETBALL, BECAUSE PARTICIPATING IN INTERCOLLEGIATE SPORTS IS NOT CONSTITUTIONALLY PROTECTED.

Caldwell contends that he has a property interest "as a player on the University basketball team."  First Amended Complaint ¶ 83, at 13.  "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 538 (quoting Bd. of Regents of State Colls v. Roth, 408 U.S. at 577).  To have a property interest, an individual "must have more than a unilateral expectation of it.  He

must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls v. Roth, 408 U.S. at 577.

In the context of high school sports, the Tenth Circuit has concluded that "[p]articipation in interscholastic athletics is not a constitutionally protected civil right."  Albach v. Odle, 531 F.2d at 984-85 (citing Okla. High Sch. Athletic Ass'n v. Bray, 321 F.2d 269, 273 (10th Cir. 1963); Mitchell v. La. High School Athletic Ass'n, 430 F.2d 1155, 1158 (5th Cir. 1970)).  And, in Colo. Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, the Tenth Circuit concluded that "the interest of the student athletes in participating in intercollegiate sports [is] not constitutionally protected."  570 F.2d at 321.  Caldwell cites no cases to the contrary.  See First Amended Complaint ¶¶ 83-93; Response at 1-10.  In Albach v. Odle, high school students were barred from "high school athletic competition for one year," when "any student . . . transfer[red] from his home district to a boarding school or from a boarding school to his home district."  531 F.2d at 984.  The Tenth Circuit explained that the students failed to state a claim under § 1983, because participating in interscholastic athletics is not a "constitutionally protected right."  Albach v. Odle, 531 F.2d at 985.  The Tenth Circuit reasoned that the "constitutionally protected right" to the

> educational process is a broad and comprehensive concept with a variable and indefinite meaning.  It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement.  We do not read Goss to establish a property interest subject to constitutional protection in each of these separate components.

Albach v. Odle, 531 F.2d at 985 (citing Goss v. Lopez, 419 U.S. at 576)).  See Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996)("In Albach we explained that the innumerable separate components of the educational process, such as participation in athletics and membership in school clubs, do not create a property interest subject to constitutional protection.").  The Tenth Circuit is

not alone in holding that there is no property in playing school sports.  See, e.g., Burrows by

Burrows v. Ohio High Sch. Athletic Ass'n, 891 F.2d 122, 125 (6th Cir. 1989); Niles v. Univ.

Interscholastic League, 715 F.2d 1027, 1031 (5th Cir. 1983)("A student's interest in participating

in interscholastic athletics falls 'outside the protection of due process.'")(quoting Mitchell v. La.

High Sch. Athletic Ass'n., 430 F.2d at 1158).  Accordingly, the Court concludes that Caldwell

does not have a property right "as a player on the University basketball team."  First Amended

Complaint ¶ 83, at 13.

### C.    CALDWELL'S ALLEGATIONS DO NOT SUPPORT A LIBERTY INTEREST IN HIS REPUTATION OR IN A FUTURE CAREER AS A PROFESSIONAL BASKETBALL PLAYER.

Caldwell contends that he has "a liberty interest in his reputation and future professional

career."  First Amended Complaint ¶ 83, at 13.  Caldwell's allegations do not support his having

a liberty interest in his reputation, because he has not alleged that UNM published any defamatory

statements resulting in a loss of legal status.  See Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th Cir.

2019).  The Supreme Court has stated that damage to "reputation alone, apart from some more

tangible interest such as employment," is insufficient to invoke the Due Process Clause's

protections.  Paul v. Davis, 424 U.S. at 701.  See Martin Marietta Materials, Inc. v. Kan. Dep't of

Transp., 810 F.3d 1161, 1184 (10th Cir. 2016)("Damage to reputation alone . . . is not sufficient.");

Gwinn v. Awmiller, 354 F.3d at 1216("Damage to one's reputation alone . . . is not enough to

implicate due process protections."); Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1268-69

(10th Cir. 1989).  Instead, "[w]hat is needed in addition to stigma, according to the Supreme Court,

is some change in legal status.  The plaintiff must show that as a result of the defamation, 'a right

or status previously recognized by state law was distinctly altered or extinguished.'"  Al-Turki v.

Tomsic, 926 F.3d at 617 (quoting Paul v. Davis, 424 U.S. at 711).  This test is the "stigma-plus"

claim sufficient to implicate a constitutionally-protected liberty interest.  See Gwinn v. Awmiller, 354 F.3d at 1216, 1223-24.  "If the plaintiff establishes that the alleged defamation would significantly change the plaintiff's legal status, then the plaintiff is entitled to a name-clearing hearing to prove the falsity of the defamatory information."  Al-Turki v. Tomsic, 926 F.3d at 617 (citing Codd v. Velger, 429 U.S. 624, 627 (1977)).

The Tenth Circuit does not recognize the right to play scholastic sports as the stigma-plus, or something more, that triggers the Due Process Clause.  See Seamons v. Snow, 84 F.3d at 1235; Colo. Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, 570 F.2d at 321; supra Analysis § I(B).  The Tenth Circuit recognizes deprivation, however, "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause.  Al-Turki v. Tomsic, 926 F.3d at 617.  Nevertheless, Caldwell has not suggested that the allegations that he assaulted someone are false, that any false statements were publicized,[30] nor that there is a significant change

------

[30]Caldwell alleges that, "[i]n a public release, UNM representatives subsequently stated that Plaintiff was 'being withheld from competition and team activity[] indefinitely' or 'until further notice.'"  First Amended Complaint ¶ 28, at 5 (quoting Goeff Grammar, Lobo Starters Carlton Bragg, J.J. Caldwell Suspended, Albuquerque Journal (December 22, 2019), https://www.abqjournal.com/1403561/lobo-starters-carlton-bragg-j-j-caldwell-suspended.html ("Albuquerque Journal Article")).  Caldwell does not dispute these statements' veracity, does not allege that the statements are defamatory, and does not allege that UNM representatives made a public statement about the campus ban.  See First Amended Complaint ¶ 28, at 5.  The Albuquerque Journal Article quotes a UNM press release and UNM head basketball coach Paul Weir, neither of which reference the reasons for the sports ban or discuss a campus ban:

> The UNM Lobos have suspended senior starter and team captain Carlton Bragg Jr. and junior starting point guard J.J. Caldwell indefinitely.

> The university confirmed the Journal's initial report of the suspensions prior to Sunday's game against Houston Baptist, but would not say why or for how long the suspensions will last.  The Journal has confirmed the suspensions are not related to one another.

in his legal status as a result of any defamation.  See First Amended Complaint ¶¶ 11-81, at 3-13;

Brown v. Univ. of Kan., 16 F. Supp. 3d at 1288.  Caldwell alleges only that the campus ban "will

severely further damage his reputation," and that the "allegations of physical violence impugn the

student's reputation and integrity."  First Amended Complaint ¶ 44, at 7; id. ¶ 87, at 14.  Caldwell

does not explain how any harm to his reputation has resulted in a change in his legal status.  See

First Amended Complaint ¶ 44, at 7; id. ¶ 87, at 14.  The Due Process Clause does not protect

Caldwell's situation, where there is no alleged public dissemination of the reputation-harming

statements that resulted in a change of legal status.[31]  See McDonald v. Wise, 769 F.3d 1202, 1212

---

"Carlton Bragg and JJ Caldwell will not participate in today's game versus Houston Baptist," UNM released in an email prior to the game.  "They are being withheld from competition and team activity until further notice.  The athletic department has received information that requires further review.  In the meantime, there will be no additional comments from anyone at UNM until that process is complete."

Neither were in the arena for the game and were not made available for comment but are, as of Sunday, still considered on the team.

After the game, UNM head coach Paul Weir said he would let the school's statement stand and he would comment [sic] further.

"Honestly I will probably refer all questions to Eddie," Weir said.  "Eddie is in charge of this right now.  I'm the basketball coach I'm gonna coach the guys that I have and I'll pretty much forward everything directly to him.  And you guys know I've always been a very forthcoming, transparent person.  If that moment presents itself, I have no problem commenting but at this very moment I am going to refuse to comment."

He also did not comment when asked about his recruiting approach to giving so many transfers with troubled pasts at previous schools a second chance to play at UNM.

Albuquerque Journal Article.

[31]See supra note 30.

(10th Cir. 2014)(concluding that a public employee "sufficiently pled a deprivation of his liberty interest" where: (i) his employer had "confirmed at press conferences that he was in fact 'fired *for* serious misconduct,'" and (ii) the public employee had "been unable to find employment because of the media reports of his misconduct")(emphasis in the original); Asbill v. Hous. Auth. of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984)(concluding that there was no harm to reputation from statements that were not "stigmatizing"); Siegert v. Gilley, 500 U.S. 226, 228 (1991). See also James L. Buchwalter, Application of Stigma-Plus Due Process Claims to Education Context, 41 A.L.R. 6th 391 § 2 (originally published in 2009)("In order to fulfill the requirements of a 'stigma-plus' due process claim arising out of the termination from government employment, a plaintiff must show that the government made stigmatizing statements, i.e., those that call into question the plaintiff's good name, reputation, honor, or integrity.").

Next, the Court concludes that Caldwell's allegations do not support a liberty or property interest in a future career as professional basketball player, because the interest of a student-athlete in his or her future professional athletic career is too speculative.  See Butler v. Nat'l Collegiate Athletic Ass'n, No. CIVA 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. August 15, 2006)(Vratil, J.)("As for the loss of an opportunity for a professional football career, such harm is speculative.").  Caldwell argues, without citation to caselaw, that he has "a liberty interest in his . . . future professional career."  First Amended Complaint ¶ 83, at 13.  The Honorable Stephen Murray Orlofsky, United States District Judge for the District of New Jersey, explained why a student-athlete's interest in a future professional athletic career as a football player is too speculative to create a constitutionally protected interest:

> I agree that damages for the loss of a potential future professional athletic career are speculative because the possibility that such damages would ever occur is too conjectural for determination.  Many contingencies must occur before [the student-

athlete] could enjoy a professional athletic career.  Those contingencies include, but are not limited to, whether [the student-athlete] would escape injury, whether [the student-athlete] would excel at college football and whether any professional team would show an interest in [the student-athlete].  In short, the road to a professional football career is long and circuitous, and [the student-athlete] has not gone down that road far enough to submit such a fanciful damage claim to a fact finder.

Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F. Supp. 2d 494, 509-10 (D.N.J. 2000) (Orlofsky, J.), opinion amended on reargument, 130 F. Supp. 2d 610 (D.N.J. 2001).  The Court agrees with Judge Orlofsky that there are many contingencies that must occur for a collegiate athlete to become a professional athlete, and Caldwell makes no factual allegations as to his prospects of obtaining a professional contract.  See First Amended Complaint ¶¶ 11-102, at 3-16; Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F. Supp. 2d at 509-10.  The view that no constitutionally protected interest in a professional sport arises out of participation in scholastic sports is the consensus among courts, including the Tenth Circuit.  See, e.g., Butler v. Nat'l Collegiate Athletic Ass'n, 2006 WL 2398683, at *4; Mattison v. E. Stroudsburg Univ., No. 3:12-CV-2557, 2013 WL 1563656, at *5 (M.D. Pa. April 12, 2013)(Mariani, J.)(stating that there is not "a 'guarantee' that Plaintiff will be a professional baseball player[;] . . . predictions concerning possible harm to the future career of a college athlete do not rise to the level of concrete constitutional injury necessary to form the basis for a preliminary injunction"); Knapp v. Nw. Univ., No. 95 C 6454, 1996 WL 495559, at *2 (N.D. Ill. August 28, 1996)(Zagel, J.)(describing that "the possibility of obtaining [a] professional basketball career is too speculative" to establish an economic interest that the court could act to protect); Hawkins v. Nat'l Collegiate Athletic Ass'n, 652 F. Supp. 602, 610-11 (C.D. Ill. 1987)(Nihm, J.)(concluding that the Constitution does not protect the right to secure a professional career in athletics); Haverkamp v. Unified Sch. Dist. No. 380, 689 F. Supp. 1055, 1058 (D. Kan. 1986)(Saffels, J.)("Any potential opportunities for the

future derived from participation in interscholastic athletics amounts only to mere expectations and are insufficient for the creation of a constitutionally-protected property interest."); Justice v.Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 368 (D. Ariz. 1983)(Kelleher, J.)("flatly reject[ing] . . . the plaintiffs' interests in participating in post-season competition or on television[, because they] are not constitutionally protected, plaintiffs were not entitled to procedural due process safeguards prior to or upon imposition of the sanctions"); Colo. Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, 417 F. Supp. at 895-96 (concluding that "the interest in future professional careers must nevertheless be considered speculative and not of constitutional dimensions"). Cf. Colo. Seminary (Univ. of Denver) v.Nat'l Collegiate Athletic Ass'n, 570 F.2d at 321 (concluding that "the interest of the student athletes in participating in intercollegiate sports [is] not constitutionally protected"). The Court sees no reason to depart from the prevailing view, where Caldwell cites no caselaw and points to no factual allegations showing that his prospects in a future professional basketball career are more than fancy.

### D.   CALDWELL DOES NOT HAVE A PROPERTY INTEREST IN HIS UNIVERSITY-PROVIDED HOUSING AND MEALS.

Next, Caldwell alleges that Torrez "violated Plaintiff's clearly established rights secured by the Fourteenth Amendment . . . by . . . evicting him from his residence," without explaining what his property or liberty interest is that ensures due process before he is evicted from student housing. First Amended Complaint ¶ 86, at 13. In his briefing, Caldwell states that he "is not from New Mexico" and "had a strong interest in remaining in his home at Lobo Village," but he does not explain what property interest or liberty interest is at stake. Response at 15. At the hearing, for the first time, Caldwell contended that UNM violated his right to university housing and meals secured by the Fourteenth Amendment when UNM removed him from his apartment

and stopped providing meals.  Compare Motion at 1-2, with Tr. at 27:18-28:10 (Harrison)("He

was deprived of his housing in a meaningful way . . . [which is] all part of that bundle that . . . is

worthy of constitutional protection.").

To have due process protections, Caldwell must have a property or liberty interest in his

student housing and meals; accordingly, he must show "more than an abstract need or desire for

it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim

of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Property interests

are not created by the Constitution, 'they are created and their dimensions are defined by existing

rules or understandings that stem from an independent source such as state law . . . .'"  Cleveland

Bd. of Educ. v. Loudermill, 470 U.S. at 538 (quoting Bd. of Regents of State Colls. v. Roth, 408

U.S. at 577).  Caldwell argues that his student housing is a property interest under Mathews v.

Eldridge, 424 U.S. 319.  See Tr. at 16:6-17:4 (Harrison)("[I]t is meaningful that he has all these

things that are agreed with UNM . . . .   [H]e has more than an expectation[;] he has an

entitlement . . . .  [T]he implications of not having housing and not having meals are huge.").

Caldwell began residing in the Lobo Village in January, 2019.  See First Amended

Complaint ¶¶ 12-13, at 3.  According to Caldwell, he had a lease term with ACC OP, that ended

on July 31, 2019.  See First Amended Complaint ¶ 13, at 3.  Caldwell alleges that the lease provides

that Caldwell was "subject to UNM's judicial process procedures."  First Amended Complaint ¶

14, at 3.  Lobo Village is a student housing option "located on the UNM south campus."  American

Campus Communities: Casas del Rio and Lobo Village, The University of New Mexico,

http://housing.unm.edu/private-partner-housing-acc/index.html (last visited May 21, 2022).[32]

---

[32]District courts may take judicial notice of "a fact that is not subject to reasonable dispute
because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be

Caldwell does not state whether his housing was derived from his basketball scholarship or that he paid for his housing himself, but the Court assumes that UNM paid for it.

In his briefing, Caldwell cites no law to support his assertion that he has a property interest in his student housing and meals, see Response at 1-10, and the Tenth Circuit has declined to subject constitutional protections to the "innumerable separate components" of the educational process, Albach v. Odle, 531 F.2d at 985.  At the hearing, Caldwell also did not provide a specific example of a case that establishes that student housing and meal is a property interest, but suggested that student housing and meals should be afforded due process protections under Mathews v. Eldridge, 424 U.S. 319.  See Tr. at 23:17-22 (Harrison).  Caldwell nonetheless argued that student housing and meals are protected rights.  Although the Tenth Circuit has held that the educational process "is not limited to classroom attendance but includes innumerable separate components," it has not "establish[ed] a property interest subject to constitutional protection in each of these separate components."   Albach v. Odle, 531 F.2d at 985 ("Participation in interscholastic athletics is not a constitutionally protected civil right.")(citing Okla. High Sch.

---

accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court takes judicial notice of UNM's description of Lobo Village, from the Lobo Village Description in the First Amended Complaint or Response, because it comes from UNM's official website and cannot reasonably be questioned.  Also, many people in Albuquerque who read the Albuquerque Journal and follow the news are familiar with the Lobo Village and its proximity to the campus.  See Tellabs, Inc. v. Makor Issues & Rts, Ltd., 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Jacobsen v. Deseret Book Co., 287 F.3d at 941("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").

Athletic Ass'n v. Bray, 321 F.2d at 273.  Cf. Schwake v. Ariz. Bd. of Regents, 821 F. App'x 768,

771 (9th Cir. 2020)(unpublished)(holding that a graduate student did not allege a property interest

in computer laboratory access at a university, a liberty interest in campus access and holding paid

or volunteer positions); Mitchell v. La. High Sch. Athletic Ass'n, 430 F.2d at 1158; Colo. Seminary

(Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n, 570 F.2d at 321 ("[T]he interest of the

student-athletes in participating in intercollegiate sports [is] not constitutionally protected.").

Although the Supreme Court, Tenth Circuit, and other Courts of Appeals have not addressed

specifically whether student housing and meals are protected interests, the Honorable Nathaniel

M. Gorton, United States District Judge for the United States District Court for the District of

Massachusetts, has declined "to expand the protected right to education to include the right to live

in on-campus housing." Doe v. Devonshire, 181 F. Supp. 3d 146, 152 (D. Mass. 2016)(Gorton, J.).

Judge Gorton determined that the student's argument that "a suspension from student housing is

tantamount to a suspension from" a university -- because of the student's mental illness and lack

of family in the area -- did not overcome the student's inability to "establish [a] property interest

in living in the residence hall at" the university, and concluded that "the protected right to a public

education does not include the right to participate in a specific housing program at school." Doe

v. Devonshire, 181 F. Supp. 3d at 152.

        Moreover, the Tenth Circuit has established that a university has "the inherent right to

discipline students." Slaughter v. Brigham Young Univ., 514 F.2d 622, 626 (10th Cir. 1975)(citing

Speake v. Grantham, 317 F. Supp. 1253 (S.D. Miss. 1975)(Nixon, J.); Esteban v. Central Mo. State

Coll., 290 F. Supp. 622 (W.D. Mo. 1968)(Hunter, J.)).  Even if a plaintiff is innocent of the

wrongdoing that led to his or her punishment, this innocence "does not in itself elevate the interest

at stake to the level of a substantive constitutional right protected by the Due Process Clause of

the Fourteenth Amendment." Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. at 370(citing

Rose v. Nashua Bd. of Educ., 679 F.2d 279, 282 (1st Cir. 1982)).

Here, the Court concludes that Caldwell does not have a property interest in his student

housing and meals.  The Tenth Circuit has been clear that there is not a "property interest subject

to constitutional protection" in the "separate components" of a person's protected interest in

education.  Albach v. Odle, 531 F.2d at 985.  Moreover, the Court sees as persuasive Judge

Gorton's decision to decline "to expand the protected right to education to include the right to live

in on-campus housing."  Doe v. Devonshire, 181 F. Supp. 3d at 152.  The Court finds Doe v.

Devonshire persuasive, because its facts are similar to Caldwell's, as the student was suspended

from his student housing and had no family in the area.  See Doe v. Devonshire, 181 F. Supp. 3d

at 152.  Furthermore, Caldwell has not alleged that his student housing and meals were related to

his scholarship, see First Amended Complaint ¶ 44, at 7, and, even assuming that UNM paid for

Caldwell's student housing and meals, the Tenth Circuit's decision in Albach v. Odle, suggests

that Caldwell's economic benefits from his scholarship are not a property interest.[33]  531 F.2d at

---

[33]Although the Seventh Circuit has held that a student deprived of due process has a liberty interest in his occupation of choice and was denied his occupation of choice when a university suspended him causing him to lose his Navy ROTC scholarship, see Doe v. Purdue Univ., 928 F.3d at 663, Caldwell's situation is distinguishable, because: (i) "[p]articipation in interscholastic athletics is not a constitutionally protected civil right," Albach v. Odle, 531 F.2d at 984-85; and (ii) in Doe v. Purdue Univ., when the university denied the student due process, the ROTC program revoked his scholarship thus denying him of his right to "occupational liberty," Doe v. Purdue Univ., 928 F.3d at 663.  In Caldwell's case, he cannot assert on a solid factual basis that he had an occupational interest in his future basketball career because, "the interest of a student-athlete in his or her future professional athletic career is too speculative." Caldwell, 510 F. Supp. 3d at 1042. See Butler v. Nat'l Collegiate Athletic Ass'n, 2006 WL 2398683, at *4 ("As for the loss of an opportunity for a professional football career, such harm is speculative.").

985.  The Court concludes, therefore, that Caldwell does not have a property interest in his student housing and meals.

### E.     EVEN IF CALDWELL HAS A PROPERTY INTEREST IN HIS STUDENT HOUSING, HE RECEIVED SUFFICIENT PROCESS, BECAUSE UNM GAVE CALDWELL ADEQUATE NOTICE AND HEARINGS.

Even if Caldwell has a property interest in his student housing, the Court concludes that Caldwell received sufficient process through UNM's disciplinary proceedings, because he received two eviction notices and four separate hearings.[34]  See Mathews v. Eldridge, 424 U.S. at 334-35; Goss v. Lopez, 419 U.S. at 579-80.  Caldwell argues that he did not receive adequate process when UNM "evict[ed] him from his residence, without making any findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against him."  First Amended Complaint ¶ 86, at 13.  Caldwell contends that, had UNM afforded

---

[34]Moreover, it is unclear from the pleadings whether Caldwell ever was evicted from his student housing, left his student housing willingly, or ever left at all.  Caldwell states that he "received an eviction notice" on December 19, 2020, and a subsequent email stating that he must return his keys and vacate willingly, otherwise eviction proceedings would begin, First Amended Complaint ¶ 26, at 5; id. ¶ 38, at 6, but never alleges that the eviction process concluded before his ban was lifted.  Caldwell implies, however, that he still had the keys to his apartment on January 9, 2020, see First Amended Complaint ¶ 37, at 6 (alleging that, on January 9, 2020, "[c]ounsel for Defendant ACC OP (UNM SOUTH) LLC sent Plaintiff an email threatening to file suit for eviction if Plaintiff did not . . . turn in the keys to his apartment immediately"), which suggests that the eviction was not immediate, the eviction proceedings had not yet begun, and Caldwell still had access to his student housing on January 10, 2020.  At the hearing, regarding the eviction, Torrez stated that UNM continued to provide Caldwell with housing and meals, stating that Caldwell "was put up in hotel and . . . was provided with meals, Your Honor, so it's completely incorrect that he went without food or housing, he had housing he had food at the university's expense Your Honor so that part was taken care [of]."  Tr. at 37:2-7 (Marcus).  It is unclear, however, when this hotel stay occurred and for how long it lasted, as the parties did not discuss it further at the hearing and Caldwell does not discuss it in his First Amended Complaint or his Response.  Accordingly, even if the Court were to determine that Caldwell's housing and meals are protected property interests, the Court would not conclude that Caldwell has alleged properly that UNM deprived him of these interests.

Caldwell "proper process then, the infringement on his property and liberty interests could easily have been avoided, and the resources required to provide Mr. Caldwell with this basic notice, the evidence against him and an opportunity to defend himself would have been negligible."  Response at 16.  Caldwell argues that UNM's process is not satisfactory under Mathews v. Eldridge, 424 U.S. at 334-35.  See First Amended Complaint ¶ 90, at 14.

"The fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner."  Turney v. Fed. Deposit Ins. Corp., 18 F.3d 865, 868 (10th Cir. 1994).  See Goldberg v. Kelly, 397 U.S. at 267 ("The fundamental requisite of due process of law is the opportunity to be heard.").  The Court analyzes three factors to determine whether UNM provided Caldwell with adequate procedures under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335.  Although education is "perhaps the most important function of state and local governments," Goss v. Lopez, 419 U.S. at 576 (citing Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954)), students posing "a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school," Goss v. Lopez, 419 U.S. at 582.  The United States Court of Appeals for the Seventh Circuit has held that, when a student was accused of battery against a nonstudent, the university was justified in immediately suspending him, holding that "an arrest warrant for aggravated battery was compelling evidence that [the student] may have been responsible for the stabbing of [the nonstudent] -- permitting [the university], in the interest of protecting other members of its

community, to promptly remove [the student] from campus pending a later hearing." <u>Hess v. Bd.</u>
<u>of Trs. of S. Ill. Univ.</u>, 839 F.3d 668, 674 (7th Cir. 2016)(citing <u>Goss v. Lopez</u>, 419 U.S. at 582-
83).  Further, the Tenth Circuit has held that a student expelled from a cadet program because of
an assault received adequate procedure under <u>Mathews v. Eldridge</u> when he received a hearing
before a board of school officials, "[d]espite the inadequacy of the written notice provided."
<u>Watson ex rel. Watson v. Beckel</u>, 242 F.3d 1237, 1240 (10th Cir. 2001).  The Tenth Circuit
explains that the student was well aware of the allegations against him, satisfying due process.  <u>See</u>
<u>Watson ex rel. Watson v. Beckel</u>, 242 F.3d at 1240.  The Tenth Circuit ultimately holds that, to
satisfy due process, "[a]ll that is necessary is that the procedures be tailored, in light of the decision
to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they
are given a meaningful opportunity to present their case."  <u>Watson ex rel. Watson v. Beckel</u>, 242
F.3d at 1241 (quoting <u>Goldberg v. Kelly</u>, 397 U.S. at 268-69).  Additionally, the Court has
concluded, when ruling on a motion to dismiss, that, under <u>Mathews v. Eldridge</u>, a student alleged
adequately that he "did not receive a 'meaningful opportunity to be heard,'" <u>Lee I</u>, 449 F. Supp. 3d
at 1128 (quoting <u>In re C.W. Mining Co.</u>, 625 F.3d 1240, 1244 (10th Cir. 2010)), when he was
expelled after he was accused of sexual assault, because the university "did not allow for any cross-
examination in determining credibility, and because UNM's procedures unreasonably hindered"
the student's "ability to present a meaningful defense," <u>Lee I</u>, 449 F. Supp. 3d at 1128.  In the same
case, on a motion for summary judgment, the Court held that "none of" the students' "alleged
procedural deficiencies substantially prejudice him, and the Defendants have satisfied their
obligations under the Due Process Clause to afford" the student adequate notice and "an
opportunity to be heard."  <u>Lee II</u>, 500 F. Supp. 3d at 1235.  The Court concluded, that, while the
student had a high interest in his continued education, none of his "alleged procedural deficiencies

created a risk of erroneous deprivation of his interest in his education or reputation," and the cost

of heightening the procedural safeguards for student disciplinary proceedings "could hamper

UNM's efforts to protect its students' well-being."[35]  Lee II, 500 F. Supp. 3d at 1235 (citing Marie

T. Reilly, Due Process in Public University Discipline Cases, 120 Penn. St. L. Rev. 1001,

1025)(citing Osteen v. Henley, 13 F.3d 221 (7th Cir. 1993)(Posner, J.)).

Caldwell argues that he received insufficient process when he was evicted from his student

housing.  See First Amended Complaint ¶ 86, at 13.  At the outset, the Court notes that, despite

UNM, Lobo Development, and ACC OP telling Caldwell that he would be evicted from Lobo

Village, Caldwell does not allege that any Defendant evicted him from Lobo Village.  Even

assuming Caldwell was evicted from Lobo Village, however, the Court concludes that Caldwell

received adequate process.

On December 19, 2019, Torrez emailed Caldwell, banning him from "all of UNM campus,

except for UNM Hospitals and Clinics . . . [and] from Lobo Village, where he resides, and all on-

campus housing facilities."  First Amended Complaint ¶ 21, at 4.  That same day, Caldwell

"received an eviction notice from Defendant Lobo Development Corporation (LDC) stating that

he was required to clear out all his possessions within three days or face eviction proceedings."

First Amended Complaint ¶ 25, at 4.  Jessika Griego, the Lobo Village's area manager, signed the

notice and stated that Caldwell was "banned from the [UNM] Residence Life and Student Housing,

---

[35]In its ruling on the motion for summary judgment, the Court noted that "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings" and that denying Lee the "right to cross-examine [his accuser] creates little risk of erroneous deprivation," because Lee had already admitted to having non-consensual sexual contact with her.  Lee II, 500 F. Supp. 3d at 1241-42.

and American Campus Communities (ACC)'[36] and that he was being evicted because he violated

his lease agreement due to his 'unlawful action causing serious physical harm to another person.'"

First Amended Complaint ¶¶ 26-27, at 4.  Caldwell then asked to remain at Lobo Village and was

told he could remain there until January 3, 2020.  See First Amended Complaint ¶ 34 at 5.  On

December 23, 2019, however, agents of "LDC went to plaintiff[']s apartment to rouse him out

because he had not left in response to Defendant LDC's initial notice."  First Amended Complaint

¶ 33, at 5.  Caldwell alleges that, on January 9, 2020, American Campus' counsel sent Caldwell a

threatening email, stating:

> If you do not contact management and turn in keys and vacate your unit prior to
> 1pm tomorrow, I will file against you.  In it, I will not only place an eviction against
> you, but will put a money judgement against you for my attorney fees and court
> costs incurred in the eviction, pursuant to your lease agreement.  So, as you can see,
> this WILL affect your credit, and future housing options, which I do not believe
> that you want.

First Amended Complaint ¶¶ 38, at 5-6.  In Caldwell's First Amended Complaint, he does not

argue that his alleged battery was not a "continuing danger or ongoing threat," Goss v. Lopez, 419

U.S. at 582; however, at the hearing, Caldwell argued that a battery is not enough to justify

"say[ing] that a person is now an ongoing threat and we have to remove them from campus as an

emergency measure."  Tr. at 24:19-22 (Harrison).  Caldwell also contends that his "accuser is not

a UNM student, and, upon information and belief, not even a resident of New Mexico."  First

Amended Complaint ¶ 18, at 4.

---

[36]ACC OP is "the Landlord or Owner of the property at Lobo Village," where Caldwell
resided.  First Amended Complaint ¶ 8, at 3. ACC is a foreign LLC incorporated in Delaware.  See
First Amended Complaint ¶ 8, at 3.  The parties dismissed ACC OP with prejudice on August 26,
2020.  See Stipulation of Dismissal, filed August 26, 2020 (Doc. 50).

That Caldwell's accuser is not a UNM student is inapposite.  See Hess v. Bd. Of S. Ill. Univ., 839 F.3d at 674 (concluding that a battery allegation against a non-student was sufficient to suspend a student from campus pending a later hearing).  In any event, an alleged battery is a serious offense that renders Caldwell a "continuing danger" to persons on campus and justifies immediate suspension and a post-deprivation hearing.  Goss v. Lopez, 419 U.S. at 58.  See Caldwell, 510 F. Supp. 3d at 1048 (concluding that Caldwell was not entitled to notice or to a hearing before the campus ban was imposed, because Caldwell's campus ban was premised on allegations that he committed battery); Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d at 668 (holding that a university was justified in immediately suspending a student alleged of stabbing another student); Watson ex rel. Watson v. Beckel, 242 F.3d at 1237 (concluding that a university was justified in immediately moving a student from his room in a campus dormitory to a different room and then expelling him after a hearing whether the student assaulted another student).  Lobo Village is a student housing option, the lease for which "further provides that the plaintiff is 'subject to UNM's judicial process procedures,'" First Amended Complaint ¶ 14 at 3, and thus, is a location[37] where a student alleged of a violent assault could pose a "continuing danger to persons or property or an ongoing threat of disrupting the academic process," Goss v. Lopez, 419 U.S. at 582.  See Carrion v. Yeshiva Univ., 535 F.2d at 730 (citing Fahey v. Mallonee, 332 U.S. 245, 67 (1947)("[An] emergency justifies an administrator's taking temporary action without a hearing even in cases where due process requires one before final action is taken.").  Consequently, the

_____

[37]Nowhere in the First Amended Complaint, the Motion, Response, or Reply is the location of the alleged battery disclosed.  At the hearing, however, the Court asked Torrez if the incident happened on campus to which Torrez replied: "It was in a campus apartment which is owned by [UNM]."  Tr. at 5:25-6:1 (Marcus).

Court concludes that Caldwell's eviction process from his apartment at Lobo Village did not deprive him of sufficient process.

Even if alleged battery's seriousness would not justify immediate action to ban Caldwell, Caldwell received the minimum "rudimentary process" that <u>Goss v. Lopez</u>, 419 U.S. at 578, requires when he received an informal hearing and a notice on December 19, 2019 -- before any action was taken to evict him. <u>See</u> First Amended Complaint ¶¶ 22-25, at 5. Here, Caldwell received notice on December 19, 2019, <u>see</u> First Amended Complaint ¶¶ 19, at 4, and he had a hearing that same day, <u>see</u> First Amended Complaint ¶ 22, at 5. Furthermore, by January 9, 2020, Caldwell had received four separate hearings with UNM officials: (i) on December 19, 2020, with Nuñez, where they discussed whether Caldwell "was banned from campus indefinitely and also banned from playing or practicing with the basketball team," First Amended Complaint ¶ 23, at 5; (ii) on December 20, 2020, in a meeting with the OEO, where Caldwell denied the "charges against him," First Amended Complaint ¶ 29, at 5; (iii) another meeting with Torrez on December 20, 2020,[38] <u>see</u> First Amended Complaint ¶¶ 22-30, at 5; and (iv) on January 10, 2020, where he received a full hearing with Torrez with his counsel present, <u>see</u> First Amended Complaint ¶ 40,

---

[38]The date of this meeting is not clearly stated, however, in the First Amended Complaint ¶ 29, at 5; Caldwell states that the meeting with the OEO was on December 20, 2019. In the First Amended Complaint, Caldwell then states: "Torrez subsequently had a brief meeting with Plaintiff." First Amended Complaint ¶ 30, at 5. In Caldwell's Response, however, he states that he "[f]inally" had a meeting with Torrez on January 10, 2020. Response at 4. December 20, 2019, was a Friday and Monday, December 23, 2019, was the beginning of Winter break, and continued through January 2, 2020. Caldwell alleges that Torrez told him not to contact her during this break and that she would not be in the office. <u>See</u> Response at 14; UNM 2019-2020 Calendar at 1; First Amended Complaint ¶ 31, at 6. The Court concludes that it is likely that the meeting the First Amended Complaint ¶ 30, at 5, refers to also occurred on December 20, 2019, and Caldwell received another hearing with Torrez on January 10, 2020, because Caldwell refers to each of these meetings separately in his First Amended Complaint.

at 7.  A hearing does not need to include "every procedure possible, nor is one entitled to a hearing of one's own design." Austin v. Univ. of Or., 925 F.3d 1133, 1139 (9th Cir. 2019)(citing Mathews v. Eldridge, 424 U.S. 319).   The nature of due process "negates any concept of inflexible procedures universally applicable to every imaginable situation." Goss v. Lopez, 419 U.S. at 578 (citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)).  Caldwell received two eviction notices and four[39] hearings before he was "forced to move out of his apartment," and before his suspension was lifted on January 17, 2020.[40]   Response at 4.  See First Amended Complaint ¶¶ 23-40, at 2-6; Reply at 7.   Some courts have been reluctant to "encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference." Medlock v. Trs. of Ind. Univ., 738 F.3d 867, 871 (7th Cir. 2013)(citing Osteen v. Henley, 13 F.3d at 225-26).  In Medlock v. Trs. of Ind. Univ., No. 11-cv-00977-TWP-DKL, 2011 WL 4068453 (S.D. Ind. September 13, 2011), aff'd 738 F.3d at 867, the Honorable Tanya Walton Pratt, United States District Judge for the United States District Court for the Southern District of Indiana, held that a dean and a provost giving testimony

---

[39]It is unclear based on the First Amended Complaint whether Caldwell received three or four hearings.  Caldwell refers to a "brief meeting" without a date.  First Amended Complaint ¶ 30, at 5.  Caldwell describes this hearing only as a subsequent meeting and makes no reference to a date.  See First Amended Complaint ¶ 30 at 5.  It is likely that this meeting occurred on December 20, 2020.  See supra note 38.  Later, in Caldwell's First Amended Complaint, he references a January 10, 2021, meeting with Torrez.  See First Amended Complaint ¶ 40, at 7.  It is unclear if these two meetings are one and the same, or two separate meetings.  To draw all reasonable inferences in favor of the nonmovant, the Court will infer that they were the same meeting.

[40]In Caldwell's Response, Caldwell states: "[O]n January 17, 2020 . . . Defendant Torrez informed Mr. Caldwell that  the campus ban on him had been lifted[.]"  Response at 5 n.1.  Caldwell had not received this notice when he filed his First Amended Complaint on January 13, 2020.  See First Amended Complaint.

regarding the impact of the plaintiff's continued presence on campus and "the two post-deprivation hearings afforded to him were consistent with affording due process under <u>Goss</u>."  2011 WL 4068453, at *7.  In addition, that Caldwell had counsel present at one hearing is a strong indicator that UNM provided him with sufficient process.  <u>See</u> <u>Doe v. Belmont Univ.</u>, 334 F. Supp. 3d 877, 893 (M.D. Tenn. 2018)(Crenshaw, J.)(holding that, where a student was permitted to have counsel at a university's formal hearing procedure, although the student had no entitlement to counsel in the university proceeding, that he was permitted to have counsel further demonstrated that he was not denied a meaningful right to counsel).  The Court has stated that students "do not have a right for counsel to 'examine or cross-examine witnesses, to submit and object to documents, to address the tribunal, and otherwise to perform the traditional function of a trial lawyer.'"  <u>Lee I</u>, 449 F. Supp. 3d at 1127-28 (quoting <u>Osteen v. Henley</u>, 13 F.3d 221 at 225).  <u>See</u> Ellen Mossman, Comment, <u>Navigating a Legal Dilemma: A Student's Right to Legal Counsel in Disciplinary Hearings for Criminal Misbehavior</u>, 160 Univ. Pa. L. Rev. 585, 600 (2012)("Although some courts have suggested that students should have limited assistance of counsel in certain situations, most have avoided requiring counsel in routine disciplinary hearings.").  Courts have recognized a few limited exceptions to this general rule: the United States Court of Appeals for the Sixth Circuit has held "that a right to counsel may exist if an attorney presented the University's case, or . . . the hearing [was] subject to complex rules of evidence or procedure.'"  <u>Flaim v. Med. Coll. of Ohio</u>, 418 F.3d 629, 640 (6th Cir. 2005)(quoting <u>Jaksa v. Regents of Univ. of Mich.</u>, 597 F. Supp. 1245, 1252)(E.D. Mich. 1984)(Feikens, C.J.)).  UNM placed no limits on the extent to which the advisor -- in this case, Caldwell's counsel -- could assist him outside of the hearings.  UNM

Student Handbook § 6.[41]   Caldwell had counsel present at a formal hearing, which is more than

UNM is required to permit for this hearing.  See Flaim v. Med. Coll. of Ohio, 418 F.3d at 640;

Doe v. Belmont Univ., 334 F. Supp. 3d 877, 893 (M.D. Tenn. 2018)(holding that a student was

not denied due process where the student was permitted to have counsel inside and outside of a

university's formal hearing procedure, the court held he was not denied a meaningful right to

counsel).  Here, the Court concludes that, assuming Caldwell was evicted, the two eviction letters

and three separate hearings given to Caldwell before he was evicted provided Caldwell adequate

notice and process.  See Turney v. Fed. Deposit Ins. Corp., 18 F.3d at 868; Watson v. Beckel, 242

F.3d at 1240; Goldberg v. Kelly, 397 U.S. at 267; Mathews v. Eldridge, 424 U.S. at 335.

## II.   UNM'S PROCEDURES COMPORTED WITH PROCEDURAL DUE PROCESS WHEN UNM BANNED CALDWELL FROM CAMPUS.

"The fundamental requisites of due process consist of notice and an opportunity to be heard

at a meaningful time and in a meaningful manner."  Turney v. Fed. Deposit Ins. Corp., 18 F.3d at

868.  See Goldberg v. Kelly, 397 U.S. at 267.  Caldwell alleges that, within twenty-five days of

Torrez banning him from campus,[42] he had not received: (i) "[a] written complaint from any office

---

[41]The UNM Student Handbook indicates that Caldwell was entitled to an advisor for the hearing, who may be an attorney; the advisor may not act as a representative, have a voice, present arguments, or evidence, or otherwise participate directly in the hearing.  See UNM Student Handbook § 6.3.

[42]Caldwell filed the First Amended Complaint on January 13, 2020, and Caldwell alleges that twenty-five days earlier, on December 19, 2019: (i) he had a meeting with Nuñez, where Nuñez "informed Plaintiff he was banned from campus," First Amended Complaint ¶ 23, at 5, and (ii) the "Dean of Students" emailed him, stating that "Plaintiff was 'hereby interim banned from all of UNM Campus . . . ,'" First Amended Complaint ¶ 21, at 4.  See First Amended Complaint ¶¶ 11-51, at 3-8.  Since then, Caldwell filed his Response, in which he states his interim ban was lifted on January 17, 2020.  See Response at 3.  In Caldwell's response he continues to allege that Torrez did not give him "notice, a proper investigation, discovery and hearing before a neutral tribunal."  Response at 19.

of the University detailing the allegations against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (iii) "[a]ny information as to the identities and statements of adverse witnesses"; (iv) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights"; and (v) any "opportunity to appeal any . . . findings, as there are none to appeal." First Amended Complaint ¶¶ 22-23, 45, 50, at 5, 7-8. The Court analyzes three factors to determine whether Torrez provided Caldwell with adequate procedures under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335. See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240; Lee I, 449 F. Supp. 3d at 1124-35. The Supreme Court has counseled that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. at 481. Although neither party briefed the due process contours as they relate to Caldwell's alleged facts, applying Mathew v. Eldridge's balancing test, the Court concludes that Caldwell's First Amended Complaint does not state a claim that UNM's hearing procedures are insufficient to comply with procedural due process, because, although the campus ban constitutes more than a de minimis taking of Caldwell's interest in his continued education, none of UNM's hearing procedures placed Caldwell at an unacceptable risk of erroneous deprivation of rights and UNM has an interest in maintaining a safe campus and conserving academic resources. See Mathews v. Eldridge, 424 U.S. at 335.

A.     THE CAMPUS BAN IS MORE THAN A DE MINIMIS TAKING OF CALDWELL'S INTEREST IN HIS CONTINUED EDUCATION.

As the Court concludes above, Caldwell has a property interest in his continued education, and a campus ban interferes with that interest.  See supra Analysis § I(A).  A campus ban does not revoke, however, Caldwell's student status; it only limits his access to campus property and school activities.  See Student Code of Conduct § 4.2.4; First Amended Complaint ¶ 66, at 10.  Caldwell does not allege that he faces expulsion for the alleged off-campus assault, but that he will face expulsion only if he fails to comply with the campus ban.  See First Amended Complaint ¶ 21, at 4.  Further, the campus ban included the holiday break, which ended on January 2, 2020, during which no classes were in session.  See First Amended Complaint ¶ 31, at 6.  Nevertheless, Caldwell alleges that he "will be unable to attend in person classes other than the one course he registered in advance of the school's ban" and that the ban "will altogether prevent Plaintiff from completing his coursework."  First Amended Complaint ¶¶ 43-44, at 7.  Because the campus ban limits the manner in which Caldwell can engage in his education without depriving him of it entirely -- Caldwell can still take some classes: online classes and the in-person class for which he already registered -- Caldwell's interest is not necessarily "exceptionally robust," Siblerud v. Colo. State Bd. of Agric., 896 F. Supp. at 1516 ("[The student] faced expulsion; therefore, his private interest was exceptionally robust."), or "high," Lee I, 449 F. Supp. 3d at 1124.  Although Caldwell's interest is not exceptionally robust or high, it is more than de minimis, because a multi-week campus ban interferes more with the educational process than, for instance, a temporary "timeout," Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1257 (10th Cir. 2008)(concluding that a timeout is a de minimis taking), or an "one-day in-school suspension," Laney v. Farley, 501 F.3d 577, 583 (6th Cir. 2007)(concluding that a "one-day in-school

suspension does not implicate a property interest in public education"). See Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1080-81 (5th Cir. 1995)("De minimis or trivial deprivations of liberty in the course of the disciplining of a student do not implicate procedural due process requirements."). The Tenth Circuit explained that a timeout is de minimis:

> Timeouts, unlike suspensions or expulsions, are intended to settle down a child while keeping him within close proximity to the classroom; this way, he can resume his education as soon as he has calmed. This method balances the need for punishment and discipline with the important goal of preserving access to public education. While the child is temporarily removed from the classroom, any loss of a property right is de minimis and not subject to procedural protections.

Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d at 1257. See Dickens v. Johnson County Bd. of Educ., 661 F. Supp. 155 (E.D. Tenn. 1987)(Hull, C.J.)(distinguishing Goss v. Lopez, and concluding that a "temporary isolation in 'timeout' was a de minimis interference with his property and liberty interests")(italics in original). Here, the campus ban is more serious than a timeout, because Caldwell alleges that he "received an email from Defendant UNM's Dean of Students' Office banning him from the University campus . . . ," First Amended Complaint ¶ 19, at 5. But see First Amended Complaint ¶¶ 10-11, 20, 39, 40, at 3, 4, 7 (repeatedly describing the campus ban as "interim"),[43] and there was no provision that the campus ban would expire if Caldwell changed his behavior or "calm[s]" down as in Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d at 1257. Likewise, Caldwell's campus ban is also unlike a one-day in-school suspension, because although Caldwell can take on-line classes, the ban lasted for at least twenty-nine days and he cannot participate in regular school activities. See Response at 5; Laney v. Farley, 501 F.3d at 581-83. The Sixth Circuit has reasoned: "An in-school suspension could, but does not

_____

[43]Even if the campus ban was not indefinite, it lasted twenty-nine days, much longer than a one- or two-day suspension. See Response at 5.

necessarily, deprive a student of educational opportunities in the same way an out-of-school

suspension would," but a "one-day in-school suspension does not implicate a property interest in

public education," because "[u]nlike students in out-of-school suspensions, students under in-

school suspensions are not denied all educational opportunities, even though they are removed

from their classrooms." Laney v. Farley, 501 F.3d at 581-83.  See Fenton v. Stear, 423 F. Supp.

767, 771-772 (W.D. Pa. 1976)(Marsh, J.)(concluding that a multi-day in-school suspension "is de

minim[i]s" where the "Plaintiff was not deprived of any in-school education" and only missed a

"one day sight-seeing trip").  Here, although the campus ban does not amount to a "total exclusion

from the educational process" as the ten-day out-of-school suspension did in Goss v. Lopez, 419

U.S. at 576, the campus ban still interferes with his "educational process," id. at 576, which, as the

Tenth Circuit has explained:

> is a broad and comprehensive concept with a variable and indefinite meaning.  [The
> educational process] is not limited to classroom attendance but includes
> innumerable separate components, such as participation in athletic activity and
> membership in school clubs and social groups, which combine to provide an
> atmosphere of intellectual and moral advancement.  We do not read *Goss* to
> establish a property interest subject to constitutional protection in each of these
> separate components.

Albach v. Odle, 531 F.2d at 985.  Caldwell's campus ban interferes with the educational process'

entirety, and not just a single component, because Caldwell can attend only one in-person class,[44]

---

[44]Although online learning is the new reality during the COVID-19 pandemic, the Court
recently has concluded that, where

> some students have been deprived of all in-person learning for an indefinite period
> of time, . . . this deprivation amounts to more than a de minimis taking, because in-
> person learning is an integral part of the educational process enshrined in Goss.  See
> Goss, 419 U.S. at 576. . . .  Although students deprived of in-person education is
> not a "total exclusion from the educational process," Goss, 419 U.S. at 576, as they
> still have access to online learning, the lack of in-person education still goes to the

and cannot participate in school athletics, school clubs, or social groups.  See First Amended
Complaint ¶ 21, at 4; Albach v. Odle, 531 F.2d at 985; Seamons v. Snow, 84 F.3d at 1235
(concluding that where a student is denied one of the "innumerable separate components of the
educational process, such as participation in athletics and membership in school clubs," that
student has not been denied "a property interest subject to constitutional protection.").  Because
the campus ban is more than de minimis, Caldwell is entitled to some degree of due process.

### B.    NONE OF UNM'S HEARING PROCEDURES PLACED CALDWELL AT RISK OF ERRONEOUS DEPRIVATION.

Even if Caldwell's allegations are true, none of UNM's hearing procedures placed
Caldwell at an unacceptable risk of erroneous deprivation.  See Mathews v. Eldridge, 424 U.S. at
334-35; Goss v. Lopez, 419 U.S. at 579-80.  Caldwell argues that Torrez and other UNM officials
did not give him sufficient notice of the charges against him, because he "has had not had the
benefit of": (i) "[a] written complaint from any office of the University detailing the allegations
against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him";
(iii) "[a]ny information as to the identities and statements of adverse witnesses."  First Amended
Complaint ¶ 45, at 7.  For students facing short-term suspension, "due process requires . . . that the
student be given oral or written notice of the charges against him."  Goss v. Lopez, 419 U.S. at
581.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240 ("[A] student may be provided with
either oral or written notice of the charges against him.")(citing Goss v. Lopez, 419 U.S. at 581).
"Longer suspensions or expulsions for the remainder of the school term, or permanently, may

---

heart of educational process by "provid[ing] an atmosphere of intellectual and
moral advancement," Albach v. Odle, 531 F.2d at 985.

Hernandez v. Lujan, No. CIV 20-0942 JB\GBW, 2020 WL 7481741, at *51 (D.N.M. Dec. 18,
2020)(Browning, J.).

require more formal procedures." Goss v. Lopez, 419 U.S. at 584. "[T]he timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." Goss v. Lopez, 419 U.S. at 579. Although Caldwell was not suspended, he alleges that the campus ban was "indefinite[]." First Amended Complaint ¶ 23, at 5. But see First Amended Complaint ¶¶ 10-11, 20, 39, 40, at 3-4, 7 (repeatedly describing the campus ban as "interim").[45] The Court concludes, based on the length of the campus ban, that Caldwell is entitled to the notice requirements that Goss v. Lopez establishes. See 419 U.S. at 579.

Here, Caldwell had constructive notice, oral notice, and written notice of the campus ban. Caldwell alleges: (i) "[o]n or about December 16, 2019, the Albuquerque Police Department took a report of allegations of battery against Plaintiff"; (ii) on December 19, 2020, the Dean of Student's Office emailed him, "banning him from the University campus," and "stat[ing] that allegations recently made against Plaintiff were being considered"; (iii) on the evening of December 19, 2020, Caldwell "was called to a meeting chaired by Defendant Nuñez and involving several other individuals from the athletic department and from UNM administration"; (iv) Nuñez "informed Plaintiff that he was banned from campus indefinitely"; and (v) "[n]obody at this meeting informed Plaintiff of the specific allegations against him." First Amended Complaint ¶¶ 17, 19-20, 22-24, at 3-5. The next day, Caldwell had a "brief conference" with the OEO, where he denied the charges against him. First Amended Complaint ¶ 29, at 5. Caldwell had a

---

[45]Even if the campus ban was not indefinite, it lasted twenty-nine days, much longer than a few-days suspension. See Response at 5.

"subsequent[]"[46] meeting with Torrez, where she "reiterated that he was suspended and that she would make the decision whether or not to continue his indefinite suspension at some unknown time." First Amended Complaint ¶ 30 at 5.

Although Caldwell alleges that "[n]body" at the meeting on December 19, 2020, or at the subsequent hearings told him of "the specific allegations against him," First Amended Complaint ¶ 24, at 5, by his own admission, Caldwell knew of the subject of the allegations against him, namely that the police had received a report that Caldwell had committed battery and that the DOS was investigating these allegations. See First Amended Complaint ¶¶ 17, 20, at 3-4. Additionally, Caldwell states that he "denied the charges against him" during the December 20, 2019, meeting with the OEO, unless Caldwell was denying "charges" separate from his alleged battery, this further leads to the conclusion that Caldwell knew the allegations against him. First Amended Complaint ¶ 29, at 5. In an analogous situation, where the student "already knew the allegations he faced" -- that he had assaulted his roommate -- the Tenth Circuit concluded that the student

> would have received little or no additional benefit from a written notice that specified the charges against him. While the burden of requiring schools to provide written notice specifying charges is slight, in this case, requiring such notice in addition to oral and constructive notice was not necessary to ensure a fair proceeding.

---

[46]The date of this meeting is not clearly stated, however, Caldwell alleges the meeting with the OEO was on December 20, 2019. See First Amended Complaint ¶ 29, at 5. Caldwell then states, "Torrez subsequently had a brief meeting with Plaintiff." First Amended Complaint ¶ 30, at 5. In Caldwell's Response, however, he states that he "[f]inally" had a meeting with Torrez on January 10, 2020. Response at 4. December 20, 2019, was a Friday and Monday, December 23, 2019, was the beginning of winter break, which continued through January 2, 2020. Caldwell alleges that Torrez told him not to contact her during this break and that she would not be in the office. See Response at 14; First Amended Complaint ¶ 31, at 6. The Court concludes that it is likely the meeting referred to in the First Amended Complaint, ¶ 30, at 5, also occurred on December 20, 2019, and that Caldwell received another hearing with Torrez on January 10, 2020, because Caldwell refers to each of these meetings separately in his First Amended Complaint.

Watson ex rel. Watson v. Beckel, 242 F.3d at 1241.  Here, as in Watson ex rel. Watson v. Beckel,

Caldwell knew the allegations against him and received both written and oral notice on the day

that the campus ban was imposed.  See First Amended Complaint ¶¶ 17, 19-20, 22-24, at 3-5; Goss

v. Lopez, 419 U.S. at 582 ("In the great majority of cases the disciplinarian may informally discuss

the alleged misconduct with the student minutes after it has occurred.").  "In order to establish a

denial of due process, a student must show substantial prejudice from the allegedly inadequate

procedure."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1242.  Caldwell does not allege any

procedural detriment because of a lack of notice; to the contrary, he was able to obtain counsel to

assist him at a meeting with administrators on January 10, 2020.  See First Amended Complaint

¶ 40, at 7.  Caldwell argues that the notice should have "detail[ed] the allegations against him."

First Amended Complaint ¶ 45 at 7.  Due process does not, however, require such specificity,

because Caldwell "already knew the allegations he faced, he would have received little or no

additional benefit from a written notice that specified the charges against him."  Watson ex rel.

Watson v. Beckel, 242 F.3d at 1241 (concluding that due process does not require that "notice . . .

include all suspected motives for a student's actions," and noting that "[s]uch extensive notice is

not even due in a criminal trial")(footnotes omitted)(citing Mathews v. Eldridge, 424 U.S. at 348).

The Tenth Circuit has explained:

> The notice given to [the student] satisfied [the due process] requirement because it
> allowed [the student] to prepare for the hearing and defend against the charges . . . .
> While the burden of requiring schools to provide written notice specifying charges
> is slight, in this case, requiring such notice in addition to oral and constructive
> notice was not necessary to ensure a fair proceeding.

Watson ex rel. Watson v. Beckel, 242 F.3d at 1241.  The Court concludes that Caldwell received

sufficient notice of the allegations against him.  See Goss v. Lopez, 419 U.S. at 581.

Next, because the campus ban was imposed before any hearings or meetings were held, the

issue is not the adequacy of the hearing, but rather when Caldwell is entitled to "some kind of

hearing." <u>Goss v. Lopez</u>, 419 U.S. at 579.  <u>See</u> First Amended Complaint ¶¶ 19-23, at 4-5 (alleging

that Caldwell received notice of the campus ban, on December 19, 2019, and had a meeting with

Nuñez and other UNM administrators later that evening).  In situations where there is a threat to

safety,

> prior notice and hearing cannot be insisted upon.  Students whose presence poses a
> continuing danger to persons or property or an ongoing threat of disrupting the
> academic process may be immediately removed from school.  In such cases, the
> necessary notice and rudimentary hearing should follow as soon as practicable.

<u>Goss v. Lopez</u>, 419 U.S. at 582-83.  The Court concludes that Caldwell was not entitled to notice

or to a hearing before the campus ban was imposed, because Caldwell's campus ban was premised

on allegations that he had committed battery.  <u>See</u> <u>Goss v. Lopez</u>, 419 U.S. at 582-83.  Although

Caldwell alleges that the "Plaintiff's accuser is not a UNM student, and, upon information and

belief, not even a resident of New Mexico," First Amended Complaint ¶ 18, at 3, the Court

concludes that UNM can ban a student from campus property based on allegations of battery before

it holds a hearing, because the student's interest in "unfair or mistaken exclusion from the

educational process" must be balanced against the school's interest in "discipline and order," <u>Goss</u>

<u>v. Lopez</u>, 419 U.S. at 579.  Even though UNM's actions are based only on allegations of battery,

at such an early stage, UNM's interest in other students' safety outweighs the necessity of a hearing

before the "interim" campus ban was imposed, First Amended Complaint ¶ 21, at 4, as long as

UNM provides Caldwell with "some kind of hearing," post hoc, that allows him to be heard and

challenge the ban, <u>Goss v. Lopez</u>, 419 U.S. at 579.  <u>See</u> <u>Butler v. Rio Rancho Pub. Sch. Bd.</u>, 341

F.3d 1197, 1201 (10th Cir. 2003)(concluding that"[t]here is no doubt the School has a legitimate

interest in providing a safe environment for students and staff"); <u>West v. Derby Unified Sch. Dist.</u>,

206 F.3d 1358, 1364 (10th Cir. 2000)(concluding that "'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures'")(quoting New Jersey v. T.L.O., 469 U.S. 325, 340 (1985)).

Last, Caldwell alleges that, by the time he filed his First Amended Complaint and his Response, he had not received an adequate hearing or the opportunity to appeal such a hearing. See First Amended Complaint ¶ 25, at 7-8; Response 4, 13-19.  According to Goss v. Lopez, if a student "denies . . . [the] charges against him," the student should be afforded an "rudimentary hearing" with "an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss v. Lopez, 419 U.S. at 579, 581-82 ("[S]tudents facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing.").  "[T]he nature of the hearing will depend on appropriate accommodation of the competing interests involved."  Goss v. Lopez, 419 U.S. at 579.  The student's interest in "unfair or mistaken exclusion from the educational process" must be balanced against the school's interest in "discipline and order." Goss v. Lopez, 419 U.S. at 579.  "[T]he risk of error should be guarded against if that may be done without prohibitive costs or interference with the educational process."  Goss v. Lopez, 419 U.S. at 580.  Even for a student facing expulsion -- a much more serious deprivation than a campus ban -- due process does not entitle the student always to the right to counsel at a hearing, to personally or have counsel cross-examine witnesses at a hearing, to have a transcript of the hearing, or to have investigating officials excluded from the deliberation process.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1243 (stating that "precedent [does not] indicate that due process does not require all of these rights");  Lee II, 500 F. Supp. 3d at 1240 (collecting cases and concluding that "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all

- 120 -

disciplinary proceedings"); <u>Lee I</u>, 449 F. Supp. 3d at 1126-27 (concluding, in the context of sexual

assault allegations, that "in light of [the student's] substantial interest and UNM's weaker interests,

not permitting any cross-examination violates Due Process").[47] "In the great majority of cases the

---

[47]The amount of process that due process requires is situation-dependent.  For instance, in the context of a student facing expulsion because of allegations of sexual assault, where credibility is crucial, the Court has stated:

> The Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," <u>Davis v. Alaska</u>, 415 U.S. 308, 316, (1974), and called it the "'greatest legal engine ever invented for the discovery of truth,'" <u>California v. Green</u>, 399 U.S. 149, 158 (1970)(quoting 5 Wigmore, Evidence § 1367 (3d ed. 1940)).  In the context of student disciplinary proceedings, "courts appear to recognize that denial of *any* opportunity to challenge the credibility of adverse witnesses may deprive an accused university student of due process if the witness's credibility is in issue and the witness is testifying on facts critical to the case."  Marie Reilly, <u>Due Process in Public University Discipline Cases</u>, 120 Penn. St. L. Rev. 1001, 1014 (2016)(emphasis in original).  <u>See</u> <u>Haidak v. Univ. Mass.-Amherst</u>, 933 F.3d 56, 59 (1st Cir. 2019)("[W]e agree with a position taken by the Foundation for Individual Rights in Education, as amicus in support of the appellant -- that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.[47]'"); <u>Doe v. Baum</u>, 903 F.3d 575 (6th Cir. 2018)("Due process requires cross-examination in circumstances like these . . . ."); <u>Winnick v. Manning</u>, 460 F.2d 545, 550 (2d Cir. 1972)("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."); <u>Doe v. Brandeis Univ.</u>, 177 F. Supp. 3d 561, 604-05 (D. Mass. 2016)(Saylor, J.).  Credibility is an issue here; Lee alleges that he has continued to deny the Complainant's accusations.  <u>See</u> Complaint ¶ 74, at 13.  Lee's opportunity to point out flaws in the Complainant's statement is not sufficient.  <u>See</u> <u>Doe v. Baum</u>, 903 F.3d at 582 ("Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives.  Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.").

. . . .

In light of [the student's] substantial interest and UNM's weaker interests, not permitting any cross-examination violates Due Process. <u>See</u> <u>Doe v. Purdue Univ.</u>, 928 F.3d at 664 ("[I]t is particularly concerning that Sermersheim and the

---

disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." Goss v. Lopez, 419 U.S. at 582.

The Court concludes that UNM afforded Caldwell "some kind of hearing." Goss v. Lopez, 419 U.S. at 584. Although Caldwell alleges that he has not had the benefit of: (i) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (ii) "[a]ny information as to the identities and statements of adverse witnesses"; (iii) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights"; or (iv) an opportunity to appeal the hearing or its findings, First Amended Complaint ¶¶ 45, 48, at 7-8, Caldwell has had four meetings with UNM administrators regarding the campus ban, see First Amended Complaint ¶¶ 22-23, 29, 30, 40, at 5, 7. Caldwell admits that he had: (i) a meeting with Nuñez on December 19, 2020, where Nuñez "informed Plaintiff that he was banned from campus indefinitely"; (ii) a "brief conference with staff at the Office of Equal Opportunity on or about December 20, 2019," where Caldwell "denied the charges against him"; (iii) a "brief meeting with [Torrez] during which she reiterated that he was suspended and that she would make the decision whether or not to continue his indefinite suspension at some unknown later date," and "Torrez informed Plaintiff that the campus ban would remain in place with no opportunity for redress or appeal over the holiday break, which continues until January 2, 2020"; and (iv) on January 10, 2020, Caldwell and his "counsel attended a meeting with Defendant Torrez at which time Defendant Torrez refused to provide any basis whatsoever

---

committee concluded that Jane was the more credible witness -- in fact, that she was credible at all -- without ever speaking to her in person."); Doe v. Baum, 903 F.3d at 583 (holding that, for sexual misconduct disciplinary proceedings, Due Process requires the university to have "some form of *live* questioning *in front of* the fact-finder" (emphasis in original)).

Lee I, 449 F. Supp. 3d at 1126-27.

for the interim ban" and when Caldwell requested the campus ban be lifted, Torrez "responded that she would consider this request but could not say how long it would take her to decide whether or not to lift the ban or portions thereof."  First Amended Complaint ¶¶ 22-23, 29, 30, 40-42 at 5, 7.

The Court concludes that four meetings and conferences with UNM administrators, including employees from the DOS and the OEO, within twenty-nine days after the ban was initially imposed were sufficient to satisfy Goss v. Lopez's "rudimentary hearing" requirement, because Caldwell was able to deny the charges against him, request that the ban be lifted, and have counsel present for one meeting, and receive several emails from the DOS outlining the parameters of the campus ban and informing him which administrators to contact.  Goss v. Lopez, 419 U.S. at 581.  See First Amended Complaint ¶¶ 22-23, 29, 30, 35, 40-42, at 5-7; Lee II, 500 F. Supp. 3d at 1240 (concluding that "UNM satisfied its obligations under the Due Process Clause to provide [the student] with an opportunity to be heard," because, "[a]ll told, the record indicates that [the student] had at least four meetings with persons from UNM's Title IX Office, the OEO, and the DOS")(citing Goss v. Lopez, 419 U.S. at 579-80).  See also Keough v. Tate Cnty. Bd. of Educ., 748 F.2d 1077, 1080 (5th Cir. 1984)(concluding that an "informal give-and-take . . . allows the student an opportunity to state his case as he sees it").  Furthermore, all of these meetings, conferences, and emails took place before the spring semester was set to begin.  See First Amended Complaint ¶ 43, at 7 (alleging that the "spring semester begins January 21, 2020").  Because the ban was lifted after twenty-nine days and before the semester began, Caldwell was not deprived of registering and attending in-person classes, and Caldwell did not suffer "substantial prejudice from the allegedly inadequate procedures."  See Response at 3; Watson ex rel. Watson v. Beckel, 242 F.3d at 1242 ("In order to establish a denial of due process, a student must show substantial

prejudice from the allegedly inadequate procedure.").  Accordingly, the Court concludes that none

of UNM's hearing procedures place Caldwell at an unacceptable risk of erroneous deprivation.

See <u>Mathews v. Eldridge</u>, 424 U.S. at 334-35; <u>Goss v. Lopez</u>, 419 U.S. at 579-80.[48]

## III.   TORREZ IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE CALDWELL'S DUE PROCESS RIGHTS ARE NOT CLEARLY ESTABLISHED.

Even if Caldwell states a claim for relief under the Due Process Clause, Torrez is entitled

to qualified immunity, because Caldwell's due process rights are not clearly established.  When a

defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's

actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly

established at the time of the alleged misconduct.  See <u>Riggins v. Goodman</u>, 572 F.3d at 1107.  <u>See</u>

---

[48]Although the Court concludes that Caldwell received "some kind of hearing" in accordance with due process, <u>Goss v. Lopez</u>, 419 U.S. at 579, the Court emphasizes that "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor," <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997), and that UNM may need to provide prompt process to students banned from campus in other circumstances, because a campus ban interferes with students' right to the educational process.  Based on Caldwell's allegations of UNM's disciplinary procedures there is reason to question whether UNM followed its own procedures, because the procedures described in the First Amended Complaint, in the Student Code of Conduct, and in the Student Handbook, are not clear as to the timing of the process required for a student saddled with an interim campus ban.  See First Amended Complaint ¶¶ 64-81, at 10-13; Student Code of Conduct §§ 1-5; UNM Student Handbook at 1-23.  To the extent Caldwell alleges that UNM failed to comply with its own procedures, however, "even in the disciplinary context, a school's failure to comply with its own rules 'does not, in itself, constitute a violation of the Fourteenth Amendment.'" <u>Brown v. Univ. of Kan.</u>, 599 F. App'x at 838 (quoting <u>Hill v. Trs. of Ind. Univ.</u>, 537 F.2d 248, 252 (7th Cir. 1976)).  <u>Cf.</u> <u>White v. Salisbury Tp. Sch. Dist.</u>, 588 F. Supp. 608, 614 (E.D. Pa. 1984)(Troutman, J.)("[W]here a state has issued regulations requiring school districts to promulgate and publish specific procedural rules and safeguards governing suspensions, a failure to comply with those regulations would violate state law <u>only</u> and would not rise to the level of a constitutional violation.")(emphasis in original).  "The Due Process Clause . . . does not require the University to follow any specific set of detailed procedures as long as the procedures the University actually follows are basically fair ones . . . ." <u>Newman v. Burgin</u>, 930 F.2d 955, 960 (1st Cir. 1991).  What matters is whether "the procedures afforded to [the student] were fair as a matter of law." <u>Brown v. Univ. of Kan.</u>, 599 F. App'x at 838.

also Lee I, 449 F. Supp. 3d at 1135; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

Qualified immunity shields officials who have "reasonable, but mistaken beliefs" and operates to

protect them from the sometimes "hazy border[s]" of the law.   Saucier v. Katz, 533 U.S. at 205.

The Court already has concluded that Caldwell has not stated a plausible claim that Torrez violated

his constitutional rights by depriving him of his right to continued education without due process.

See supra Analysis § II.   The next question is then whether Caldwell's constitutional right to due

process was clearly established.   See Riggins v. Goodman, 572 F.3d at 1107.   Here, the Court

concludes that Caldwell's constitutional right to due process is not clearly established.

Proving that the law was clearly established is a high burden for a plaintiff.   See Ashcroft

v. al-Kidd, 563 U.S. at 741 ("A Government official's conduct violates clearly established law

when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every

reasonable official would have understood that what he is doing violates that right.").   "Ordinarily,

in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit

decision on point, or the clearly established weight of authority from other courts must have found

the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923.   There are no Supreme

Court or Tenth Circuit opinions clearly establishing the appropriate level of procedural safeguards

for students accused of assault in university-owned housing.

The Supreme Court has addressed, however, the adequacy of due process afforded students

in disciplinary proceedings in Goss v. Lopez, where students were suspended from various public

high schools without hearings and argued that this procedure violated due process.   See Goss v.

Lopez, 419 U.S. at 567.   The Supreme Court agreed with the students, concluding that "due process

requires, in connection with a suspension of 10 days or less, that the student be given oral or written

notice of the charges against him and, if he denies them, an explanation of the evidence the

authorities have and an opportunity to present his side of the story." Goss v. Lopez, 419 U.S. at 581.  The Supreme Court noted that "[t]here need be no delay between the time 'notice' is given and the time of the hearing," and that, although there are exceptions, "as a general rule, notice and hearing should precede removal of the student from school." Goss v. Lopez, 419 U.S. at 582.  The Supreme Court also observed that the administrative burden of affording students maximum process in all circumstances prevented it from holding that "hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Goss v. Lopez, 419 U.S. at 583.  Finally, the Supreme Court emphasized its holding's narrowness, stating that "we have addressed ourselves solely to the short suspension, not exceeding 10 days," and that longer suspensions "may require more formal procedures," while shorter suspensions may require less.  Goss v. Lopez, 419 U.S. at 584.

The Supreme Court addressed a tangential issue in Board of Curators of University of Missouri v. Horowitz, in which it reviewed the procedural safeguards to which students facing academic dismissal are entitled.  See 435 U.S. at 87-89.  The Supreme Court distinguished disciplinary dismissals from academic dismissals and noted that the Constitution "may call for hearings in connection with the former but not the latter." Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. at 87.  See id. at 88-89 (explaining the distinction between disciplinary and academic dismissals).  It observed that even Goss v. Lopez "stopped short of requiring a *formal* hearing" in a disciplinary setting, Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. at 89 (emphasis in original), and that whether to dismiss a student for academic reasons is not "readily adapted" to determination via hearing, Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. at 90.  The Supreme Court also noted that Goss v. Lopez concludes that "the value of some form of

hearing in a disciplinary context outweighs any harm to the academic environment."   Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. at 90.

The Tenth Circuit has addressed the procedural safeguards to which students are entitled on several occasions, most notably and thoroughly in Watson ex rel. Watson v. Beckel, 242 F.3d at 1238-39.  See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1181-82; West v. Derby Unified Sch. Dist. No. 260, 206 F.3d at 1363-65; Edwards ex rel. Edwards v. Rees, 883 F.2d 882, 885 (10th Cir. 1989); Harris v. Blake, 798 F.2d 419, 422-24.  In Watson ex rel. Watson v. Beckel, the New Mexico Military Institute ("NMMI") expelled a student after NMMI's investigation revealed that the student had assaulted his roommate, in part, because the roommate was Hispanic.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1238-39.  The Tenth Circuit notes that, while the Supreme Court has not answered what additional processes long-term suspensions or expulsions require, it had given some guidance in Goss v. Lopez.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240.  The Tenth Circuit then held that the Mathews v. Eldridge balancing test "is appropriate for determining when additional procedure is due."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1240 (citing Mathews v. Eldridge, 424 U.S. at 334-35).  Applying this test, the Tenth Circuit concluded that NMMI's failure to provide written notice specifically listing the charges against the student did not violate due process.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240-41.  Even though the burden of providing greater notice was "slight," the Tenth Circuit stated that written notice was unnecessary where the student had already received oral and constructive notice.  Watson ex rel. Watson v. Beckel, 242 F.3d at 1241.  It further concluded that NMMI did not need to notify the student that NMMI suspected that the assault was racially motivated, because it could not find "any precedent for the proposition that notice must include all suspected motives for a student's actions," and because the burden of providing such

- 127 -

notice would be great.  Watson ex rel. Watson v. Beckel, 242 F.3d at 1241-42.  Finally, the Tenth Circuit rejected the student's request that, for the "'proposed expulsion or long-term suspension of any student attending a state-supported educational institution,' the student must be afforded written notice specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and independent review of the decision."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1242-43 (quoting the student's request). The Tenth Circuit concluded that "precedent indicates that due process does not require all of these rights," and the student lacked standing to request them, "because he has not demonstrated that he will be subject to future disciplinary procedures."  Watson ex rel. Watson v. Beckel, 242 F.3d at 1243 (citing Gorman v. Univ. of R. I., 837 F.2d 7, 16 (1st Cir. 1988); Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 924 (6th Cir. 1988)).

Caldwell relies heavily on his arguments that he has a property interest in his continued education -- qualified immunity's first prong -- to support his contention that Torrez violated his clearly established rights -- qualified immunity's second prong.  See First Amended Complaint ¶¶ 86, 91-92 at 13-14.  As a general matter, Caldwell's entitlement to due process before Torrez could ban him from campus is clearly established, see Goss v. Lopez, 419 U.S. at 576; Albach v. Odle, 531 F.2d at 985; Harris v. Blake, 798 F.2d at 422, but "the clearly established law must be 'particularized' to the facts of the case," White v. Pauly, 580 U.S. at 79 (quoting Anderson v. Creighton, 483 U.S. at 640).  Caldwell cites only to Goss v. Lopez and an out-of-circuit case, Doe v. Purdue University, 928 F.3d at 663, to support his contention that Torrez violated his clearly established rights.  Caldwell's reliance on Doe v. Purdue University is of no help, because the Seventh Circuit "affirm[ed] the dismissal of [the student's] individual-capacity claims against" university officials, because they were entitled to qualified immunity.  Doe v. Purdue Univ., 928

F.3d at 666.  The Seventh Circuit explained that the university officials were entitled to qualified immunity, because: (i) in the Seventh Circuit, students do not "have a property interest in their public university education"; and (ii) "this is our first case addressing whether university discipline deprives a student of a *liberty* interest, the relevant legal rule was not 'clearly established,' and a reasonable university officer would not have known at the time of [the student's] proceeding that her actions violated the Fourteenth Amendment."   Doe v. Purdue Univ., 928 F.3d at 665-66 (emphasis in original).  Furthermore, none of the cases to which Caldwell cites deal with a campus ban imposed because of allegations of an off campus-assault, see Goss v. Lopez, 419 U.S. at 567-70 (temporary suspension of high school students for disruptive behavior); Doe v. Purdue Univ., 928 F.3d at 656-57 (suspension from university for sexual assault); Gaspar v. Bruton, 513 F.2d 843, 845 (10th Cir. 1975)(dismissal from nursing program for academic deficiencies); Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d at 1175 ("involuntary withdrawal" because of alleged gender discrimination); Doe v Miami Univ., 882 F.3d 579 (6th Cir. 2018)(suspension from university for sexual assault); and the discussions in Albach v. Odle, 531 F.2d at 985, and Goss v. Lopez, 419 U.S. at 576, about the right to an "educational process" are highly generalized, and not particularized to the facts of Caldwell's campus ban.

Next, Caldwell argues that he had a right to more notice and to "view the school's evidence against him," Response at 21, and Caldwell cites a case from the Sixth Circuit to argue that "clearly established law" requires that a student must receive oral or written notice of the charges against him in a student disciplinary action.  Response at 21-22 (citing Doe v. Miami Univ., 882 F.3d 579 ("[The student's] procedural-due-process right to an impartial adjudicator and access to the evidence used against him was also clearly established.")).  This case is distinguishable, as the student accused of sexual misconduct by the University of Miami had his disciplinary file withheld

by a potentially biased adjudicator.  See Doe v. Miami Univ., 882 F.3d at 604.

Here, Caldwell has not alleged what, if any, potential information UNM has withheld from him, or that Torrez or any other UNM administrator was not impartial.  See Response at 21, 22; First Amended Complaint ¶ 86, at 13 ("Caldwell has not sought relief pursuant to Title IX"). Although Caldwell could be entitled to evidence UNM used against him in a disciplinary proceeding, Doe v. Miami Univ., 882 F.3d at 603 ("The Constitution does require . . . that the student be provided the evidence against him.  Thus, to the extent any of the evidence contained within this report was used by the Administrative Hearing Panel . . . , and John was not provided this evidence, he has alleged a cognizable due-process violation.")(citing Doe v. Univ. of Cincinnati, 872 F.3d 393, 399-400 (6th Cir. 2017)), Caldwell does not allege that there is additional evidence apart from the initial allegations of battery or the subsequent police report that UNM did not provide him.  See First Amended Complaint ¶¶ 17-51; Response 4-6, 13-16.  The Court already has concluded Caldwell received proper notice and was aware of the allegations against him when he promptly denied them on December 20, 2019.  See supra Analysis § II; First Amended Complaint ¶ 29, at 5.  Caldwell was, therefore, provided with sufficient notice of the allegations against him.  See Goss v. Lopez, 419 U.S. at 581.

Additionally, the precise contours of Caldwell's procedural due process rights are not clearly established.  The Tenth Circuit has prescribed Mathews v. Eldridge's balancing test to determine whether procedural safeguards are constitutionally adequate.  See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240.  This mandate necessarily requires an intensely fact-specific analysis, which limits predictability and doctrinal development.  See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 987 (9th Cir. 1998)("Justice Brennan lamented the proliferation of so-called 'balancing tests' in constitutional jurisprudence, warning that the

freewheeling multifactor inquiries would pave the road to 'doctrinally destructive nihilism.' Nowhere is Justice Brennan's observation more apropos than in the realm of qualified immunity, in which 'clearly established' law reigns supreme."); White v. Pauly, 580 U.S. at 79 ("[R]eiterat[ing] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'")(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).  "[T]he interpretation and application of the Due Process Clause are intensely practical matters and . . . 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'"  Goss v. Lopez, 419 U.S. at 578 (quoting Cafeteria Workers v. McElroy, 367 U.S. at 895).  Caldwell alleges that, during his twenty-nine day campus ban, he did not receive: (i) "[a] written complaint from any office of the University detailing the allegations against him"; (ii) "[a]ny evidence or discovery whatsoever regarding the allegations against him"; (iii) "[a]ny information as to the identities and statements of adverse witnesses"; (iv) "[a]ny opportunity to challenge the allegations at a hearing with confrontation rights"; and (v) an "opportunity to appeal any . . . findings, as there are none to appeal."  First Amended Complaint ¶¶ 22-23, 45, 50, at 5, 7-8.  The Court has not identified any Supreme Court or Tenth Circuit case law addressing the contours of procedural due process afforded a student banned from a college or university campus after an alleged assault.  More broadly, the Tenth Circuit's one case thoroughly discussing "the requirements of due process in cases of long-term suspension or expulsion" because of an alleged on-campus assault, Watson ex rel. Watson v. Beckel, 242 F.3d at 1240, is not sufficiently "particularized," Anderson v. Creighton, 483 U.S. at 640, to Caldwell's facts for the Court to conclude that Torrez violated Caldwell's clearly established rights.  Watson ex rel. Watson v. Beckel rejects some of his alleged due process violations based on its own unique facts and does not address the others.  See 242 F.3d at 1241-42 (rejecting the student's right to written notice of

charges against him and to cross-examine witnesses).  The Court's recent decision on due process in the context of expulsion because of allegations of sexual assault in Lee I, 449 F. Supp. 3d at 1122-34, is of no aid to Caldwell, because Lee I also is not sufficiently "particularized" to Caldwell's facts.  Anderson v. Creighton, 483 U.S. at 640.  In Lee I, the Court concludes that, under the Mathews v. Eldridge balancing test, the student's allegations that UNM's investigator made a determination against him without ever holding a formal hearing, and that he was not allowed to learn the witnesses' identities, attend any witness interviews, acquire the interview recordings, question witnesses regarding factual assertions, or get an opportunity to cross-examine . . . [were sufficient to] state[] a claim that UNM's hearing procedures do not comply with Due Process."  Lee I, 449 F. Supp. 3d at 1124 (citing Mathews v. Eldridge, 424 U.S. at 335).  The Court concluded in deciding the Nuñez' Motion that there was no clear precedent to suggest that Caldwell's specific procedural due process rights were clearly established, and that Nuñez was entitled to qualified immunity.  Caldwell, 510 F. Supp. 3d at 1057-58.

By contrast, the ban at issue here is an "interim" campus ban, First Amended Complaint ¶ 21, at 4, not an expulsion, and the administrative process was completed only twenty-nine days after Caldwell had meetings with Nuñez, OEO, and Torrez, and the DOS emailed him, informing him he was banned from campus, whereas in Lee I the administrative process took many months to unfold.  Compare First Amended Complaint at ¶¶ 11-51, 3-8 (alleging that Caldwell met with Nuñez on December 19, 2019, was emailed by the Dean of Students that same day and had a meeting with Torrez and OEO on December 20, 2019), with Lee I, 449 F. Supp. 3d at 1081-85 (alleging that the disciplinary process began with a sexual-assault allegation in September, 2015, and culminated in the plaintiff's expulsion in July, 2016).  Caldwell's contention that the lack of process within twenty-nine days violates due process implicates different considerations under the

Mathews v. Eldridge balancing test than the issues in Lee I, 449 F. Supp. 3d at 1124.  See Plummer

v. Univ. of Hous., 860 F.3d 767, 777 (5th Cir. 2017)("Whether a state university has provided an

individual student sufficient process is a fact-intensive inquiry and the procedures required to

satisfy due process will necessarily vary depending on the particular circumstances of each case.").

Without clear precedent suggesting that any of Caldwell's specific procedural due process rights

were clearly established, qualified immunity operates here to protect Torrez from the "hazy

border[s]" in this area of law.  Saucier v. Katz, 533 U.S. at 205.

## IV.   TORREZ' ACTIONS DO NOT SHOCK THE JUDICIAL CONSCIENCE, BECAUSE TORREZ' CONDUCT IS NEITHER EGREGIOUS NOR OUTRAGEOUS.

In the First Amended Complaint, Caldwell "mak[es] . . . substantive due process claims

under the Fourteenth Amendment to the United States Constitution."   See First Amended

Complaint at 1.[49]  At the hearing, however, Torrez stated there was no substantive due process

claim and Caldwell did not argue in favor of a substantive due process claim.[50]  The Court will

---

[49]Caldwell asserts that the Defendants, including Torrez, violated Caldwell's

clearly established rights secured by the Fourteenth Amendment, including but not limited to the right to procedural and substantive due process, by suspending Plaintiff, banning him from campus and evicting him from his residence, without making any findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against him.

First Amended Complaint ¶ 86, at 13.

[50]At the hearing, when the Court asked Torrez if "it's just a procedural due process claim, it's not a substantive or anything like that, correct it's just a procedural due process," Tr. at 3:17-20 (Court), Torrez responded: "I think it was established that nothing shocked the conscience so yes it's just the procedural due process, your Honor." Tr. at 3:21-23 (Harrison).  During a previous hearing regarding Caldwell's claim against Nuñez, Caldwell conceded he was not bringing a substantive due process claim:

nonetheless address Caldwell's substantive due process claim below and will conclude that Torrez'

actions -- allegedly banning Caldwell from campus property -- do not violate Caldwell's

substantive due process rights, because a campus ban does not shock the Court's conscience.  See

Rochin v. California, 342 U.S. 165, 172 (1952); Schaefer v. Las Cruces Pub. Sch. Dist., 716

F. Supp. 2d at 1059 n.2.  "A substantive due process claim can take one of two forms.  One form

may involve the violation of an individual's fundamental liberty interests, and the other form may

arise from governmental conduct that shocks the conscience."  Milner v. Mares, No. CV 17-254

KG/LF, 2017 WL 5151311, at *5 (D.N.M. November 3, 2017)(Browning, J.)(citing Seegmiller v.

LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008)), aff'd, 754 F. App'x 777 (10th Cir.

2019)(unpublished).  See Chavez v. Martinez, 538 U.S. 760, 775 (2003).  "[T]he 'shocks the

conscience' and 'fundamental liberty' tests are but two separate approaches to analyzing

governmental action under the Fourteenth Amendment.  They are not mutually exclusive,

however.  Both approaches may well be applied in any given case."  Seegmiller v. LaVerkin City,

528 F.3d at 769.  For the first substantive due process strand, only fundamental rights and liberties

which are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of

ordered liberty'" qualify for such protection.  Seegmiller v. LaVerkin City, 528 F.3d at 767

(quoting Chavez v. Martinez, 538 U.S. at 787).  A right that is "deeply rooted" and "implicit in the

---

Caldwell admitted, however, that he is only "really raising a procedural due process claim, so I'm not going to get into details of argument of substantive due process. I concede that this is really a procedural due process claim."  Tr. at 21:20-23 (Fox-Young).  The Court asked: "So you're not bringing a substantive due process claim?"  Tr. at 25:8-9 (Court).  Caldwell responded "No."  Tr. at 25:10 (Fox-Young).

See Caldwell, 510 F. Supp. 3d at 1003-04.

concept of ordered liberty" requires objective, substantive standards mandating particular outcomes, Castanon v. Cathey, 402 F. Supp. 3d 1136, 1140 (10th Cir. 2020), which is a requirement that the allegations in the Complaint do not meet.  Although, Caldwell has a property right in his continued education, see Goss v. Lopez, 419 U.S. at 581-82; supra Analysis § I(A), education is not a fundamental right or liberty.  See Plyler v. Doe, 457 U.S. 202, 223 (1982); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973)(Powell, J.)("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is implicitly so protected."); Bivens ex rel. Green v. Albuquerque Pub. Sch., 899 F. Supp. 556, 561 (D.N.M. 1995)(Campos, J.)("[T]here is no constitutional right to an education at public expense . . . ."); Petrella v. Brownback, 787 F.3d 1242, 1261 (10th Cir. 2015).

The Court now turns to the second substantive due process strand, "[e]xecutive action that shocks the conscience requires much more than negligence."  Doe v. Woodard, 912 F.3d at 1300.  Conduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice."  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).  "The behavior complained of must be egregious and outrageous."  Hernandez v. Ridley, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432, 435 (1957)); Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 ("'[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'")(quoting Uhlrig v. Harder, 64 F.3d at 574).  "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Peña v. Greffet, 922 F. Supp. 2d at 1227.

The Tenth Circuit, for example, has held that a social worker's behavior shocked the judicial conscience when the social worker removed a child from his mother's home to place him

in his father's home and: (i) withheld information about the father's criminal history, including his conviction for attempted sexual assault against a minor in his care; (ii) withheld concerns about his father "for fear of being fired"; and (iii) was aware of, and failed to, "investigate evidence of potential abuse," including the child's report that his father "had hit him with a wooden mop and school official's reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father . . . ." T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017). Ultimately, the child "suffered severe physical and sexual abuse at the hands of his father," and the Tenth Circuit concluded that the social worker had violated the child's substantive due process rights "by knowingly placing" the child "in a position of danger and knowingly increasing" his "vulnerability to danger." T.D. v. Patton, 868 F.3d at 1212. By contrast, the Court has held that school officials' conduct did not shock the conscience, where the plaintiffs alleged that the defendants did not take action to protect students at the school from being kicked and punched in the testicles on at least three occasions. See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.

In Martinez v. Uphoff, the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of

this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

Torrez' alleged actions -- "banning [Caldwell] from campus . . . without making any findings whatsoever of wrongdoing on his part and without providing him with a formal complaint or charging document, evidence against him, a live hearing, or an opportunity to cross-examine witnesses against him," First Amended Complaint ¶ 86, at 13 -- are not "egregious and outrageous." Hernandez v. Ridley, 734 F.3d at 1261. There are no allegations that Torrez' actions were "intended to injure" Caldwell. Cnty. of Sacramento v. Lewis, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). There are also no allegations of emotional or physical abuse, only deprivation of a property right without adequate procedures. See T.D. v. Patton, 868 F.3d at 1212; First Amended Complaint ¶¶ 11-81, at 3-12. See also James v. Chavez, 830 F. Supp. 2d at 1276 (concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"); Camuglia v. City of Albuquerque, 448 F.3d at 1222 ("'[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'")(quoting Moore v. Guthrie, 438 F.3d at 1040)). The Court concludes, therefore, that Torrez' actions are not egregious or outrageous, nor do they shock the judicial conscience. See Hernandez v. Ridley, 734 F.3d at 1261.

**IT IS ORDERED** that Defendant Nasha Torrez's Motion for Judgment on the Pleadings, filed April 29, 2020 (Doc. 43), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Justine Fox-Young
Justine Fox-Young, P.C.
Albuquerque, New Mexico

-- and --

Paul J. Kennedy
Kennedy, Hernandez & Harrison, P.C.
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Patrick J. Hart
Office of University Counsel, University of New Mexico
Albuquerque, New Mexico

-- and --

Alfred A. Park
Geoffrey D. White
Park & Associates, LLC
Albuquerque, New Mexico

> *Attorneys for Defendants University of New Mexico Board of Regents, Nasha Torrez, and*
> *Eddie Nuñez*

Agnes F. Padilla
Butt Thornton & Baehr PC
Albuquerque, New Mexico

> *Attorneys for Defendant ACC OP (UNM SOUTH) LLC*

- 138 -